# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

In the Matter of the Search of

6151 Tuckerman Lane
Rockville, Maryland

### APPLICATION AND AFFIDAVIT
### FOR SEARCH WARRANT

CASE NUMBER:  05-691-CBD

I, <u>Andrew Sekela</u>, being duly sworn depose and say:

I am a <u>Special Agent of the Federal Bureau of Investigation</u> and have reason to believe that ☐ on the

person or ☒ on the property or premises known as (name, description and or location)

## See Attachment "A"

in the District of Maryland there is now concealed a certain person or property, namely

## See Attachment "B"

which are

## evidence, fruits and instrumentalities of alleged crime(s)

in violation of Title <u>18</u> United States Code, Section 371, and Title <u>26</u> United States Code, Section 7201. The facts to support the issuance of a Search Warrant are as follows:  **See attached Affidavit of Andrew Sekela.**

Continued on the attached sheet and made a part hereof. ☒ Yes    ☐ No

_____

Andrew Sekela
Special Agent
Federal Bureau of Investigation
Affiant

Sworn to before me, and subscribed in my presence

_February 18, 2005_ at Greenbelt, Maryland
Date

_____

United States Magistrate Judge              Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

1.      Your affiant is a Special Agent of the Federal Bureau of Investigation (FBI) and

has been so employed for ten months. I am currently assigned to the Public Corruption Squad of

the Washington, DC field office. I have had training and experience in the enforcement of laws

of the United States, including the preparation, presentation, and service of search warrants. My

duties include investigation of various criminal allegations, including those involving

government fraud and bribery of public officials.

This affidavit is written in support of a search warrant for the following location:

The residence of John Brownell at 6151 Tuckerman Lane, Rockville, MD as

further described in Attachment A.

2.      I believe that there is probable cause to believe that  in this location will be found

evidence of the violations of Title 18, United States Code, Sections 371 (Conspiracy to Commit

Wire Fraud and Tax Evasion), and of Title 26, United States Code 7201 (Tax Evasion) and of

other crimes..

3.      This affidavit is based in part upon documents obtained in connection with an

investigation, interviews, and other information gathered during the investigation. The

information contained herein is based on my personal knowledge and experience, and

information provided to me by other law enforcement personnel who have participated in the

investigation described in this affidavit. This affidavit does not contain all of the information

known to me regarding this investigation. Your affiant has included in this affidavit facts which

he believes are sufficient to support a probable cause finding for the issuance of the requested

warrant.

4.    Douglas Jemal owns Douglas Development, as well as over 100 properties. Each property is set up as its own "limited liability corporation," or "LLC." For some of these LLCs, Douglas Jemal shares ownership with other individuals. Douglas Development manages the various individual properties.

5.    Norman Jemal is Douglas Jemal's son and an employee of Douglas Development. His responsibilities include leasing various Jemal-owned properties that are managed by Douglas Development. He also is an owner with his father in several properties.

6.    Blake Esherick is an employee of Douglas Development. His responsibilities include leasing various Jemal-owned properties that are managed by Douglas Development. He has been employed by Douglas Development since at least prior to 1996.

7.    John E. Brownell ("Brownell") is variously referred to as the Treasurer or Chief Financial Officer of Douglas Development.

<u>Evidence of Tax Violations</u>

8.    Records obtained from Douglas Development's payroll service, "ADP," reveal that Brownell has received the following gross annual salary from Douglas Development:

2002 - $128,715.96

2003 - $128,715.96

9.    I have reviewed bank records from Brownell's bank account at the Adams National Bank. These records reflect, in calendar years 2001, 2002, and 2003, weekly direct deposits from Douglas Development consistent with the annual income reported above.



10.     Pursuant to an <u>ex parte</u> <u>Order</u> signed by the Chief Judge of the United States District Court, District of Columbia, the IRS has disclosed that Brownell has not filed federal tax returns for calendar years 2000 through 2003.

11.     In addition to the "payroll income," it appears that Brownell has received substantial additional unreported income from Douglas Development, as described in the following paragraphs.

