**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **:** |
| | **:** |
| **v.** | **:**    **Crim. No. 06-0077 (RMU)** |
| | **:** |
| **JOHN E. BROWNELL,** | **:** |
| | **:** |
| **Defendant.** | |

**GOVERNMENT'S OPPOSITION TO**
**DEFENDANT BROWNELL'S MOTION TO SUPPRESS EVIDENCE**
**OBTAINED BY ILLEGAL SEARCHES OF RESIDENCE AND OFFICE**

The United States, through its attorney, the United States Attorney for the District of

Columbia, respectfully opposes <u>Defendant Brownell's Motion to Suppress Evidence Obtained by

Illegal Searches of Residence and Office</u>.  In support of this opposition, the Government

respectfully submits:

I.  THE WARRANTS WERE PROPER
IN ALL PERTINENT RESPECTS

A. Introduction

On February 23, 2005, search warrants were executed at several locations:  the business

offices of Douglas Development Corporation (DDC) at 702 H Street, N.W., Washington, D.C.

(the DDC warrant) and the homes of defendant John E. Brownell at 6151 Tuckerman Lane,

Rockville, Maryland and of Blake Esherick at 6001 Nevada Avenue, Washington, D.C.  The

warrants had been issued by Magistrate Judge Alan Kay of this Court for the District of

Columbia searches, and Magistrate Judge Charles B. Day of the United States District Court,

District of Maryland, for the search of Brownell's Rockville residence.

Defendant Brownell argues that:  1) there was no probable cause to believe crimes were

committed; 2) the information was stale; 3) the "command section" was facially overbroad and

lacked particularity; 4) there was no "substantial basis" to support the Magistrate Judge's decision; 5) and thus, the "good  faith exception" does not apply.

The affidavits and warrants are free from defect in all material respects.  They reflect precision, care and detail, and present a powerful case that crimes described were committed. The affidavits amply support the determinations of the respective Magistrate Judges that the warrants should be issued to search the specific locations for certain evidence.   Moreover and in any event, the seizing agents appropriately relied in good faith on the decisions by the Magistrate Judges that the warrants were legally appropriate.  In short, no grounds exist to suppress evidence seized in the searches and the defendant's motion must be denied.

**B.  The Court Should Follow its Prior Ruling
As to the February 23, 2005 Searches**

In United States v. Jemal, Crim. No. 05-359 (RMU), Douglas Jemal, et al, filed motions to suppress evidence seized in the search of the DDC offices located at 702 H Street and Esherick's residence at 6001 Nevada Avenue.  The defendants – Douglas Jemal, Norman Jemal and Blake C. Esherick – advanced a series of arguments, including the claims of lack of probable cause, staleness, overbreadth, lack of particularity, and that the "good faith exception" did not apply.   The Court denied the motions by Order of March 7, 2006.  As to probable cause and deference to the Magistrate Judge, this Court stated:

> Noting that a combination of factors may establish probable cause even when individual factors standing [alone] may not, the court first considers whether there is a substantial basis for judge Kay's issuance of the warrant, that is, was it reasonable for Judge Kay to conclude that the affidavit set forth a probability of criminal activity and a fair probability that the evidence would be found in the particular places set forth.

> This court concludes that there was a substantial basis for
> Judge Kay's findings and for the likelihood that the evidence
> would be found as suggested.

United States v. Jemal, et al, Crim. No. 05-359 (RMU), March 7, 2006 Tr. at 10. The Court

addressed and rejected specific arguments, including the staleness claim and the claim that there

were insufficient bases to conclude that financial records – including records related to taxes –

would be found at the specific locations, Id. at 11-12, and concluded: "Therefore, I conclude that

the appropriate course of action in this case is to find that Judge Kay had a substantial bas[i]s in

that his issuance of the warrant was appropriate in every way and the warrant was not otherwise

constitutionally infirm." Id. at 13.[1]

In the instant case, defendant Brownell has raised essentially the same legal arguments in

support of his suppression motion as were raised in the prior litigation. He has alleged no new

facts and advanced no new arguments that would justify the Court reaching any different

decision as to the search of the DDC offices from the decision it reached in the Jemal case.[2]

---

[1]    Excerpts from the pertinent pages of this transcript are attached as "Exhibit 1."

[2]    We further note that it does not appear that Brownell has standing to contest the
DDC search. This property is owned by Douglas Jemal. Brownell has alleged no facts that
would suggest that he has can validly assert a privacy interest over the entirety of books and
records of DDC, let alone a claim to "privacy" even as to the contents in his own office. He has
not shown that he has an expectation that the world would be excluded from his office and the
DDC computer files, or, to the contrary, that his office and computer files would not be
accessible to others at the direction of Douglas Jemal or other management at DDC.

Typically the standing issue must be raised and resolved prior to a decision on the merits.
In this case, this would require an evidentiary hearing. However, because this Court has
resolved the DDC search issue vis-a-vis Douglas Jemal – who by any standard has superior
claims to privacy than Brownell – and because defendant Brownell has raised substantially
identical issues as Jemal, it is the government's position that this Court has, in effect, already
decided the DDC search issues on the merits. Accordingly, the government does not seek an
evidentiary hearing at this time as to Brownell's standing to challenge the DDC search (or any

We urge the Court to follow its prior opinion in this case – based on truly indistinguishable facts and indistinguishable legal arguments – and affirm the seizure of evidence pursuant to the two warrants.

