UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA          :
                                  :
            v.                    :          Crim. No. 05-359-01,-2, -3 (RMU)
                                  :
DOUGLAS JEMAL, et al              :

GOVERNMENT'S NOTICE OF INTENT
TO INTRODUCE EVIDENCE UNDER FED.R.EVID. 404(b)

The Government hereby provides notice of intent to introduce evidence of acts not

charged in the Indictment.  In support of this pleading, the Government respectfully submits:

I  ACTS WHICH ARE "INTRINSIC" TO THE CHARGED OFFENSES,
AND THUS NOT SUBJECT TO ANALYSIS UNDER FED.R.EVID. 404(b)

A.  General Legal Principles

Evidence of acts which are part of, or "inextricably intertwined" with, a charged crime is

direct proof of that crime and is not subject to Rule 404(b) analysis.  United States v. Badru, 97

F.3d 1471, 1474-75 (D.C. Cir. 1996), cert denied, 520 U.S. 1213 (1997); United States v. Allen,

960 F.2d 1055, 1058 (D.C. Cir.), cert denied, 506 U.S. 881 (1992); United States v. Diaz, 878

F.2d 608, 614-16 & n.2 & 3 (2d Cir.), cert denied, 493 U.S. 993 (1989).[1]  This rule applies with

even greater force where the crime charged is a conspiracy and the so-called "other crimes" are,

in fact, acts in furtherance of the charged conspiracy.  "In cases where the incident offered is a

---

[1]      The bifurcation of evidence into that which is "inextricably intertwined" or "intrinsic" and that which is "extrinsic" has been occasionally criticized, see, e.g., United States v. Bowie, 232 F.3d 923, 927  (D.C. Cir. 2000), yet this analysis remains the law in this Circuit, see United States v. Alexander, 331 F.3d 116 (D.C. Cir. 2003) (commenting on Bowie: "Although we have recently expressed our dissatisfaction with the extrinsic-intrinsic distinction, see Bowie, 232 F.3d at 927-29, we have nonetheless recognized that 'at least in a narrow range of circumstances . . . evidence can be "intrinsic to" the charged crime.'").  Even in this pleading, the Government acknowledges that some of the proffered evidence may be analyzed under either basis.

part of the conspiracy alleged in the indictment, the evidence is not admissible under Rule 404(b)

because it is not an 'other' crime.  The evidence is offered as direct evidence of the fact in issue,

not as circumstantial evidence requiring an inference as to the character of the accused." Badru,

97 F.3d at 1475.[2]

### B.  The Fraud/Bribe Scheme Against the DC Government

The Indictment provides substantial detail as to the nature of the Government's case.  In a

nutshell, Counts One through Four allege a series of crimes stemming from the defendants'

dealings with the District of Columbia (DC) Government relating to two properties: 4800

Addison Road, Capitol Heights, Maryland (Addison Road), a property the DC Government

leased from a Douglas Jemal-owned entity to use as an impound lot for towed vehicles, and 77 P

Street, N.E., Washington, D.C. (77 P Street), a property the DC Government leased from a

Douglas Jemal-owned entity for office space.  The events occurred primarily in 2001 and 2002.

Defendants, particularly defendant Blake Esherick, dealt primarily with Michael Lorusso

(Lorusso), Deputy Director of the DC Government's Office of Property Management, in

---

[2]        See also United States v. Thai, 29 F.3d 785, 812-13 (2d Cir.) (evidence of
uncharged crimes admitted in RICO trial was not 404(b) evidence; these crimes were
independently admissible since they were in furtherance of the RICO conspiracy), cert denied,
513 U.S. 977 (1994); United States v. Escobar-De Jesus, 187 F.3d 148, 168 n.17 (1st Cir. 1999)
("[b]ecause we conclude that the Lajas incident was not 404(b) evidence, but rather was direct
evidence of the conspiracy charged, we have no occasion to decide whether [the witness's]
testimony went beyond matters included in the notice required by Rule 404(b)"); United States v.
Green, 175 F.3d 822, 831 (10th Cir.), cert denied, 528 U.S. 852 (1999); United States v. Garcia
Abrego, 141 F.3d 142, 175 (5th Cir.), cert denied, 525 U.S. 878 (1998); United States v. Miller,
116 F.3d 641 (2d Cir. 1997), cert denied, 524 U.S. 905 (1998); United States v. Chin, 83 F.3d 83,
87-88 (4th Cir. 1996); United States v. Maceo, 947 F.2d 1191, 1198-99 (5th Cir. 1991), cert
denied, 503 U.S. 949 (1992);  United States v. Coiro, 922 F.2d 1008 (2d Cir.), cert denied, 501
U.S. 1217 (1991);  United States v. Tejada, 886 F.2d 483, 486-87 (1st Cir. 1989); United States
v. Angelilli, 660 F.2d 23, 39 (2d Cir. 1981), cert denied, 455 U.S. 910 (1982); United States v.
Salazar, 485 F.2d 1272, 1276 (2d Cir. 1973), cert denied, 415 U.S. 985 (1974).

connection with the leases of these properties, and the Indictment alleges both that the defendants conspired to bribe Lorusso by providing him things of value and that the defendants submitted various false and inflated invoices to the DC Government related to these properties.

There can be little questions that <u>all</u> the acts of the defendants in the nature of direct dealings with Lorusso and the DC Government concerning Addison Road and 77 P Street during the time of the conspiracy are intrinsically part of the conspiracy, and not "other crimes" subject to Rule 404(b) analysis, even if these acts are not specifically charged in the Indictment.[3]  This includes, for example, the defendants' requests to have Lorusso sign or prepare documents to assist the defendants in connection with loans secured by those properties or in connection with zoning issues, the defendants' submission of invoices or correspondence prepared by the defendants to Lorusso or the DC Government seeking miscellaneous payments (such as for utilities or parking) or changes in rent terms for these properties, and discussions with Lorusso of means of committing fraud against the DC Government.  In a similar vein, the defendants provided items of value to Lorusso's direct subordinate, to whom they sent certain invoices for approval for payment, as well as to former city official with whom they had dealings related to 77 P Street.[4]  These are all acts in furtherance of the charged conspiracy.  As such, they "[are] not [] 'other act[s]' within the meaning of Rule 404(b); [they are] part of the very act charged," <u>United States v. Concepcion</u>, 983 F.2d 369, 392 (2d Cir. 1992), and not subject to analysis under Rule 404(b) as "other crimes."

---

[3]    The United States has in fact specified additional acts in a letter in response to the defendants' request for a bill of particulars.

[4]    The identities of these two individuals have been disclosed.

<u>C.  The Tax Scheme Involving Blake Esherick</u>

The Indictment charges three years of tax evasion involving defendants Douglas Jemal, Norman Jemal[5] and Blake Esherick.  The three years charged in the Indictment are 2001, 2002 and 2003.

The Government intends on introducing evidence as to certain tax evasion activities in the years both <u>prior to 2001</u> and <u>subsequent to 2003</u>.  This evidence is admissible as "intrinsic" to the tax charges and is not subject to Rule 404(b) analysis.