12.     Brownell has had an equity line account at Potomac Valley Ban (PVB). Bank records reveal he opened the account in 1996. Originally, the credit line was $60,000. Over time, it has increased to about $126,700.

13.     On numerous occasions since 1996, Brownell would cause Douglas Development to issue checks to pay down his credit line, and, at about the same time, make a draw on his credit line of the same amount as the Douglas Development check. For example, if he wanted, say, $6,200, he would direct that a Douglas Develoment check be prepared payable to PVB as a payment on his credit line for $6,200, and write a check on his credit line to himself for $6,200. The general ledger of Douglas Development would not reflect that Brownell would be personally enriched by $6,200 – rather, the general ledger would only show a check to a PVB.

14.     As examples of the above pattern:

a)      On or about May 7, 1999, Douglas Development check 98391 was written to PVB in the amount of $10,391.04, consisting of $10,000 principal and $391.04 interest, payable to the Brownell line of credit account. The PVB account statement reflects the deposit of this check on

-3-

May 10, 1999.[1]

Thereafter, on May 17, 1999, check no. 115 in the amount of $12,500 was drawn against the account.

b)    The very next month, on June 10, 1999,  Douglas Development check 98946 was written to PVB in the amount of $3846.67, consisting of $3,500 principal and $346.67 interest, payable to the Brownell line of credit account.  The PVB account statement reflects the deposit of this check on June 11, 1999.  Thereafter, on June 14, 1999, check no. 116 in the amount of $3500, was drawn on the account.

c)    On or about September 13, 2000, Douglas Development check 86299 was written to PVB in the amount of $1928.43, consisting of $1400 principal and $528.43 interest, payable to the Brownell line of credit account.  The PVB account statement reflects the deposit of this check on September 15, 2000.  Thereafter, on September 19, 2000, $1400 was drawn on the account.

d)    The next month, on or about October 16, 2000, Douglas Development check 87046 was written to PVB in the amount of $2434.13, consisting of $2000 principal and $434.13 interest, payable to the Brownell line of credit account.  The PVB account statement reflects the

---

[1]    This affidavit is using the dates on the bank statements as the dates for the deposits of the Douglas Development checks into the line of credit and the date that the checks were drawn on the line of credit.  The actual deposit or the negotiation of the check may have occurred a short time prior to the date indicated.

deposit of this check on or about October 16, 2000. Thereafter, on October 23, 2000, $2000 was drawn on this account.

e)    On or about December 19, 2001, Douglas Development check 86299 was written to PVB in the amount of $6961.05, consisting of $6500 principal and $461.05 interest, payable to the Brownell line of credit account. The PVB account statement reflects the deposit of this check on December 20, 2001. Thereafter, on December 19 and 24, 2001, two checks, in the amounts of $5000 and $1000 respectively, were drawn on the account. These checks were either deposited into Brownell's personal account or cashed.

f)    On or about July 3, 2003, Douglas Development check 109634 was written to PVB in the amount of $6250, payable to the Brownell line of credit account. The PVB account statement reflects the deposit of this check on July 7, 2003. Thereafter, on July 8, 2003, check #161 in the amount of $6200 was drawn on this account.

15.    In 2001, Douglas Development checks amounting to over $50,000 were drawn on accounts of Douglas Development made payable to Brownell's account at PVB. In 2002, checks in excess of $40,000 were prepared. There are numerous checks in other years as well. Many of the PVB checks were simply deposited (in whole or in part with cash taken out) into Brownell's personal account. I have seen numerous "check request forms" of Douglas Development, including forms related to the specific checks described above. These forms reflect that

Brownell personally directed the checks to be written to PVB to pay his account. Also, as part of the check request documents, Brownell's personal monthly PVB equity line statements would be attached.

16.    It was the practice of Douglas Development that all Douglas Development checks were signed by Douglas Jemal personally.

17.    The Douglas Development checks to PVB were recorded in the books of Douglas Development in an account for "loan repayments." The purpose of this account is to keep track of expenditures by Douglas Development which constitute repayments of loans <u>to Douglas Development</u> – such as loans from financial institutions and third parties.