C.  The Affidavits Set Forth Probable Cause
to Believe Offenses Were Committed

The affidavits set forth ample grounds to support a finding that probable cause existed to conclude that three separate sets of offenses had been committed.

The Supreme Court has repeatedly stressed that affidavits are to be read in very common sense, non-technical manner.  In Gates, the Court discussed "probable cause" as follows:

> As early as Locke v. United States, 7 Cranch. 339, 348 (1813),
> Chief Justice Marshall observed * * * that "the term 'probable
> cause' * * * means less than evidence which would justify
> condemnation * * *. It imports a seizure made under circumstances
> which warrant suspicion." * * * Finely-tuned standards such as
> proof beyond a reasonable doubt or by a preponderance of the
> evidence, useful in formal trials, have no place in the magistrate's
> decision* * *. [I]t is clear that "only the probability, and not a
> prima facie showing, of criminal activity is the standard of
> probable cause." [Spinelli v. United States, 393 U.S. 410, 419
> (1969)].

Gates, 462 U.S. at 235.  Thus:

> The task of the issuing magistrate is simply to make a practical,
> common-sense decision whether, given all the circumstances set
> forth in the affidavit before him * * * there is a fair probability that
> contraband or evidence of a crime will be found in a particular
> place.

Id. at 238. "Consequently, the affidavit cannot be attacked paragraph by paragraph; it must be

---

part of it).  If the Court were decide the legal issues raised by Brownell differently from how it decided the similar issues raised in the Jemal case, a hearing on standing would at that time be required to determine whether Brownell's personal constitutional rights were violated.  See, e.g., United States v. Costin, 2006 WL 2522377, at ** 4-5 (D. Conn., July 31, 2006).

-4-

evaluated as a whole." <u>United States v. Anderson</u>, 933 F.2d 612, 614 (8th Cir. 1991). Despite the efforts by which defendant Brownell seeks to argue the evidence, we submit that it was reasonable for Magistrate Judge Kay to conclude that the affidavits set forth the "probability * * * of criminal activity " and the "fair probability that * * * evidence will be found in a particular place."

     <u>The DDC Warrant</u>.  The affidavit in support of the DDC warrant sets forth evidence that agents of DDC, personally and through DDC,  provided Michael Lorusso, a former DC Government official, numerous items of value at about the same time that Lorusso was taking official acts to benefit Jemal and DDC.  The affidavit provided substantial corroborating detail to support the contentions related to the items of value provided by DDC to Lorusso, and discussed the numerous acts that Lorusso undertook of value to DDC.  This sets forth probable cause to believe the offense of bribery has been committed.

     Second, the affidavit provided the essential details to support the conclusion that the Jemal, though his employees, provided a false invoice in the name of "MTD Real Estate" (MTD) to obtain from Morgan Stanley approximately $430,000 funds that at that time were being held in escrow.  The affidavit provided grounds to conclude:

        •   that MTD was not in fact the DC Government's real estate agent and was not entitled to the real estate commission specified in the invoice; in fact, the DC Government had two legitimate agents;

        •   that MTD was in substance the alter ego of Douglas Jemal, Blake Esherick and Paul Millstein (not charged in this case);

        •   that the funds from Morgan Stanley passed through an account on

which Douglas Jemal was the sole signor;

- that documents in the name of "MR" were created to facilitate this transaction;

- that in fact, MR was a friend of Douglas Jemal and had nothing to do with MTD and had no actual knowledge of the contents of the documents, and that such documents were created to further the deception on Morgan Stanley by creating the false appearance that the monies were going elsewhere other than to Douglas Jemal.

This portion of the affidavit provides probable cause to believe offenses, including wire fraud were committed related to the use of "MTD" to obtain funds from Morgan Stanley. Finally, the affidavit set forth an abundance of evidence to support the conclusion that defendant Brownell, along with Esherick and Paul Millstein received substantial compensation in forms that were not reported to the Internal Revenue Service.

For defendant Brownell in particular, the DDC affidavit sets forth ample detail to support the conclusion that Brownell was engaged in a scheme whereby he would cause to be prepared DDC checks payable to Potomac Valley Bank (PVB) as payments on Brownell's personal line of credit. These checks, by their terms, made no reference that they were for the personal benefit or enjoyment of Brownell. Moreover, they were recorded in the DDC books as a <u>loan payable</u> – not a loan receivable --thus suggesting that they were not loans from DDC to Brownell, rather they were loan "repayments" by DDC to PVB. Moreover, that affidavit reported that Brownell had not filed tax returns for 2000 through 2003.

Moreover, there was ample evidence to support the conclusion that these payments were

truly intended to constitute a tax evasion scheme.  In particular, the evidence demonstrated that

Jemal also compensated both Esherick and Millstein in ways to disguise the compensation.  For

Esherick,  the evidence demonstrated the existence of payments directly from DDC to Esherick

that were classified as "loans," payments from DDC to third parties for Esherick's benefit, and

the provision of free housing.  For Millstein, this compensation consisted of DDC payments for

the construction of his house and his credit card.  The tax evasion portions of the affidavit

provided bases to conclude a tax evasion scheme was perpetrated involving the compensation by

Douglas Jemal of DDC's high-ranking employees, including Brownell.