In each of the calendar years 1998 through 2000, Douglas Jemal compensated Esherick in numerous ways which were not reported to the Internal Revenue Service (IRS)  – similar to the means of unreported compensation during the years charged in the Indictment.   Thus, to various degrees in 1998, 1999 and 2000, Douglas Jemal, through his company, Douglas Development Corporation (DDC) and through third parties (apart from the salary checks) provided funds to Esherick, provided him rent-free housing, made payments to Esherick's ex-wife, and made payments to creditors for Esherick's personal vehicles (a Chevy Tahoe and Jeep Wrangler).  The payments were of a lesser magnitude than the amounts in 2001 through 2003 (thereby reflecting Esherick's increased compensation over time).

Not only did the scheme continue through the "charged" years 2001 through 2003, the scheme continued thereafter in 2004, with more payments to Esherick (or to third parties for

_____

[5]        Though Norman Jemal is not a named defendant in the substantive tax charges, the Indictment charges, and the evidence will reveal, that Norman Jemal assisted the tax evasion scheme.  Norman Jemal was one- half owner of the property at 7804 Radnor Road, Bethesda, Maryland, where Esherick resided rent-free.  Not only did Norman Jemal make the monthly mortgage payments on that property from his personal account, but he personally sacrificed his share of the potential rental income that property could yield.  (The house was located off Bradley Boulevard in Bethesda, Maryland, in the Walt Whitman High School district.).

Esherick's personal benefit) and were of the same nature.

In October 2004, the defendants were put on notice of the tax aspects of this investigation.  In January 2005, after 7 straight years of (ostensibly) paying Esherick approximately $70,000 per year —  a time period during which Douglas Jemal did not (purportedly) provide Esherick even so much as a one dollar raise or bonus – Douglas Jemal increased Esherick's salary to $300,000.  Thereafter, in 2005, Esherick began paying out of his personal checking account for expenses that had long been paid by Douglas Jemal (through DDC).  Esherick was no longer provided a Mercedes automobile (which had been provided and paid for by DDC) for his wife's use.  Douglas Jemal stopped signing DDC checks payable to Esherick's ex-wife for child support, and Esherick commenced paying her himself out of his personal account.  And, in January of 2005, a full year and a half after moving into 6001 Nevada Avenue, N.W., a property owned by Douglas Jemal, Esherick commenced paying "rent" to Douglas Jemal at the rate of $3000 per month.  (As charged in the Indictment, this house was purchased in June 2003 by Douglas Jemal for $825,000, specifically for Esherick's use; DDC thereafter paid for numerous expenses and improvements associated with the property.  From summer 2003 to January 2005, Esherick resided in that property – as he previously lived in the Bethesda property –  rent-free.  A photo of the property is attached to this pleading as "Attachment I..")  In short, the defendants have abandoned even the pretense that Esherick is compensated at $70,000 per year and his "true" compensation and the life-style which it supports is obvious.

Courts are nearly uniform in permitting the admission of evidence of a taxpayer's conduct in one tax year as relevant to explaining his conduct, motive and intent in the

subsequent years, and such evidence is frequently admitted without being considered under Rule

404(b).  See, e.g., United States v. Ebner, 782 F.2d 1120, 1126 n. 7 (2d Cir.1986) ("The jury may

consider evidence of intent to evade taxes in one year as evidence of intent to evade payment in

prior or subsequent years."); United States v. Farber, 630 F.2d 569, 572 (8th Cir.,  1980)

("[S]ubsequent tax paying conduct is relevant to the issue of intent or wilfulness in a prior year."

[citations omitted].), cert. denied, 447 U.S. 1127 (1981); United States v. Magnus, 365 F.2d

1007, 1011 (2d Cir.1966) ("[P]rior taxpaying history, both federal and state, was probative of

[taxpayer's] wilfulness in failing to pay substantial amounts of federal taxes in [the years at

issue.]"), cert. denied, 386 U.S. 909 (1967).[6]

    Moreover, the fact that the defendants changed their means of compensating Esherick in

2005 after having been put on notice in late 2004 of the existence of a criminal tax investigation

– raising Esherick's "reported"salary over four-fold from $70,000 to $300,000 – is not a "bad

act" at all, but it is all the same plainly relevant as evidence of the true intended compensation by

Douglas Jemal of Esherick during the "charged" years.   These facts are analogous to those in

United States v. Bok, 156 F.3d 157, 166 (2d Cir. 1998) where defendant Bok failed to file until

he was pressed to do so by the taxing authorities:  "As a simple matter of logic, Bok's failure to

---

[6]       At least one District Court has squarely rejected 404(b) analysis in deciding
whether to admit tax misdeeds of years other than those charged in the Indictment. Though the
decision is not published, we draw the Court's attention to United States v. Ristovski, 2000 WL
491513 (6th Cir., April 18, 2000) at *6, in which the trial court reasoned:  "Because he was not
charged with tax evasion for 1988, Ristovski argues that the trial court erred in declining, as it
did, to exclude evidence of the amount of money Precision received from Mason in 1988 in the
form of checks payable to cash. Because the 1988 receipts were part of the same tax evasion
scheme as that charged, however, the evidence was admissible as "intrinsic" to the charged
conduct.  The evidentiary rule on which Ristovski relies – Rule 404(b), Fed.R.Evid. –  need not
be applied here."

file state or federal returns for either himself or his corporations until told to do so by the IRS is
indicative of an intent to evade the tax system. This is particularly true in light of Bok's legal
education, which included coursework in both corporate and personal taxation."[7]

The conduct of the two men related to Esherick's reported and true compensation
encompassing the time-frames immediately predating and postdating the charged offenses, even
though uncharged, is inherently part of the conspiratorial relationship between the two men and
not "other crimes" subject to Rule 404(b) analysis. "Rule 404(b) is not implicated when the
other crimes or wrongs evidence is part of a continuing pattern of illegal activity." United States
v. Barnes, 49 F.3d 1144, 1149 (6th Cir, 1995) (quoted in United States v. Senffer, 280 F.3d 755,
766  (7th. Cir.), cert. denied, 536 U.S. 934 (2002).  As a general matter, evidence demonstrating
the existence or development of a conspiracy, immediately prior to and subsequent to the dates
charged in the Indictment, is considered "intrinsic" and not subject to Rule 404(b) analysis.[8]

---

[7]     Defendant Esherick, like the defendant in Bok, graduated with a degree in
accounting and had worked as an accountant for years prior to going into the real estate leasing
business.

[8]     Where evidence of the defendants' acts are either inextricably intertwined with a
charged conspiracy, or is evidence of the conspiracy itself, it is admissible without Rule 404(b)
analysis, regardless of whether those acts fall outside the period during which the indictment
alleges the conspiracy existed.  United States v. Diaz, 878 F.2d at 614-616 & n.2 (crimes, wrongs
or acts occurring before alleged inception date of conspiracy were relevant and admissible in
drug conspiracy prosecution and did not raise Rule 404(b) question); United States v. Bates, 600
F.2d 505, 509 (5th Cir. 1979) (testimony concerning acts and backgrounds of co-conspirators,
including evidence of behavior antedating period covered by indictment, was not extraneous
evidence of other crimes, but admissible as bearing on the existence and purpose of the
conspiracy and the significance of later behavior); United States  v. Bermudez, 526 F.2d 89, 95
(2d Cir.), cert denied, 425 U.S. 970 (1975) (upholding admission of traces of narcotics and
narcotics-related equipment seized in home six weeks after conspiracy to distribute cocaine
ended).  The fact that the tax charges in this case are set forth in three separate counts and do not
include an overarching conspiracy count does not effect the analysis.