18.    I am aware of a copy of a 1996 check in the amount of $50,000 by Brownell to Douglas Development, drawn on the PVB account and a 1999 check from Brownell to Douglas Development drawn on BBT Bank in the amount of $20,000. Copies of these two checks have been provided by Douglas Develoment to the United States. They appear constitute loans from Brownell to Douglas Development.

19.    There is ample evidence which negates the possibility that all the payments to PVB discussed above were "repayments" for these loans.

20.    First, there is evidence that Brownell used the "loan repayment" account, in which he reported the Douglas Develoment checks to PVB, for other personal means as well. As an example, a check to "Tex-Mex Construction" for $8,700 which is recorded in the same "loan repayment" account as the checks to PVB. The supporting invoice for this check reveals that Tex-Mex performed construction work at Brownell's house – and did not make a "loan" to Douglas Development for which the $8,700 was a repayment..

-6-

21.    Second, Brownell's account balance on his PVB account in 1999 was at the limit of $60,000. Even if this entire balance reflected some sort of outstanding "loan" to Douglas Development, the payments from Douglas Development to PVB subsequent thereto were well in excess of $60,000, and there are no additional loans from Brownell to Douglas Development recorded in the loan payable account after that date.

22.    Third, in 1999 and 2000, there are two other Douglas Development checks written directly to Brownell of $20,000 each. These were recorded in Douglas Development's general ledger as loans _to_ Brownell (that is a loan receivable to Douglas Development), and not, at that time, as a loan payable to Brownell, suggesting that as of those dates, any loans from Brownell to Douglas Develoment had been repaid in full and these new distribution now represented loans from Douglas to Brownell.

23.    Thus, although there may have at one time been a basis for Douglas Development to have made payments to Brownell or to Brownell's account at PVB as "loan repayments," I submit it is reasonable to conclude that Douglas Development and Brownell have used the existence of loans as a pretext to conceal and obscure the payments of funds to Brownell well in excess of any loans he may have made.

24.    I have reviewed numerous items such as car registration records, real property records from an on-line State of Maryland Department of Assessments and Taxation database. These records give Brownell's address as 6151 Tuckerman Lane. I have spoken with an official at a bank where Brownell maintains a current bank account. The official confirms that as of February 18, 2005, Brownell's home address in the bank records is 6151 Tuckerman Lane.

Brownell's Role in the Company and

-7-

As CAP

<u>Actions to Benefit Jemal</u>

25.    As part of his duties at Douglas Development, Brownell handled much of the financing relationships of Douglas Jemal. For example, Brownell dealt with lenders on large construction and financing loans and has dealt with the tax preparers. He has taken steps in connection with loans, financing and handling the financial affairs of Douglas Develoment which have provided significant value to Douglas Jemal.

26.    In late 2002, a company owned 50-50 by Jemal and another (the "partner"), through a "limited liability company" ("LLC"), obtained a $67 million loan secured by the LLC's property at 77 P Street, Northwest. (Though the property was held in the legal form of an LLC, the men were functionally partners, and will on occasion be referred to as such.) A portion of this $67 million loan was held in escrow by the lender to be disbursed for purposes of completing construction at that property. Settlement on this loan occurred November 19, 2002.

27.    On November 21, 2002, two days after settlement, Douglas Development submitted a "draw" request to the lender, requesting the lender provide funds from the loan for payment to several entities, including, for example, construction companies. As part of this draw request, the lender was informed that $430,039.38 was due to "MTD Real Estate Services" ("MTD"), purportedly for a commission owed by the DC Government to MTD for representing the DC Government in obtaining a lease at 77 P Street. An MTD invoice in that amount, approved by Blake Esherick, was attached.

28.    An official with the DC Government familiar with the real estate operations of the city has stated that the DC Government only used two agents for leasing space: Cushman & Wakefield and Staubach & Co. The various DC Government agencies were "divided" among

-8-

those two companies. He had not heard of "MTD Real Estate Services" and stated that MTD
Real Estate Services did not represent any city government agency in connection with the leases
at 77 P Street.