> Brownell's Residence.   The same tax evasion allegations were incorporated in

connection with the affidavit in support of the search of Brownell's residence.

* * *

As the Court has previously ruled, the allegations in the DDC affidavit provided ample

grounds to conclude that federal offenses of bribery, wire fraud and tax evasion were committed.

The issue for the Magistrate Judges was not whether the facts proved the certain individuals

guilty, but rather whether the facts demonstrated a "fair probability that * * * evidence of a crime

will be found in a particular place." <u>Gates</u>, 462 U.S. at 238.[3]  Moreover, the companion search of

---

[3]        As one court noted in response to a defendant's claim that there were innocent explanations to the evidence set forth in an affidavit (detailing failure to file tax returns):

> It is obvious that were defendant to go to trial solely on the
> evidence presented in the search warrant affidavit he might have
> defenses to the charge.  That is not the test, however.  Here, the
> "practical considerations of everyday life," on which a reasonably
> prudent magistrate would act, would dictate that there was
> probable cause to believe that a well-established businessman with
> proven significant sources of income who files no business or
> personal income taxes for three years is in violation of applicable

Brownell's residence for financial records was proper, just as this court previously upheld the

comparable search of Esherick's residence for personal financial records.  As this court noted:

"A showing of nexus to a defendant's home ' may be based on "reasonable inferences" from the

facts presented based on common sense and experience.'"  United States v. Jemal, et al, Crim.

No. 05-359 (RMU), March 7, 2006 Tr. at 12 (citing  United States v. Singh, 390 F.3d 168, 182

(2d Cir. 2004) (citations omitted)).   This same reasoning applies to affirming the search of

Brownell's house.

<u>D.  The Information was not Stale</u>

"[T]he amount of delay which will make information stale depends upon the particular

facts of each case, including the nature of the criminal activity and the type of evidence sought."

United States v. Freeman, 685 F.2d at 951.  An obvious distinction exists between a "mere

isolated violation," for which probable cause to search "dwindle[s] with the passage of time," as

opposed to "protracted or continuous [criminal] conduct" for which "time is of less significance."

Bastida v. Henderson, 487 F.2d 860, 864 (5th Cir. 1973).  In connection with the affairs of an on-

going business, it is reasonable to conclude that certain records would be kept for extended

periods of time. As the Supreme Court noted in Andresen v. Maryland, 427 U.S. 463, 478

(1976):  "The business records sought were prepared in the ordinary course of petitioner's

business in his law office of that of his real estate corporation.  It is eminently reasonable to

expect that such records would be maintained in those offices for a period of time and surely as

---

state income tax laws.

United States v. McManus, 719 F.2d 1395, 1400 (6th Cir. 1983) (footnotes omitted) (quoting
Brinegar v. United States, 338 U.S. 169, 174 (1949)).

long as three months required for the investigation of a complex real estate scheme."[4]   See, also, United States v. Singh, 390 F.3d 168, 182 (2nd Cir. 2004) (search and seizure of records from medical practice:  "The records made and retained in the business office were of the type that would necessarily be kept over a period of years and would reasonably be found in the business office of any medical practice."); United States v. Cherna, 184 F.3d 403, 410 (5th Cir. 1999) ("Especially in light of the facts that [the two businesses at issue] were ongoing businesses and that financial records typically are retained for long periods of time, we cannot say that [the agent's] affidavit was based on stale information." (citations omitted)), cert. denied, 529 U.S. 1065 (2000)); United States v. Shomo, 786 F.2d 981, 984 (10th Cir. 1986) ("[W]here the property sought is likely to remain in one place for a long time, probable cause may be found even though there was a substantial delay between the occurrence of the event relied on and the issuance of the warrant." (citations omitted));  United States v. Schaefer, 87 F.3d 562, 568 (1st Cir. 1996) (years-old information not stale where items to be seized in marijuana cultivation conspiracy were likely to be in service for years); United States v. (Patricia) Williams, 897 F.2d 1034, 1039 (10th Cir. 1990) (information, some of which dated back four years, not stale where drug conspiracy ongoing and business records likely to be kept for long time), cert. denied, 500 U.S. 937 (1991).[5]   As this Court previously ruled:  "With regard to the defendants' staleness

---

[4]      The search in Andresen was only three months after the offense at issue.  The Court's understanding of the inherent record-keeping requirements of a real estate business is nonetheless applicable to the facts of this case.

[5]      One formulation of the "staleness" criteria is:

Staleness is not measured merely on the basis of the maturity of the information but in relation to (1) the nature of the suspected criminal activity (discrete crime or "regenerating conspiracy"), (2)

challenge, it is reasonable that a business retains financial records for several years, and a two- or three year time lapse is not significant enough to render the warrant invalid.  The entire point of creating business and financial records is for preservation."   United States v. Jemal, et al, Crim. No. 05-359 (RMU), March 7, 2006 Tr. at 12.