The evidence described above shows the evolution of the financial relationship between the two men over time as well as the increasing compensation to Esherick over time in the form of ever-greater amounts of unreported income.

Even if the tax behavior of the defendants in the years prior to and subsequent to the charged years is considered "other crimes" subject to Rule 404(b) analysis, for the "relevance" reasons set forth above such evidence is probative of the intent of the two men, and is admissible under Rule 404(b) under the legal principles set forth in the Section II of this pleading.[9]

---

[9]    Thus, even if such evidence were to be considered under Rule 404(b), courts have uniformly determined such evidence is admissible – for reasons set forth in the text – as relevant to proof of intent, plan, scheme and absence of mistake or accident.  See United States v. Ausmus, 774 F.2d 722, 727-28 (6th Cir. 1985) ("The defendant's failure to pay taxes, both prior to and following the years in question, demonstrates a pattern, plan, and scheme indicating that his failure to pay his taxes in 1978, 1979, and 1980 was not the result of an accident, negligence, or inadvertence.  The pattern demonstrates willfulness, which was part of the government's prima facie case.").  In United States v. Ringwalt, 213 F.Supp.2d 499, 506 (E.D. Pa. 2002), in upholding the admissibility of such evidence under Rule 404(b), the District Court Judge summarized the law as follows:

> [Defendant's pursuit of the identical tax evasion scheme during 1992 and 1993 is additional evidence of willfulness for the charged years of 1994 and 1995. "[A] defendant's past taxpaying record is admissible to prove willfulness circumstantially."  United States v. Bok, 156 F.3d 157, 165 (2d Cir.1998) (holding that defendant's failure to file returns for years before and after those in the indictment admissible to show intent to evade tax system).  See also United States v. Johnson, 893 F.2d 451, 453 (1st Cir.1990) ("The evidence that [defendant] submitted W-4 form in 1987 claiming more allowances than he was entitled to and did not file an income tax return for 1987, was relevant to show [defendant's] willfulness and absence of mistake in filing the Schedule C forms containing false information during the years 1982-86.");  United States v. Ebner, 782 F.2d 1120, 1126 n. 7 (2d Cir.1986) ("The jury may consider evidence of intent to evade taxes in one year as evidence of intent to evade payment in prior or subsequent years.");  United States v. Adcock, 558 F.2d 397, 402 (8th Cir.1977) ("It is ... well settled that in a tax case the government may show proof of

  <u>D. Other Acts in Furtherance of the Conspiracy Related to 4800 Addison Road</u>

The property located at 4800 Addison Road, Capitol Heights, Maryland, consists of a large warehouse with surrounding land. A portion of the land adjacent to the warehouse is in the nature of a paved lot. Douglas Jemal had bought the entire property at the end of 1998 for $1.5 million. (The property is owned 80% by Douglas Jemal and 20% by Norman Jemal.[10])

In 2001, DDC leased a portion of the paved area to the DC Government for use as an impound lot. This lease was negotiated between DDC (through Douglas Jemal and Esherick) and Lorusso for the DC Government. The "letter of intent" to lease this property was signed by the District of Columbia (Lorusso) and Douglas Jemal on May 25, 2001, within a week after Lorusso had been a guest of Douglas Jemal's at the Bellagio Hotel in Las Vegas. As a result of the negotiations between Lorusso and representatives of DDC, the DC Government ended up leasing the paved lot area at $1 million per year. As is obvious, this was staggeringly lucrative. The lease was signed by Lorusso in August 2001.

In order to realize the true income-potential from this deal with the city, Douglas Jemal sought to obtain appropriate permit from Prince George's County to use that location as an impound lot. On May 23, 2001 (prior even to the "letter of intent" having been executed), DDC

──────────────

unreported income in prior years indicating a pattern of understatement of income which is relevant to the issue of willful intent.").

<u>See also</u>, <u>United States v. Dixon</u>, 698 F.2d 445, 447 (11th Cir. 1983) ("Finally, we note that other courts have consistently admitted evidence of tax evasion in pre- and post-indictment years on the issue of the willfulness of the evasion charged in the indictment." [citations omitted].)

[10]     The property was held in the name of "Jemal's Fairfield Farms, LLC." For purposes of this pleading, the property will treated as being owned by Douglas Jemal and managed by DDC.

sought from PG County zoning officials a permit to operate an automobile towing station.

PG County issued a permit for such use on June 15, 2001, but withdrew the permit on July 9,

2001, as having been granted in error.  In the fall of 2001, the Construction VP testified on two

occasions before the PG County Zoning Hearing Examiner in an attempt to obtain the

appropriate permit.

In his testimony, the Construction VP testified to certain costs incurred by DDC

improving the impound lot (to show reliance on the permit that had been issued in error).  He

provided a list of costs and supporting invoices which he identified in his testimony.  No permit

was ever obtained.  The DC Government continued to occupy the property and use it as an

impound lot during the pendency of the permit litigation and for a time thereafter.  At all times, it

did so without the benefit of a permit having been issued by PG County for such a use of

property.

In February 2002, DDC submitted a claim to the DC Government for reimbursement for

costs associated with construction, repairs and other costs incurred by DDC associated with

improving the impound lot.  The contents of this document – that is, the list of the costs – tracks

nearly item for item a list of costs that was provided to the PG County Zoning Authorities in

testimony by the Construction VP in December 2001.  The cover letter submitting this claim to

the DC Government was signed by the Construction VP.  Certain claims in the PG County

submission were false, and as repeated in the claim to the DC Government, were again false.

Separate and apart from the events concerning the impound lot, in September 2001,

various contractors were doing demolition work in the warehouse when a major fire broke out,

setting the warehouse roof ablaze and causing millions of dollars damage. DDC, again primarily

through the Construction VP, put together claims for reimbursement from the insurance company in November 2001 and March 2002.  These initial claims were for clean-up expenses incurred by DDC, primarily "demolition."  (These claims did not involve replacement of the roof.)  These claims consisted of an itemized list of expenses with accompanying invoices.

Thus, as of March 2002, three sets of representations had been made to three separate entities related to Addison Road:  testimony and documents regarding impoundment lot costs to PG County ("the PG County claim"), claims as to fire damage to the insurance company (the "insurance company claims"), and a claim regarding impoundment lot costs to the DC Government (the "DC Government claim").  These three events are inter-twined, and the facts surrounding the PG County claim and the insurance claims are relevant to the DC Government claim in several ways:

- The DC Government claim closely tracks the PG County claim, and proof of the creation of the DC Government claim – a document charged in the Indictment – requires proof of the creation of the similar document for use in PG County;

- The PG County claim arose from a need to obtain a permit for the lawful use of the space as an impound lot, and was thus in furtherance of the interests of the defendants to enrich Douglas Jemal by the lease arrangement with the DC Government;

- Both the DC Government claim and the PG County claim inflate the labor costs supposedly incurred by DDC improving the impound lot;

- Certain of the costs for which reimbursement was claimed from the DC Government had nothing to do with the impound lot but instead, involved

demolition of the warehouse (both prior to and subsequent to the fire).  Indeed, some of the same invoices submitted to the DC Government for reimbursement were also presented to the insurance company, to support the insurance claims for warehouse fire damage.  Some of the truthful insurance company claims tend to prove the falsity of the DC Government claim;