29.    The lender requested a lien release and wiring instructions. Douglas Development
submitted a lien release signed by "MR," an acquaintance of Douglas Jemal. MR has been
interviewed. He is an old friend of Douglas Jemal, and a personal trainer at a local health club.
(He was once a linebacker for the Baltimore Colts but got injured.) He has on occasion lent
money to Jemal. However, MR denied knowing what he was signing or why. He also denied
knowledge of the operations of MTD. He claimed that it was either Douglas Jemal or Blake
Esherick who asked him to sign the document, and that he did so as a favor.

30.    In addition, the wiring instructions submitted to the lender were set forth on a
memorandum from "MR" to Douglas Development personnel. MR claimed to have no
knowledge of the bank account, nor did he give anyone permission to use his name on the
memorandum related to wiring instructions.

31.    As a result of this request, over $430,000 was wired from the lender to an account
in the name of MTD at Adams National Bank ("Adams") in the District of Columbia.

32.    Douglas Jemal was the signor on the Adams MTD account. The account was
opened December 10, 2002; the funds were wired from the lender into the account December 12,
2002. On December 13, 2002, $400,000 was wired out of the MTD bank account to the account
of a settlement company, where those funds were used by Jemal as part of the monies paid at
settlement to purchase another property through another LLC. (The approximately $30,000
balance in the MTD account was returned to Douglas Development.)

33.     Douglas Development's controller was interviewed. He stated that he was told Paul Millstein, a senior Douglas Development employee, that the purpose of the MTD invoice was to allow Douglas Jemal to have access to funds from the refinance loan without his partner being aware.

34.     In effect the MTD invoice accomplished the diversion of $430,039.38 from an entity owned 50-50 by Jemal and his partner to the personal benefit of Douglas Jemal and his son Norman, who also had an ownership interest in the property which was purchased with the monies.

35.     Brownell, as Chief Financial Officer and the individual intimately connected with the various financing activities of Jemal, was in a position to know about the activities described above. Records reflect he had substantial involvement lining up the $67 million loan and he had substantial contacts with Jemal's partner on the financial relationship between the two men.

36.     In particular, he took two steps which furthered the scheme:

First, on November 18, 2002, Brownell for Douglas Development wrote a letter to Jemal's partner, explaining details of the loan, in which Brownell stated:

> Note that $7 million is being held back to fund the remaining
> tenant improvement and leasing commissions (<u>all of these are to
> outside brokers</u>). (emphasis supplied).

I believe that Brownell's use of the phrase "outside brokers" was intended to suggest brokers other than Douglas Development (or related Douglas Jemal entities). The evidence supports the conclusion that this statement was a deliberate lulling comment and that even prior to settlement Brownell was a participant in a scheme to submit the false invoice to the lender in

-10-

order to divert loan proceeds to Jemal.

Second, the wire transfer documents from Adams to the settlement attorney reflect that Brownell instructed Adams to wire the $400,000 from the MTD account to the account of the settlement attorney. These funds were then used by Douglas Jemal and Norman Jemal to purchase a property. As part of Brownell's job, he would have been familiar with the financing issues and need for cash to complete the purchase of the property that was being acquired.

37.    It was the practice of Jemal's partner in the ownership of 77 P Street to closely scrutinize the expenses of the LLC. Although employees of Douglas Develement would write checks on the LLC account to pay for expenses of the LLC, one of the partner's employees would co-sign all the checks. The partner was interviewed by law enforcement authorities in January 2005 and stated he does not now know whether or not he would have objected at the time to Douglas Development receiving a leasing commission, but Douglas Jemal would have had reason to be concerned that the partner would have objected. Thus, the MTD invoice accomplished the following: it caused a wire payment to be made directly from the lender to an account under the control of Jemal, bypassing both Douglas Development and the partnership account.

38.    For reasons set forth above including statements of Douglas Develement personnel, the evidence demonstrates that MTD was simply entity used by Jemal to receive funds from the lender.