The DDC warrant.  The warrant for the DDC offices specified the seizure of the sorts of records that would be retained or found in the offices of an on-going business, months or even years after the conduct at issue.  In this case, for example, it would be reasonable to conclude that lease files, loan agreement files, historical payroll records or loan records, cancelled checks, check stubs and supporting documents, would be found at DDC.  Though some of the events associated with the Addison Road and 77 P Street leases happened in 2001 and 2002, these leases by their nature contemplated on-going financial relationships covering many years between Douglas Jemal (and his entities) and the DC Government, and would likely be maintained in lease files, property files (or similar files whatever their title) at the offices of DDC, the entity that managed those properties.  Similarly, it is difficult to imagine that documents associated with a $67 million loan would have been destroyed, and it was reasonable

---

the habits of the suspected criminal ("nomadic" or "entrenched"), (3) the character of the items to be seized ("perishable" or " of enduring utility"), and (4) the nature and function of the premises to be searched ("mere criminal forum" or "secure operational base").

United States v. Bucuvalas, 970 F.2d 937, 940 (1st Cir 1992) (citations omitted). Bucuvalas involved a RICO prosecution related to the adult bookstore business in Boston, so the terms it uses are somewhat inapt to the facts of this case.  Nonetheless, the principles set forth by the First Circuit have at least general application here.  DDC was an on-going concern, the records were not "perishable," and the occupants were "entrenched" in the "operational base" of the DDC offices insofar as they conducted their business at this location.

to conclude that records associated with such a transaction would be maintained at the business offices. Finally, there is every reason to conclude that financial information related to the compensation of employees would be found at the business offices at which the employees worked. In this regard, even though the affidavit covered the tax years through calendar year 2003, evidence of subsequent financial dealings between DDC and its employees, including financial arrangements in 2004 and 2005 would likewise be inherently relevant as well. Indeed, the sheer length of time that spanned the events covered in the affidavit (2001 through 2003), and numerous events at issue, many necessarily leaving a financial and record trail, made it nearly inevitable that some substantial volume of evidence covered by the warrant would exist and be present at the business offices of DDC. Though this is not such a case where it was alleged there was on-going criminal activity as of February 2005; this is a case where there were on-going business and financial activities as of February 2005, including the maintenance of records having evidentiary relevance to the investigation.

The Tuckerman Lane search. Similarly, there is every reason to believe that Brownell would maintain personal financial records, to include such records as banking records, at his personal residence. Although every person is unique and has different practices regarding his or her own financial records, it is at least reasonable to conclude that Brownell would have historical personal financial records at his residence. See, e.g., United States v. Freeman, 685 F.2d at 952 (recognizing that bank records are the sort of item that would normally be kept at one's personal residence and "are the sort which could be reasonably expected to be kept there for long periods of time."); United States v. McManus, 719 F.2d at 1400-01 ("The locations to be searched were defendant's home and business, which locations were not only verified by official

records but by personal observation and discussion with a neighbor. * * *  It certainly would be reasonable for a magistrate to conclude that on January 7, 1980, defendant's business records for the years 1977, 1978 and 1979 would be found at either his place of business or his residence.). Thus, for the same reasons this Court concluded that the warrant was reasonable, and not stale, in supporting a search of Esherick's house, this Court should likewise conclude the warrant was not stale in affirming the search of Brownell's house.

### E.  The Command Section was not Overbroad

The defendant claims that the affidavit suffered from overbreadth and lack of particularity.  These reflect two closely related concepts:  "Particularity is the requirement that the warrant must clearly state what is sought.  Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based."  In re Grand Jury Subpoenas Dated December 10, 1987, 926 F.2d 847, 856-57 (9th Cir. 1991) (citations omitted).[6]

Dealing first with the "overbreadth" challenge, a plain reading of the affidavits and warrants reveal that the scope of the warrants was limited by the probable cause set forth in the affidavits.  The seizing language of the DDC search commands the seizure of records related to the relationship between DDC and Lorusso and the DC Government (Item 1); the financial affairs of three DDC employees referenced in the tax evasion allegations (Items 2 through 4),

---

[6]     Brownell merges these into a single argument, that the command was overbroad because it was insufficiently particular.  Defendant's Motion at 14.   The government responds separately to each component of this argument.

"MTD" (Item 4)[7], 77 P Street and 4800 Addison Road (Items 5 and 6),[8] other items of value provided to other individuals (Item 7), specified transactions involving Lorusso (Item 8), appointment books and similar planners (Item 9), photographs (Item 10), and such documents that may be found on the computer or stored electronically.  The language of the Tuckerman Lane warrant is far narrower, and involves only financial items linked to Brownell.  This is not a case where the agents were authorized to seize "all or virtually all of appellant's business records and equipment."  See, e.g., United States v. Maxwell, 920 F.2d 1028, 1033 (D.C.Cir. 1990).  The specific categories of documents are directly linked to the probable cause established in the warrant, nor, for reasons described in the next section as to "particularity," can the defendant make a claim that the warrant was "overbroad" because some of the categories of items to be seized encompass documents that turn out to have little or no evidentiary relevance.

Indeed, this is not even a case where the Government sought to seize all business records on the theory that there was pervasive fraud through the entire company.  The seizing language is far narrower than seizing language that has been approved in other contexts.  See, e.g, United States v. Travers, 233 F.3d 1327, 1330 (11th Cir. 2000) (in connection with a complex scheme to commit financial fraud, search warrant allowed for the seizure of "all documents involving real estate, litigation, property, mailings, photographs and any other material reflecting identity, and anything reflecting potential fraud"), cert. denied, 534 U.S. 830 (2001).