- There are other "double billings" – where the same invoice was submitted both to the DC Government (purportedly to represent a cost incurred for improvement or repair on the impound lot) and the insurance company (supposedly as a cost incurred to repair fire damage) and as a result of which DDC received double reimbursement.  For some of these double billings, the invoice is sufficiently vague so as it is not clear which entity should reimburse DDC, but perforce, DDC was not entitled to reimbursement from both the DC Government and the insurance company for the same invoice;

- Finally, there are claims made to the insurance company in the form of invoices which in fact were not paid at all by DDC.[11]

As a practical matter, a significant portion of the evidence described above will involve proof of statements and conduct of the Construction VP.  For the most part, these acts are simply

---

[11]     The Government would not call any witnesses to address any stand-alone fraud on the insurance company who would not otherwise testify to the matters otherwise related to the DC Government.  To the extent there are stand-alone false claims to the insurance company, they are in the nature of submitting invoices for reimbursement which were not in fact paid by DDC, and are thus of the same nature as other false documents at issue in this case that were submitted to the DC Government, representing that specific obligations that had been paid or were to be paid by DDC for which reimbursement was required.  In this case, the victim was an insurance company, as institutional victim not dissimilar from the DC Government, a financial institution (Morgan Stanley) (Count Five), or even the federal government (the tax charges).

acts in furtherance of a conspiracy, of which the Construction VP was a participant, particularly those parts of the conspiracy which contemplated the preparation and submission of an inflated invoice to the DC Government.  Douglas Jemal was the owner of DDC; the roles and functional relationships of Esherick, Norman Jemal, and the Construction VP suggest they were all agents for DDC, Douglas Jemal and each other, in the pursuit of the goals of enriching Douglas Jemal and DDC (and thereby enriching themselves).  Furthermore, the Government has provided notice to the Defense that the Construction VP was a "Participant" in the Wire Fraud Count (Count 5) and has given notice that the evidence would tend to he might be an uncharged conspirator in this case.[12]

At the evidentiary level, to the extent the statements made by the Construction VP are not true, they would not be offered "for truth" as an exception to the hearsay rule, but would rather be offered as conduct of the coconspirator in furtherance of the conspiracy.  To the extent the statements are being offered for truth – for example, that certain "truthful representations" by the Construction VP to the insurance company show the falsity of other representations to the DC Government – the Government will urge admissibility of the statements under the agency principles Fed.R.Evid. 801(d)(2)(E) (statements of coconspirator) and 801(d)(2)(D) (statement of a party's agent or servant concerning a matter within the scope of the agency or employment,

---

[12]      In this regard, as alluded to in another parts of this pleading, the Construction VP was an intimate part of the operations of DDC.   Certainly, the unreported compensation paid to and received by the Construction Vice President in 2001 through 2004 – in excess of $1 million, far more than paid to and received by Esherick – is a measure of the centrality of the Construction VP's role at DDC and his significance to Douglas Jemal.

made during the existence of the relationship).[13]

We would not be relying on any 404(b) "bad act" inferences from the above series of events. Rather, proof of the above events simply fills out the operations of the conspiracy by explaining the attempts to secure the appropriate permit from PG County, attempts to profit from the 4800 Addison Road property (by the submission of invoices to the DC Government and the insurance company), and the circumstances surrounding the creation of the claim to the DC Government.[14]

---

[13]     Such statements would be admissible under Rule 801(d)(2)(E), even though the Construction VP is not named in the Mail Fraud Count and even though that count does not charge conspiracy. Rule 801(d)(2)(E) is applicable to a co-conspirator's statement made during the pendency of a conspiracy regardless of whether conspiracy has been charged in the indictment. See, e.g., United States v. Candeleria-Silva, 162 F.3d 698, 706 (1st Cir. 1998) ("Whether or not a conspiracy has been charged, such statements are admissible if the district court finds that 'it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy.'" [citation omitted].); United States v. Stratton, 779 F.2d 820, 829 (2d Cir. 1985), cert. denied, 476 U.S. 1172 (1986) ("[I]t is not necessary that the Government charge a conspiracy to take advantage of Fed.R.Evid. 801(d)(2)(E). The Government merely needs to demonstrate that the declarant and the defendants against whom the statements are offered are members of a conspiracy in furtherance of which the statements are made, [citation omitted], and that this conspiracy is "factually intertwined" with the offenses being tried [citation omitted]."); United States v. Talley, 164 F.3d 989, 998 n.4 (6th Cir. 1999) ("Although it is true that the government did not charge Talley with conspiracy, we have noted that a conspiracy charge is unnecessary to admit statements under Rule 801(d)(2)(E). [citation omitted.] The court is merely required to find, by a preponderance of the evidence, that a conspiracy existed, the defendant against whom the hearsay is offered was a member of that conspiracy, and the hearsay statement was made in furtherance of the conspiracy." [citation omitted.]).

[14]     Even under Rule 404(b) – discussed in greater detail in Section II of this pleading -- we note these events were related to 4800 Addison Road, they involved the creation and submission of documents to governmental and institutional entities, the documents are problematic and false by virtue of representations as to costs incurred by DDC, they occurred during the same time as the conspiracy and "course of conduct" offenses described in Counts One through Three of the Indictment, with the same goal as those counts: that is, to enrich Douglas Jemal and entities under his control through conduct relating to his property at 4800 Addison Road.

We are aware of the difficulties associated with analyzing this proffer on the cold record. We recognize that it is likely that certain decisions relating to admissibility of the above events must await trial when this Court has a better feel for the case, and, though we believe the entire chronology is relevant, we are aware that the Court will be faced with discrete decisions on the admissibility of evidence at the time the Government makes particular offers of proof through certain witnesses. Nonetheless, through this pleading, the Government serves notice of the range of proof it may seek to introduce at trial.

## II.  NOTICE OF POTENTIAL "404(b)" EVIDENCE

### A.  General Legal Principles

The legal principles associated with Rule 404(b) are oft-stated and not subject to serious dispute.[15]  We cannot improve on the summary provided by one District Judge of this Court:

> The D.C. Circuit has described Rule 404(b) as one of inclusion rather than
>
> exclusion, United States v. Bowie, 232 F.3d 923, 929 (D.C.Cir.2000), and has
>
> explained that it excludes only evidence that "is offered for the sole purpose of

---

[15]     Rule 404(b) of the Federal Rules of Evidence governs the admission of other crimes, wrongs, or bad acts of a defendant.  In relevant part, Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to
> prove the character of a person in order to show action in
> conformity therewith. It may, however, be admissible for other
> purposes, such as proof of motive, opportunity, intent, preparation,
> plan, knowledge, identity, or absence of mistake or accident,
> provided that upon request by the accused, the prosecution in a
> criminal case shall provide reasonable notice in advance of trial, or
> during trial if the court excuses pretrial notice on good cause
> shown, of the general nature of any such evidence it intends to
> introduce at trial.

Fed.R.Evid. 404(b).

proving that a person's actions conformed to his or her character," United States v. Long, 328 F.3d 655, 661 (D.C.Cir.1993), cert. denied, 540 U.S. 1075 (2003).[16]

To the extent that it is not already admissible due to being direct and substantive evidence of the charged offenses, evidence of other crimes, wrongs, or bad acts is admissible under Federal Rule of Evidence 404(b) if offered for a permissible purpose. Such permissible purposes include proof of intent, motive, opportunity, plan, knowledge, identity or absence of mistake or accident. United States v. Pindell, 336 F.3d 1049, 1056 (D.C.Cir.2003); United States v. Miller, 895 F.2d 1431, 1436 (D.C.Cir.1990); see also United States v. Brazel, 102 F.3d 1120, 1153-54 (11th Cir.1997) (threats made by defendant to cooperating co-conspirator in holding cell was properly admissible under Rule 404(b) as evidence showing "consciousness of guilt"). The Court of Appeals for this Circuit has made clear, however, that Rule 404(b) merely defines the one *im*permissible purpose for bad act evidence; it does not define the set of permissible purposes for use of such evidence. Miller, 895 F.2d at 1436.[17] . . .