39.    This incident involving MTD evidences the intimate role Brownell played in the most critical matters for Douglas Jemal, involving, for example, relations between Douglas Development/Douglas Jemal and lenders, and relations between Douglas Jemal and his

-11-

partner(s). This incident reveals Brownell's participation in deceitful conduct to enrich Douglas

Jemal, it demonstrates his intimate role in the company, and establishes a motive for Jemal to

compensate Brownell with unreported income.

40.     It is my experience that individuals maintain personal financial records at their

place of residence, and, as mentioned, numerous financial records of the sort which are typically

mailed, bear the 6151 Tuckerman Lane address.  It is my experience as well that a person, such

as Brownell, who has a long history of working closely with Douglas Development and Douglas

Jemal and whose personal financial relationship is enmeshed with his personal and financial

relationship with Douglas Development and Douglas Jemal, is likely to have documents and

records related to his employment and employer at his home.

WHEREFORE, the undersigned requests a warrant to search for evidence and proceeds

of the following offenses:  Title 18, United States Code, Section 371 (Conspiracy to Commit

Wire Fraud and Tax Fraud), and Title 26, United States Code 7201 (Tax Evasion).

_____

Andrew Sekela
Special Agent, Federal Bureau of Investigation


Subscribed and sworn to before me this _____ day of February, 2005.

Charles B. Day
United States Magistrate Judge

-12-

**ATTACHMENT A**
**Location to be Searched**

6151 Tuckerman Lane, Rockville, MD, a detached house on Tuckerman Lane, with a mailbox on a post near the street in front of the house which bears the numbers "6151," with red siding, a white storm door, and a charcoal shingle roof.

## ATTACHMENT B
## <u>ITEMS TO BE SEIZED</u>

1)      All records and documents relating to all financial affairs of John "Jack" E. Brownell, including all financial statements, canceled checks, receipts for purchases of goods and services, copies of money orders and money order stubs, correspondence with banks and financial institutions, credit card and other purchase records, loan applications, notes, memoranda and correspondence relating to financial matters, ledgers and check registers, personal financial statements, retained copies of tax returns, accounting work papers, correspondence to and from the Internal Revenue Service, contracts, and all other documents related to the receipts and expenditures of monies, the accumulation and disposition of assets, and the disposition of other assets by John Brownell from 1996 to the present.

2)      All records and documents related to Douglas Jemal, Norman Jemal, and Douglas Develoment and its agents and officers.

In addition, the searching agents may photograph the premises and record serial numbers and identifying information off of any items, such as large screen televisions and other consumer goods.

If the above said documents and records are found in a file/folder with other documents, the entire folder may be seized.

### <u>Seizure of Documents/records Stored Electronically</u>

To effectuate the search and to the extent necessary to retrieve documents identified in the affidavit which may be stored electronically/digitally, the following items may be seized:

A.      Computer hardware consisting of computers, and all equipment connected or networked with the computer or computers located at 6151 Tuckerman Lane, Rockville, MD, which can collect, analyze, create, display, convert, store, conceal or transmit electronic, magnetic, optical, or similar computer impulses or data.

B.      Computer software consisting of digital information which can be interpreted by a computer and any of its related components to direct the way they work, in whatever form it may be found, to include electronic, magnetic, optical or other digital form, in addition to printed source code.

C.      Computer-related documentation consisting of written, recorded, printed, or electronically stored material, which explains or illustrates how to configure or use the computer hardware, software, or other related items.



E.    Passwords and Data Security Devices that are designed to restrict access to or hide computer software, documentation or data.

<u>Search Procedures for Computers</u>

The agents executing the search may attempt to copy and/or "image" the computer hardware at the site of the search.

A.    The copied/"imaged" material, or such computer equipment that has not been copied/ "imaged" on site, shall be moved to the safekeeping of the Federal Bureau of Investigation to permit examination of the contents of the hard-drive files and other storage media (such as disks) to search for and separate out the magnetically stored documents and information described in paragraphs 1 through 5.

B.    Individual records will be examined by investigating agents charged with the duty to determine whether the particular record is within the scope of the warrant.  If the record is not seizable, no further examination of the record will occur.  Only records or files which are described in paragraphs 1 and 2 will be printed out.

Either copies or originals of all seized items shall be returned within 60 days of the execution of the warrant.