_____

[7]        There was a numbering error in the list of Items to be Seized, with two items labeled number 4.

[8]        The Government acknowledges that the text of the affidavit refers to "Addison Road" while the seizing language refers to "4800 Addison Road."  This defect is truly "hypertechnical" on the facts of this case, and would not be such a problem as to vitiate the "good faith exception," discussed at pp. 17-19, infra.

-13-

Defendant specifically complains that the warrant as to Brownell's residence was overbroad and lacked particularity because it permitted the seizure of "'all records and documents relating to all financial affairs of Mr. Brownell,' including a long list of general categories of documents, a 'all other documents related to the receipts and expenditures of monies, the accumulation and disposition of assets and the disposition of other assets by John Brownell from 1996 to the present.'" Defendant's Motion at 17.  However, the warrant alleged that Brownell had not filed tax returns for any year subsequent to 1996.   It was necessary for the government to determine, in re-creating Brownell's tax status, whether at any time Brownell had a "cash horde," whether he had itemized deductions, whether he had sources of cash, whether he had income other than his Douglas Development salary, whether he had assets that generated income, whether he had itemized deductions that would reduce his tax liability, what accounts he used, and similar records.  It was reasonable for the government to seize all financial records accounting for Brownell's income and expenses for those years.[9]

.               F.  The Items to Be Seized Were Defined with Particularity

For largely the same reasons that the warrant was not overbroad, we submit the seizing language was sufficiently "particular."  The seizing language set forth specific categories of evidence (10 for the DDC search, 2 for the Tuckerman Lane) in simple straight-forward language that effectively constrained the agents' discretion in executing the warrant.  "In  assessing particularity, courts are concerned with realities of administration of criminal justice.  It is

---

[9]       The defendant alleges that certain attorney-client materials were seized.  We note that all attorney-client issues as to the DDC documents were resolved.  The paper documents as to which privilege was claimed were returned within days.  The computer records as to which privilege was claimed were never reviewed by the government.   These matters were the subject of pre-trial litigation that was handled by Chief Judge Hogan.

sufficient if the warrant signed by the judicial officer is particular enough if read with reasonable

effort by the officer executing the warrant." United States v. Dale, 991 F.2d 819, 846 (D.C. Cir.)

(citations and internal quotations omitted), cert. denied, 510 U.S. 906 (1993). The particularity

standard is one of "'practical accuracy' rather than a hypertechnical one." United States v. Peters,

92 F.3d 768, 69-70 (8th Cir. 1996) (citation omitted).  As one court noted:

> The degree of specificity required when describing the goods to be
> seized may necessarily vary according to the circumstances and
> type of items involved * * * [T]here is a practical margin of
> flexibility permitted by the constitutional requirement for
> particularity in the description of items to be seized.

United States v. Truglio, 731 F.2d 1123, 11128 (4th Cir. 1984) (citing United States v. Davis, 542

F.2d 743, 745 (8th Cir.1976)).  The seizing language in this warrant is far narrower than the

language approved in Dale.  It is well within the "practical margin of flexibility" contemplated of

such seizing language, and is sufficient to "permit an executing officer to reasonably know what

items are to be seized." United States v. Beaumont, 972 F.2d 553, 560 (5th Cir. 1992), cert.

denied, 508 U.S. 926 (1993).

The Supreme Court has recognized the need to review broad collections of documents in

the investigation of a fraud case:

> Under investigation was a complex real estate scheme whose
> existence could be proved only by piecing together many bits of
> evidence. Like a jigsaw puzzle, the whole "picture" of petitioner's
> false pretenses scheme with respect to Lot 13 T would be shown
> only by placing in the proper place the many pieces of evidence
> that, taken singly, would show comparatively little. The complexity
> of an illegal scheme may not be used as a shield to avoid detection
> when the State has demonstrated probable cause to believe that a
> crime has been committed and probable cause to believe that
> evidence of this crime is in the suspect's possession.

Andresen v. Maryland, 427 U.S. at 480 n.10. Similarly, in this case it may well be that some of the seized items seized do not end up yielding evidentiary value, and, as in Andresen, it is likewise the case that documents in the nature of routine business records seized pursuant to the warrants acquire evidentiary significance only when understood in conjunction with other documents. However, "no tenet of the Fourth Amendment prohibits a search merely because it cannot be performed with surgical precision. * * * This flexibility is especially appropriate in cases involving complex schemes spanning many years that can be uncovered only by exacting scrutiny of intricate financial records." United States v. Christine, 687 F.2d 749, 760 (3rd Cir. 1982).[10]

As but one example, in order to fully investigate the potential tax crimes of Brownell, it was reasonable to seize all his financial records, for such records were reasonably likely to detail his income, sources of income, his spending and spending patterns (cash, check, credit card), and even changes in spending patterns over time. To investigate the potential tax crimes for 1996 through 2004, it was necessary not only to obtain and review financial records for those specific years, but to investigate his financial circumstances both prior to and subsequent to those years, to account for or negate such factual issues as the existence of loans, debts, a "cash horde," other sources of income, or similar such matters that bear on income during the charged years of evasion. This sort of detailed financial review is not possible on the scene of a search, nor is it feasible to draft seizing language that would provide effective constraint so that only records and

---

[10]    See also, United States v. Loveto, 343 F.Supp.2d 434, 447 (W.D. Pa. 2004) ("We must consider the practicalities of the situation and conclude that in a tax conspiracy case, still in the nascent stage of its investigation, a more detailed description might not be feasible." (citing United States v. Christine, supra in text)).

documents that would ultimately prove helpful would be seized.