The Court undertakes a two-part analysis to determine admissibility in the

---

[16]    These principles were most recently ratified by this Circuit in United States v. Lawson, 410 F.3d 735, 741 (D.C. Cir. 2005) (Roberts, J.): "Federal Rule of Evidence 404(b), which governs the admission of evidence of other crimes or bad acts, 'is a rule of inclusion rather than exclusion.' [Bowie, 232 F.3d at 929.] The rule bars admission of such evidence when offered for the purpose of proving that a defendant acted in conformity with his character, but allows admission so long as the evidence is offered for any other relevant purpose. Id."

[17]    The precise language of Miller could hardly be more explicit: "[U]nder Rule 404(b), any purpose for which back acts evidence is introduced is a proper purpose so long as the evidence is not offered solely to prove bad character." United States v. Miller, 895 F.2d at 1436 (emphasis in original).

-16-

Rule 404(b) context. See <u>Miller</u>, 895 F.2d at 1435. First, the Court considers whether the evidence is "probative of some material issue other than character." <u>United States v. Clarke</u>, 24 F.3d 257, 264 (D.C.Cir.1994); Fed.R.Evid. 401. Second, if the Court deems the evidence to be relevant, the Court should exclude the evidence only if probative value "is substantially outweighed by the danger of unfair prejudice. Fed.R.Evid. 403; <u>Long</u>, 328 F.3d at 662. In close cases, the rule tilts toward the admission of the uncharged conduct evidence. <u>See</u> <u>United States v. Johnson</u>, 802 F.2d 1459, 1464 (D.C.Cir.1986) ("the balance should be generally struck in favor of admission when the evidence indicates a close relationship to the event charged") (quoting <u>United States v. Day</u>, 591 F.2d 861, 878 (D.C.Cir.1978)). The D.C. Circuit has recognized that "Rule 404(b) evidence will often have ... multiple utility, showing at once intent, knowledge, motive, preparation, and the like." <u>United States v. Crowder</u>, 141 F.3d 1202, 1208 (D.C.Cir.1998) (en banc). If evidence is ruled admissible, the trial court, when the defendant so requests, must give a limiting instruction. Fed.R.Evid. 105. A trial court's Rule 404(b) admissibility determination is reviewed under an abuse of discretion standard. <u>Pindell</u>, 336 F.3d at 1056-57; [<u>United States v. Linares</u>, 367 F.3d, 941, 949 (D.C. Cir. 2004)].

<u>United States v.  Morrow</u>, 2005 WL 3159572 (D.D.C. April 7 2005) *3-4 (footnotes inserted).

Each of the categories of proof set forth below: 1) is "probative of some material issue other than character," and 2) is not being offered for the "sole purpose" of proving that a defendant's "actions conformed to his or her [bad] character."  Under the principles of inclusion,

not exclusion, that attach to such probative evidence, evidence of the below acts is admissible in the Government's case.

### A.  Broader Tax Fraud Scheme

In addition to paying Esherick substantial sums of unreported income as charged in the Indictment, Douglas Jemal likewise compensated the two other senior officials of DDC in ways which were not reported to the IRS.  In short, the compensation of Esherick was part of a "common plan or scheme," in which the ostensible compensation provided by Douglas Jemal to his senior employees as paid through the company's standard payroll service and reported to the IRS was simply a sham, while the true compensation consisted of the reported amounts plus hundreds of thousands of dollars of other payments and in-kind expenditures by DDC for the benefit of these three employees.  Notably, the true compensation was not reported to the Internal Revenue Service.   The total amount of unreported compensation is well in excess of one million dollars.

### 1.  The Construction Vice President

The Vice President for Construction of DDC ("Construction VP") worked for Douglas Jemal from the early 1990s and, as the title indicated, was in charge of construction.  He occupied a crucial role in the company. He hired subcontractors and approved payments to subcontractors.  He had substantial responsibility directing the construction activities of DDC, including substantial real estate construction projects, and had substantial authority dealing with outside individuals and entities, such as contractors, public officials and representatives of insurance companies on matters which impacted the financial affairs of Douglas Jemal and DDC. As set forth below, Douglas Jemal compensated the Construction VP in ways which were not

reported to the IRS.

As but one notable example, in November 1999, Douglas Jemal provided the Construction VP $50,000 by way of a check drawn on an attorney's escrow account, paid from the proceeds of a real estate settlement involving the refinancing of some of Douglas Jemal's properties. From the same real estate settlement, Douglas Jemal also directed the attorney pay $10,000 to Esherick and $10,000 to DDC's Chief Financial Officer. These payments – which have all the feel of an end-of year bonus – were not reported to the IRS as income for any of the three men. This is but one example – and not even a large one at that -- but it is telling. It involves the distribution of funds under the control of Douglas Jemal (in the possession of his attorney) in a way so as to leave no trace on DDC's books. Moreover, it is emblematic of the numerous ways that Douglas Jemal secretly compensated his most trusted employees.

More significantly, starting in 2001, Douglas Jemal, through DDC, commenced making payments toward the building of the Construction VP's house in Spencerville, Maryland. After the house was built, Douglas Jemal, through DDC, made payments toward the construction of a barn at that location. The total DDC payments toward this property were in excess of approximately $500,000. Furthermore, in 2001 and 2002, DDC made payment for the Construction VP's credit card, in amounts reaching $15,000 per month (amounting to over $180,000 in 2001, $88,000 in 2002 and $96,000 in 2003), and DDC made direct payments to a personal mortgage account of the Construction VP at Potomac Valley Bank (in amounts in excess of $30,000 in 2002 and $18,000 in 2003) by way of DDC checks signed by Douglas Jemal. (A photo of the Construction VP's house and barn, paid by Jemal (through DDC) is

attached to this pleading as "Attachment II..")[18]  The total amount of payments to third parties on

behalf of the Construction VP from 2001 through 2004 was in excess of $1 million.  At least in

the years 2001 through 2003, these payments were not reported by DDC to the IRS as income to

the Construction VP.

### 2.  The Chief Financial Officer

DDC's Chief Financial Officer ("CFO") had worked for Douglas Jemal and DDC from

the early 1990s.  The CFO was instrumental in handling the financial affairs of Douglas Jemal's

real estate businesses as well as certain personal financial matters of Douglas Jemal.  The CFO

dealt with the banks in connection with numerous loans and refinancings of commercial real

estate owned or controlled by Douglas Jemal, as well as real estate owned and used personally by

Douglas Jemal.  The CFO had an intimate knowledge of all the financial details of Douglas

Jemal's personal and business affairs and was instrumental in Douglas Jemal's success.