This reasoning applies to nearly every category of items to be seized. The warrants in this case provide straight-forward commands as to the objects to be seized by relation to the matters under investigation. The seizing language is not so general as in effect to permit a wholesale seizure of the defendant's records. In light of the allegations in the affidavit, it was "reasonable" for the Magistrate Judges to authorize the agents to seize the documents associated with Lorusso, the two properties at issue, the specific employees, "MTD," and the other categories related to income and expense items for the specific employees (including Brownell). Nearly any agent, let alone the agents involved in this investigation, would be able to execute the warrants and have a good sense of the documents to be seized.

### G. The Warrants Were Otherwise Executed in Good Faith

Even if this Court were to reach a different determination as to the sufficiency of the affidavit to support any aspect of the warrants, no basis whatsoever exists to find that the warrants, approved by Magistrate Judge Kay and Magistrate Judge Day were not thereafter executed in good faith by the agents and that evidence should be suppressed. See United States v. Leon, 468 U.S. 897 (1984).

The suppression of evidence obstructs the truth-seeking process and is a harsh sanction with profound costs to society. Because the exclusionary rule is designed "to deter unlawful searches by the police, not to punish the errors of magistrates and judges," Gates, 462 U.S. at 263 (White, J., concurring), the benefits of suppression are "marginal or non-existent" when law enforcement officers rely in good faith upon the determination of a sworn federal Magistrate

Judge.[11]  Thus, there is no justification to suppress evidence when law enforcement conduct is

beyond reproach, when agents have brought a detailed and carefully drafted affidavit to a

Magistrate Judge, when the Magistrate Judge has signed it, and when the agents have executed

the warrant pursuant to the permission so granted.  No grounds exist to support any finding other

than that the "officers conducting the search acted in 'objectively reasonable reliance' on the

warrant and the warrant was issued by a detached and neutral magistrate."  United States v.

Maxwell, 920 F.2d at 1034 (D.C. Cir. 1990) (quoting United States v. Leon, 468 U.S. at 922

(1984)) (evidence seized pursuant to an overbroad warrant not suppressed where agents acted in

good faith).[12]  Even if an "error of constitutional dimensions may have been committed with

_____

[11]     "[T]he marginal or nonexistent benefits produced by suppressing evidence
obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot
justify the substantial costs of exclusion." Leon, 468 U.S. at 922.

[12]     In the body of its opinion in Leon, the Court listed three instances where the good
faith exception would not apply: 1) where the warrant was issued on a knowing or recklessly
false affidavit; 2) where the magistrate was not neutral and detached, and 3) where the affidavit
"does not 'provide the magistrate with a substantial basis for determining the existence of
probable cause'" [Gates, 462 U.S. at 239].  Leon, 468 U.S. at 914-95.  It further explained what it
intended by this third category: "Sufficient information must be presented to the magistrate to
allow that official to determine probable cause; his action cannot be a mere ratification of the
bare conclusions of others."  Id. at 915 (citing Gates, 462 U.S. at 239).

At the conclusion of the opinion, in summarizing its holding, the Court in Leon repeated
the first two grounds – falsity of the affidavit and abdication of judicial role – as circumstances
where the good faith exception would not apply. The Court continued: "Nor would an officer
manifest objective good faith in relying on a warrant based on an affidavit 'so lacking in indicia
of probable cause as to render official belief in its existence entirely unreasonable.' * * * Finally,
depending on the circumstances of the particular case, a warrant may be so facially deficient -
i.e., in failing to particularize the place to be searched or the things to be seized-that the
executing officers cannot reasonably presume it to be valid."  Id. at 923 (citation omitted).

Whether the Court in Leon intended on setting forth three or four criteria is not important.
However, what is critical is that the one example the Court provided of an inadequate affidavit
was one that provided only "bare details" and insufficient information to permit the magistrate to

respect to the issuance of the warrant, * * * it was the judge, not the police officers, who made the critical mistake." <u>Massachusetts v. Sheppard</u>. 468 U.S. 981, 990 (1984)

In his suppression motions, the defendant argues that notwithstanding the detailed affidavits and the warrants that track the allegations, the "good-faith" exception does not apply. For reasons already stated, however, we submit that a fair reading of the affidavit supports a finding of probable cause, and a fair reading of the seizing language suggests that it is fully supported by the affidavit.

The issue of good faith presents purely a legal issue.[13]   In this case, this issue may be

---

perform his duties.  <u>See</u>, <u>e.g.</u>,  <u>United States v. Satterwhite</u>, 980 F.2d 317, 321 (5th Cir. 1992) (citations omitted) ("When a warrant is supported by more than a 'bare bones' affidavit, officers may rely in good faith on the warrant's validity. * * * 'Bare bones' affidavits contain wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause.").