Although the CFO received a purported salary which varied over time through the DDC

payroll system, this "payroll" salary – like that of Esherick and the Construction VP – was a

sham.  Douglas Jemal compensated the CFO in addition to the CFO's weekly paychecks through

a variety of means which were not reported to the IRS,  including:  signing DDC checks payable

to the CFO's line of credit at Potomac Valley Bank,[19] providing funds to the CFO personally in

the form of checks drawn on accounts of DDC and from Douglas Jemal personally, signing DDC

---

[18]     The Construction VP has been identified as "Participant #1" and DDC's Chief
Financial Officer, discussed below, as "Participant #2"  in the Wire Fraud count.

[19]     These payments commenced in 1996 and amounted to over $30,000 in 1999,
$13,000 in 2000, $49,000 in 2001, $41,000 in 2002 and $26,000 in 2003.

checks payable directly to construction contractors performing services for CFO,[20] directing the payment of monies to CFO from other sources (as, for example, $10,000 from settlement proceeds as described above) and thereby concealing Douglas Jemal's involvement in these payments. These amounts were not reported to the IRS. Many of these payments drawn on accounts of DDC were falsely recorded on DDC's books as "loan repayments."[21] In 1999, a year when the CFO purportedly received $54,000 salary – an amount not even remotely commensurate with his duties and responsibilities as Chief Financial Officer – Douglas Jemal provided him at least another $50,000 in unreported compensation. (Even in 2001, when the CFO's purported salary had increased to $125,000, Douglas Jemal signed DDC checks amounting to another $50,000 made payable to Potomac Valley Bank as payment for the CFO's line of credit at that bank.[22]

### 3. The Legitimate Evidentiary Inferences

The above evidence relating to Douglas Jemal's compensation of the Construction VP and the CFO is not offered for the sole illegitimate purpose, namely, to prove "that a person's actions conformed to his or her character," United States v. Long, 328 F.3d at 661. Rather, evidence that Douglas Jemal compensated the Construction VP and the CFO in ways not

---

[20]    These payments amounted to over $17,700 in 2002.

[21]    On one or two occasions, the CFO made payments to DDC; these were recorded as loans to DDC. However, the amount of the "loan repayments" from DDC to the CFO dwarf the ostensible loans from the CFO to DDC.

[22]    Indeed, in 2001 and 2002, the CFO purportedly made less than DDC's "Controller," that is, an employee who reported to the CFO. If the payments to Potomac Valley Bank for the CFO were included as part of the CFO's salary, then the salaries of the two men would reflect their actual relative positions in the company.

reported to the IRS supports the following conclusions:

- The tax fraud involving Esherick is part of a broader common scheme or plan executed by Douglas Jemal to reward his critical employees and provide them an incentive to commit dishonest acts on his behalf by compensating them in ways which are not reported to the IRS.  He fostered not only financial dependence but extreme loyalty from these subordinates by bringing them into a corrupt financial relationship, where a substantial portion of the executives' financial well-being and accumulation of wealth resulted from payments of unreported compensation.

- Although there were some differences among the tax schemes, common features predominate, as examples: Douglas Jemal caused all three men to receive funds from the real estate refinancing in 1999; Douglas Jemal provided Esherick rent-free accommodations, paid for the Construction VP's house, and paid for certain renovations on the CFO's house; Douglas Jemal paid the various institutional creditors of the three men (including financial creditors (for Esherick, his auto finance company, for the Construction VP and the CFO, their lines of loans from Potomac Valley Bank) and even personal creditors (be it an ex-wife or a construction contractor).

- As an accounting matter, these numerous and various payments to these three men were accounted for in the books of DDC by distributing the DDC checks and payments on their behalves among many different accounts in the company books, including  "loan", "loan repayment,' and "miscellaneous G&A" accounts.  By so sprinkling these accounting entries associated with these payments throughout the

-22-

books of DDC, the sheer dollar volume of the payments in kind or for the benefit

of the three men was obscured.

- The respective financial relationships between the Douglas Jemal and the three

men are characterized by the same lack of evidence suggesting such in-kind

payments were "loans" or anything other than disguised compensation; there are

no loan documents between Douglas Jemal and/or DDC and any of the three men

and there were no loan repayments (other than those briefly noted in connection

with the CFO) by Esherick or the Construction VP.

- These events all occurred in the same time period – roughly 1999 through 2003 --

and, in the case of Esherick and the Construction VP, the most significant

activities occurred in 2001, 2002 and 2003. The compensation of the three men in

the ways discussed above came to an end after the investigation commenced in

this case.

Thus, the scope of the tax evasion activities in which Douglas Jemal participated, and the

fact that these activities encompassed several employees and persisted over several years,

demonstrates that Douglas Jemal's charged conduct vis-a-vis Esherick was simply part of a

broader "common scheme or plan" and reflects his modus operandi. As such, the evidence tends

to prove his criminal intent and tends to prove that his conduct – whereby he compensated

Esherick in forms not reported to the IRS – was not innocent, accidental or inadvertent.[23] The

---

[23]      Although we are aware that Douglas Jemal will contest his wilful involvement in
the above schemes – as any defendant may contest the 404(b) evidence -- the Government is
entitled to present its case, and should the jury find Douglas Jemal to be complicitous in paying
other employees in means calculated to deceive the IRS, the jury is likewise entitled to conclude
that the he was complicitous in paying Esherick in means calculated to deceive the IRS. In this

jury is permitted to infer that if Douglas Jemal participated in a tax evasion scheme with one

employee or two employees, it make is more likely that he had the intent to participate in a tax

evasion scheme with Esherick, and, indeed, it makes it more likely that Douglas Jemal was the

initiator of that relationship.  See, e.g., United States v. Long, 328 F.3d  at 662 (in federal child

molestation prosecution, government permitted to introduce evidence of acts involving

"uncharged" victims, including persons who were above the age of consent over defendant's

claim that the evidence failed to establish "criminal intent, modus operandi, or a common plan or

scheme":   "What matters is that the evidence be relevant 'to show a pattern of operation that

would suggest intent' and that tends to undermine the defendant's innocent explanation. 2

Weinstein's Federal Evidence § 404.22[1][a].").  This is not character evidence; it is proof of

closely related conduct going directly to Douglas Jemal's intent by proof of a broader scheme

which encompasses the charges in the Indictment.  This evidence is thus admissible against

Douglas Jemal.

> ### 4.  Any "Spillover" Prejudice to Defendants Blake Esherick and Norman Jemal Can be Cured by a Limiting Instruction.

    This evidence is directly aimed at Douglas Jemal, and there is no reason to concern a

"spillover"which would unfairly prejudice Esherick.[24]  In any event, any prejudice to Esherick

---

regard, there only need be sufficient evidence for the jury to find, by a preponderance, that the
defendant committed the other crime; "the trial court neither weighs credibility nor [itself] makes
a finding that the Government has proved the conditional fact by a preponderance of the
evidence."  Huddleston v. United States, 485 U.S. 681, 690 (1988).  See also United States v.
Long, 328 F.23 at 660 (citing Huddleston).

    [24]     Moreover, the charged case presents the possibility of different defenses by the
two men, further highlighting the legitimate need for the evidence against Douglas Jemal.  It is
certainly plausible that Douglas Jemal would argue, for instance, that he truly believed and
expected that Esherick – an accountant by training – would pay the taxes on whatever Esherick's

can be easily cured by instructing the jury that such evidence is to be considered solely against

Douglas Jemal.  "With proper instructions, evidence of other crimes may be admitted against one

defendant in a multiple defendant trial." United States v. Kane, 726 F.2d 344, 350 (7th Cir.1984).