[13]      The issue of "good faith" is entirely a legal issue.  The agents' subjective intent is irrelevant:

> As the Supreme Court in <u>Leon</u> emphasized, "the standard of reasonableness * * * is an objective one." [<u>Leon</u> at 919 n.20.] Thus, the determination of whether the good faith exception applies in a particular case does not depend on the subjective beliefs of the officers involved. See <u>United States v. Maggitt</u>, 778 F.2d 1029, 1035 n. 3 (5th Cir.1985) ("Because the <u>Leon</u> standard is objective, the testimony of the agent who prepared the affidavit *** is not particularly relevant."); <u>United States v. Gant</u>, 759 F.2d 484, 487-88 (5th Cir.1985) ("[T]he determination of good faith will ordinarily depend on an examination of the affidavit by the reviewing court.").

<u>United States v. Allen</u>, 211 F.3d 970, 978 (6th Cir. 2000)(Gilman, J., concurring).  Moreover, no other allegations have been raised that would appear to require an evidentiary hearing.  There is no allegation that the information in the affidavit was false or made in reckless disregard for the truth – to the contrary, the allegations in the warrant largely consist of a description of documents or sworn statements that leave a precise record trail.  Furthermore, the defendant does not allege Magistrate Judge Kay abdicated his judicial in issuing the warrant.  <u>See</u>, <u>e.g.</u>, <u>Lo-Ji Sales, Inc. v.</u>

decided solely by an examination of the warrants and their relationship to the affidavits. First

and foremost, the affidavits provided the Magistrate Judges an abundance of detail, thus

requiring them to exercise his independent judgement in determining the existence of probable

cause. The Magistrate Judges were not put in the position of simply "ratif[ying] the bare

conclusions of others." Leon, 468 U.S. at 915. The facts do not present "bare-bones" affidavits

that were "rubber stamped" by the reviewing judicial official. See, e.g., United States v.

Wilhelm, 80 F.3d 116, 121-22 (4th Cir. 1996). Indeed, it is difficult to conceive facts involving a

detailed affidavit and detailed warrant where the "good faith exception" would not apply, absent

a showing of falsity of the affidavit or inappropriate conduct by the Magistrate Judge. The

defendant provides little in the way of authority, and certainly cites no other case where the

"good faith exception" was held not to apply on a warrant even remotely as rich in factual detail

as the affidavit and warrant in this case.   In light of the detail of the affidavits and the consequent

decisions of the respective Magistrate Judges to sign the warrants, the defendant's claims that the

agents did not act in good faith must be denied.

**II.  THE DEFENDANT'S MOTION MUST BE REJECTED
BECAUSE A "SUBSTANTIAL BASIS" EXISTED FOR
THE MAGISTRATE JUDGES TO SIGN THE WARRANTS**

In review a magistrate's finding of probable cause, "[a] deferential standard of review is

appropriate to further the Fourth Amendment's strong preference for searches conducted

pursuant to a warrant." United States v. Vaughn,  830 F.2d 1185, 1187 (D.C.Cir. 1987) (quoting

Massachusetts v. Upton, 466 U.S. 727, 733 (1984)). "A magistrate's 'determination of probable

---

New York, 442 U.S. 319,  327 (1979) (by participating in the search "[magistrate] was not acting
as a judicial officer but as an adjunct law enforcement officer").

cause should be paid great deference by reviewing courts.'" Illinois v. Gates, 462 U.S. 213, 236

(1983) (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)).  In effect, this Court sits as

a reviewing court in applying a deferential standard of review of the decision by Magistrate

Judge Kay to issue the warrants.[14]  Thus, the issue for this Court is not whether it would have

made the same probable cause decisions as the respective Magistrate Judges.  Rather, the issue

for this Court in deciding the defendant's motion is whether there was a "substantial basis" to

support the Magistrate Judges' decisions.  If the Court finds there to be a substantial basis, then

the warrants stand, and the defendant's motions must be denied.  Only if the Court were to

determine that no "substantial basis" existed to support the Magistrate Judges' decision would

further scrutiny be warranted.

    In Gates, supra, the Supreme Court characterized its prior decisions relating to the review

of warrants as "repeatedly [saying] that after-the-fact scrutiny by courts of the sufficiency of an

affidavit should not take the form of de novo review.  A magistrate's 'determination of probable

cause should be paid great deference by reviewing courts.'" Gates, 462 U.S. at 236 (quoting

Spinelli, 393 U.S. at  419).  These principles of deferential review have been adopted among the

federal courts in various formulations.  See United States v. Warren, 42 F.3d 647, 652 (D.C. Cir.

1994) ("On review, the appellate court inquires only whether the magistrate had a 'substantial

basis for concluding that probable cause existed.'" (citing Gates at 238-39) (internal quotations

and alteration omitted).[15]  See also, United States v. Singh, 390 F.3d at 181 (review on appeal

---

[14]    The nature of the review process is discussed in greater detail in Section II of this
pleading.