See, e.g., United States v. Moore, 732 F.2d 983, 990 (D.C. Cir. 1984) (any prejudice arising from

404(b) evidence could have been cured with appropriate limiting instruction).  See also United

States v. Cihak, 137 F.3 252, 359  (5th Cir.) ("A jury is presumed to be able to follow an

instruction regarding separating the evidence according to its admissibility against each

defendant at a joint trial. [citation omitted.]  Thus, given the limiting instruction given by the

district court, we are confident that the jury was able to give separate, individual consideration to

the charges against each defendant."), cert. denied, 525 U.S. 947 (1998).[25]   This is hardly

_____

compensation turned out to be and that he, Douglas Jemal, was just a generous man dispensing
DDC funds with little concern to the tax implications.  In this way, Douglas Jemal could distance
himself from how Esherick handled his personal taxes, suggesting he shared no responsibility for
Esherick's tax issues; they were Esherick's alone to bear.  However, the evidence that Jemal paid
others as he paid Esherick in ways which were not reported to the IRS bears very directly on this
sort of defense.  It is like watching dancers: the more pervasive, elaborate, deliberate and intricate
the dance steps, the more obvious that the steps are a result of choreography and design and not
accident, inadvertence, mistake or thoughtless improvisation.  Tax evasion intent by Douglas
Jemal may be difficult to detect when looking at his conduct solely vis-a-vis Blake Esherick; it
becomes obvious when looking at his financial relationship with all his senior employees.

       To the same end, Esherick could claim that he had a good faith belief that the payments
by Douglas Jemal to him were in fact loans, and was unaware that Douglas Jemal may have had a
different intent.

       [25]       The facts here are no different than those of a routine drug conspiracy case where
the Government seeks to introduce 404(b) evidence against one but not all the defendants.  For
example, in United States v. Manner, 887 F.2d 317 (D.C. Cir. 1989), cert. denied,  463 U.S. 1062
(1990), the defendant at trial had moved for a severance based on the fact the alleged spillover
prejudice arising from the introduction of  404(b) evidence in the nature of uncharged drug sale
against the codefendant.  In affirming the denial of the severance, the Court of Appeals reasoned:
 "[First], given our strong policy in support of the joint trial of defendants indicted together, . . .
we find no undue risk, here, that the jury would unjustly impute Leeper's subsequent bad act to

shocking evidence of the sort which would inflame the jury.  (To the same end, since Norman

Jemal is not charged in any substantive tax counts, there is little concern that he would be

prejudiced by such evidence.)

Finally, the evidence related to the CFO and the Construction VP will be presented nearly

entirely by the same witnesses who would testify in this case.  The evidence is in the form of

certain DDC accounting records, certain IRS records (showing the purported compensation was

not reported) and some narrative testimony from witnesses who would otherwise testify.

Although it is possible that some testimony may be required from other persons – for example, it

may require a summary witness simply to add up the amounts distributed to the Construction VP

and the CFO over the years – the Government, well-cognizant that this is in fact evidence of an

---

Manner. . . .   Second, the trial judge properly instructed the jury that they 'must not consider ...
in any way' with respect to Manner the evidence of Leeper's later drug sale."  Id. at 325 (citations
omitted).  See also United States v. Gibbs, 904 F.2d 52, 56 (D.C. Cir 1992) (in prosecution of
four individuals for possession with intent to distribute cocaine found in vehicle, government
permitted to introduce evidence of prior hand to hand drug sales of one of the defendants);
United States v. Springs, 102 F.3d 1245, 1256 (D.C. Cir. 1996) ("Further, the district court cured
any vestigial risk of such ['spillover'] prejudice by repeatedly instructing the jury to consider the
evidence against each defendant separately.").

Thus, courts rarely order severance where 404(b) evidence comes in against one but not
all the defendants.  (Indeed the law is clear that the disparity in evidence against charged
defendants is rarely grounds for severance.)  Rather, courts properly trust juries to appreciate the
significance of the evidence and follow the instructions.  See, e.g., United States v. Rocha, 916
F.2d 219, 228-29 (5th Cir.1990) ("[T]his Court has repeatedly stated that an appropriate limiting
instruction is sufficient to prevent the threat of prejudice of evidence which is incriminating
against one co-defendant but not another. . . .  The evidence was not so complicated as to prevent
the jury from separating the evidence and properly applying it only to those against whom it was
offered. . . .  Consequently, there is no reason to believe that the jury would be unable to separate
the evidence as it was relevant to each defendant. The district court explicitly instructed the jury--
before, during and after the evidence was presented--to consider each offense separately and each
defendant individually. This cautionary instruction sufficiently enabled the jury to
compartmentalize such evidence and prevent any spillover from tainting another defendant's
case." (citations omitted)).

"other crime" would intend on introducing this evidence with the minimum amount of trial resources as possible.

### C.  The Preparation of other False MTD Invoices

#### 1.  Background - Count Five

Douglas Jemal owned 77 P Street and other properties (to include the Woodies building) with a partner.[26]  The partner had loaned Douglas Jemal the funds for Jemal to purchase his own interest in these properties, and, in 2001, Jemal owed his partner over $20 million.  The essence of the Count Five, Wire Fraud, is that Douglas Jemal (through Esherick and others), used a fraudulent invoice to divert partnership assets (i.e., cash) to his personal purposes.  These assets were at the time held in escrow by a lender – Morgan Stanley.  The fraudulent invoice was thus presented to Morgan Stanley to pay from the escrow funds, and Morgan Stanley did so.  Morgan Stanley caused the funds to be wired to a bank account on which Douglas Jemal was the sole signor.  Thus, in one fell swoop, the defendants defrauded the partner, Morgan Stanley, and indeed, the Internal Revenue Service, which was not informed of Douglas Jemal's receipt of this cash.

Thus, as set forth in Count Five, the defendants created a fraudulent invoice, purportedly from "MTD Real Estate Services" (MTD) to the 77 P Street partnership in the amount of approximately $430,000.  This invoice sought payment from the 77 P Street partnership to MTD, purportedly as a result of MTD's representation of the DC Government in leasing space at 77 P Street.  (In commercial real estate leases, the agent for the lessee and agent for the lessor typically

---

[26]     The entity which owned 77 P Street was called "Cayre Jemal's Gateway, LLC." For the purposes of this pleading, it will simply be called the 77 P Street partnership.

split a commission that is paid by the lessor, just as connection with in a residential real estate

purchase, the agent for the purchaser and agent for the seller split a commission that is typically

paid by the seller.  Thus, in this case, the MTD invoice represented that the 77 P Street

partnership (the lessor) owed MTD a commission for representing the tenant, that is, the DC

Government.)  In truth and in fact, the DC Government had no agency relationship with MTD

and the invoice was false.

     As noted, the MTD invoice was not submitted directly to or paid directly by the 77 P

Street partnership.  Rather, as indicated, it was presented to a third party – a financial institution

– for payment directly to MTD.

     As background, in November 2002, Morgan Stanley made a loan of $67 million to the 77

P Street partnership.  One component of the $67 million loan, approximately $7 million, was

held back by Morgan Stanley and placed in escrow.  Pursuant to the terms of the loan agreement,

this $7 million was to be used to pay for certain "tenant improvement" expenses (which could

include bona fide commissions associated with securing tenants).  The loan agreement explicitly

stated that the funds were to be paid by Morgan Stanley directly to "third party vendors and/or

contractors."