[15]    There is no different standard for the district court in review of the Magistrate
Judge's exercise of his judgement.

limited "to whether the issuing judicial officer had a substantial basis for the finding of probable cause") (citation omitted); United States v. Nixon, 918 F.2d 895, 900 (11ᵗʰ Cir. 1990) ("The standard for our review of the magistrate's determination is simply to ensure that the magistrate had a substantial basis for concluding that probable cause exited." (internal quotations, ellipses and brackets omitted; citations omitted)); United States v. Oloyede, 982 F.2d 133, 138 (4ᵗʰ Cir. 1992) ("The sufficiency of a search warrant and its supporting affidavit is reviewed de novo to determine whether a "substantial basis" exists for the magistrate judge's decision. * * * Yet, a determination of probable cause by a neutral and detached magistrate judge is entitled to substantial deference. * * * The Fourth Circuit has held that courts should not suppress evidence seized pursuant to a warrant because of 'hypertechnical errors.'" (citations omitted)); United States v. Castillo, 866 F.2d 1071, 1076 (9ᵗʰ Cir. 1988) ("In applying the substantial basis test, we must give deference to the magistrate's finding of probable cause. We do not engage in de novo review. * * * 'We may not reverse a magistrates's finding of probable cause unless it is clearly erroneous.'") (citations omitted); United States v. Conley, 4 F.3d 1200, 1205 (3ʳᵈ Cir.1993) ("Keeping in mind that the task of the issuing magistrate is simply to determine whether there is a 'fair probability that contraband or evidence of a crime will be found in a particular place,' [citing Gates], a reviewing court is to uphold the warrant as long as there is a substantial basis for a fair probability that evidence will be found."(footnote omitted)), cert. denied, 520 U.S. 1115 (1997).

The defendant seeks to draw the Court into a legally and factually intensive analysis of every aspect associated with search warrants – probable cause, nexus, staleness, breadth, and particularity -- as necessary steps to support his arguments that the Magistrate Judges' decisions

were wholly deficient (because they made legal errors) and that good faith reliance by the agents

on the signed warrant was hence improper.  The defendant has it all backwards.  The "substantial

deference" principles of Gates and the "good-faith exception" of Leon would have no vitality if

this Court were to address the claims as structured by the defendant.  Such an approach would

entail precisely the sort of invasive judicial review and second-guessing that is absolutely

antithetical to the approach mandated by Gates and would reflect insufficient recognition of the

"good faith" principles enunciated in Leon.

Rather, this Court's analysis must instead start with a deferential review of the Magistrate

Judges' decisions to issue the warrant, limited to the determination as to whether there were

"substantial bases" for their decisions to sign the warrant.  If so, this ends the inquiry.

"Principles of judicial restraint and precedent dictate that, in most cases, we should not reach the

probable cause issue if a decision on the admissibility of the evidence under Leon will resolve the

matter."  United States v. Craig, 861 F.2d 818, 820 (5th Cir. 1988)  United States v. McKneely, 6

F.3d 1447, 1454 (10th Cir. 1993) (same) (quoting Craig); United States v. Brown, 1994 WL

717580 (4th Cir.) at *1 (same) (quoting Craig).  See also, United States v. Cherna, 184 F.3d at

407 ("If the good-faith exception applies, [the court] need not reach the question of probable

cause." (citing Gates and Craig)).[16]

Thus, we urge this Court to undertake a deferential review of the warrants to determine

---

[16]    Although "substantial basis" deference is a somewhat different analytical issue
than the existence of good faith, as a practical matter, these issues are frequently conflated; for if
a substantial basis existed for the magistrate to sign the warrants,  the agents were entitled in
good faith to execute them.  As a purely analytical matter, however, it is possible for the agents
to have executed the warrants in good faith, even if the Magistrate did not have a "substantial
basis" to sign them.

the narrow issue of whether there is a substantial basis for the Magistrate Judges' decisions.  It would be of little consequence if this Court were to find there were short-comings in the warrants (a conclusion with which we strenuously disagree for the reasons set forth in this pleading) or if this Court were to find it would have handled the warrants differently than the respective Magistrate Judges, for even if the Court were to make such findings, this Court can also easily conclude that any flaws were "hypertechnical" and not of such quality or magnitude as to justify a determination that the affidavits were "so lacking in probable cause" and the warrants so "facially deficient" as to call into question the agents' good faith.  Indeed, we submit there is really no substantial question that the warrants were properly issued, and, hence really no claim whatsoever that the agents were not reasonably permitted to rely on the warrants.

Accordingly, we request this Court review the affidavits and warrants, with deference to the Magistrate Judges, and we further request this Court find:  1) there was a "substantial basis" to issue the warrants, and thus, 2) no grounds exist to find that the warrants were "facially deficient" and based on affidavits that were so "lacking in probable cause" as to call into question the "good faith" of the agents in relying on the warrant.  Upon making such findings, no reasons exist to address any of the numerous issues raised by the defendant.

WHEREFORE, we request the defendant's Motion to Suppress be DENIED.

RESPECTFULLY SUBMITTED,


JEFFREY A. TAYLOR
UNITED STATES ATTORNEY

By: _____
MARK H. DUBESTER
ASSISTANT UNITED STATES ATTORNEY
DC Bar No. 339655
555 Fourth Street, N.W., Room 5917
Washington, D.C.  20530
Ph. (202) 514-7986