     A few weeks after the settlement on this $67 million loan, Douglas Jemal found himself

in desperate need of approximately $400,000 to complete a purchase of 111 Massachusetts

Avenue – the large black building, formerly owned by ULLICO, near Union Station.  To obtain

$400,000, Douglas Jemal, through Esherick (and the Construction VP and the CFO) used the

MTD invoice described above.  By all appearances, MTD was a legitimate third party that was

owed a commission by the 77 P Street partnership (the landlord) for having represented the DC

Government (the tenant) in leasing space at 77 P Street. (The defendants even used the name of

an acquaintance of Douglas Jemal's on certain documents such as a "lien release" to further

suggest the independence of MTD. This individual has disavowed knowledge of the contents of

the invoices or the purported business of MTD.) The $430,000 MTD invoice was submitted to

Morgan Stanley to be paid from the $7 million construction funds that had been held back. They

did not disclose that MTD was in fact owned and controlled by Douglas Jemal but perpetuated

the deceit that MTD was an unrelated third party. Having been presented with this invoice,

Morgan Stanley approved the wiring of $430,000 to an account in the name of MTD at Adams

Bank (a bank across the street from DDC's offices on H Street). This account was opened within

a day or two prior to the funds being transferred into it, with Douglas Jemal being the sole signor

on the account. The day after the $430,000 was received, Douglas Jemal, through the CFO,

caused $400,000 to be wired out of the MTD bank account to the account of a settlement

company for use in the purchase of 111 Massachusetts Avenue.

Thus, the MTD invoice served a variety of purposes. First, it deceived Morgan Stanley

and prompted Morgan Stanley to disburse the funds.

Second and just as critically as far as Douglas Jemal was concerned, this invoice

concealed from his partner – the co-owner of 77 P Street partnership – that he (Douglas Jemal)

was tapping partnership loan proceeds for Douglas Jemal's uniquely personal purposes. The $67

million loan was issued to the partnership and on the entirety of this loan (including the

$430,000) the partnership was liable; yet this $430,000 component of the $67 million was not in

fact used by the partnership entity for partnership purposes, but was instead used for the sole use

and benefit of Douglas Jemal personally. In short, Douglas Jemal concealed his diversion of

-29-

partnership assets to his personal use, and, in this regard, 50% of the $430,000 taken by Douglas

Jemal was, in concept, money "belonging" to Douglas Jemal's partner.[27]  As alluded to above,

concealing this diversion of loan proceeds was particularly critical to Douglas Jemal because he

was in substantial personal debt to his partner at the time, the partner was pressing for repayment,

and Douglas Jemal certainly knew that his partner would not have taken well to permitting him

to take $430,000 from the partnership loan proceeds for any purpose other than applying those

funds to the repayment of Douglas Jemal's personal debt.

### 2.  Other Use of MTD

In connection with our proof at trial, the Government may present evidence that the

defendants contemplated the use of MTD to divert funds in nearly the same fashion in connection

with another property, namely, the old Woodies building on F Street.  Douglas Jemal co-owned

the Woodies building with the same partner with whom he owned 77 P Street.

Several documents have been found which suggest that "MTD" was to be paid from the

construction loans in place for the development of the Woodies building.  Several invoices from

"MTD" to DDC were prepared which represented that MTD was entitled to payments for

"construction management" services for that project.  (In fact, MTD provided no "services"

separate and apart from the very same "services" provided by DDC personnel.)  In addition, the

defendants and co-conspirators made deceptive statements to Douglas Jemal's partner describing

MTD.  Further, there is no purpose to support the partnership payments to MTD as opposed to,

---

[27]    We anticipate that Douglas Jemal will claim he was entitled to this money as a
result of certain understandings with his partner, and that he used the dishonest invoice as a
means of self-help to obtain funds to which he was entitled.  Of course, the honest way ran the
substantial risk that either the partner or Morgan Stanley would have said "no way."

for example, having the Woodies partnership pay DDC directly, other than to conceal the fact

that such payments were going to Douglas Jemal. In particular, there is at least one document

related to these Woodies invoices which purports to be a letter from same individual whose name

was fraudulently used in connection with the MTD invoices for 77 P Street.

    For essentially the same reasons set forth above discussing the broader tax conspiracy,

this evidence is modus operandi/"common plan or scheme" evidence against Douglas Jemal and

Blake Esherick. The scheme, most naturally defined, involves the use of MTD as a vehicle to

obtain monies for Douglas Jemal personally out of various loans, and to do so in way to conceal

those receipts from Douglas Jemal's partner. This scheme was implemented as charged in

relation to the 77 P Street loan, and as uncharged in connection with loans related to the Woodies

building. This evidence is not being offered for the one illegitimate purpose – to prove bad

character and conduct in conformity therewith. Rather, this evidence, as suggested, tends to

establish intent, by way of proof of modus operandi, proof of a common scheme or plan

encompassing the acts charged in the Indictment, and by negating a defense of innocent mistake.

Again the language of this Circuit in United States v. Long, supra, controls the analysis: "What

matters is that the evidence be relevant "to show a pattern of operation that would suggest intent"

and that tends to undermine the defendant's innocent explanation. 2 Weinstein's Federal Evidence

§ 404.22[1][a]. Thus, this court has opined, 'the admissible bad acts evidence need not show

incidents identical to the events charged, so long as they are closely related to the offense,'

United States v. DeLoach, 654 F.2d 763, 769 (D.C.Cir.1980), and are probative of intent rather

than mere propensity." Thus, the evidence of the defendant's use of "MTD" to work an on-going

deception of Douglas Jemal's partner is either "intrinsic" to Count Five, or, if extrinsic, is closely

related, part of a "common plan or scheme," and admissible to show intent.

WHEREFORE, the Government serves notice of its intent to introduce evidence of the above events at trial.

RESPECTFULLY SUBMITTED,

KENNETH L. WAINSTEIN
DC Bar No. 451058
UNITED STATES ATTORNEY

By: _____

MARK H. DUBESTER
ASSISTANT UNITED STATES ATTORNEY
DC Bar No. 339655
555 Fourth Street, N.W., Room 5917
Washington, D.C.  20530
Ph. (202) 514-7986

## CERTIFICATE OF SERVICE

I hereby certify that I have caused to be sent by fax or by electronic means a copy of the attached pleading, to:


Michele Roberts, Esq.
Counsel for Douglas Jemal
Akin Gump
1333 New Hampshire Avenue, NW
Washington, DC 20036

Paul Kemp, Esq.
Carol Elder Bruce
Counsel for Blake C. Esherick
Venable LLP
One Church Street,
Rockville, MD    20850


Reid Weingarten, Esq.
Brian M. Heberlig
Counsel for Douglas Jemal
Steptoe and Johnson
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036-1795

Stan Brand, Esq.
Counsel for Norman D. Jemal
923 15th Street, NW
Washington, DC   20005


Christopher Mead, Esq.
Counsel for Douglas Jemal
London & Meade
1225 19th Street, NW, Suite 320
Washington, DC  20036


this 22nd day of December, 2005.


_____
Mark H. Dubester
Assistant United States Attorney
DC Bar No. 339655
555 Fourth Street, NW
Rm. 5917
Washington, DC 20001
(202) 514-7986



ATTACHMENT 1



ATTACHMENT 2

