UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **Crim. No. 06-077 (RMU)** |
| | : | |
| **JOHN E. BROWNELL** | : | |

GOVERNMENT'S MEMORANDUM
IN SUPPORT OF GUIDELINES CALCULATION

The United States, by and through its attorney, the United States Attorney for the District

of Columbia, respectfully submits this Memorandum in support of its Guidelines calculation in

this case.

I. INTRODUCTION

On March 22, 2006, the grand jury returned an Indictment charging John E. Brownell

with 6 counts of tax offenses – an overarching conspiracy (Count One) and 5 counts of tax

evasion for the calendar years 1999 through 2003 (Counts Two through Six).  Brownell is a

skilled accountant and the Chief Financial Officer for Douglas Development Corporation (DDC),

a real estate development firm owned by Douglas Jemal.  The Indictment charged a course of

conduct commencing in the mid-1990s that involved Brownell's receipt as income of hundreds

of thousands of dollars of income from his employer.  These funds were not reported to the

Internal Revenue Service (IRS) in Brownell's annual W-2s, and Brownell, for his part, failed to

file tax return from 1994 through 2003.  The payments to Brownell were falsely recorded on the

DDC books – at Brownell's direction – either as:  1) "loans" to Brownell, 2) "loan payments" to

Brownell, or, with a few checks, 3) not recorded at all.

On February 8, 2007, four days prior to trial, the defendant pleaded guilty to Count Two

of the Indictment charging tax evasion for 1999.  In pleading guilty, the defendant admitted only

that he received $10,000 directly from a Douglas Jemal real estate refinancing settlement (paid directly out of escrow funds by Jemal's attorney at Jemal's direction). This receipt of income was not included on Brownell's W-2 (filed by DDC) and Brownell failed to file a 1999 income tax return reporting this payment as income.

By pleading guilty, the defendant avoided having powerful evidence of his guilt revealed before a jury of (tax-paying) citizens. At the same time, the defendant has staked out a position that the conduct of which he is guilty is truly insignificant. The defendant has said by his plea: I am guilty, but only of a $2,800 crime.[1]

The Government sought and the Court granted a prompt hearing as to the scope of the scheme and the actual tax loss. At the hearing of February 13 and 14, 2007, the Government proved beyond a reasonable doubt the essential aspects of the scheme charged in the Indictment, and proved, for Guidelines purposes, a "tax loss" of between $80,000 and $200,000.

## II. GUIDELINES CALCULATION - SUMMARY

For reasons set forth below, the Government maintains that the defendant's Guidelines should be calculated as follows:

|  |  |  |
|---|---|---|
| § 2T1.1 Tax Evasion | | |
| (a) Base offense level | | |
| From 2T4.1 - Tax Table | | |
| (F) more than $80,000 | 16 | |
| (b)(2) "sophisticated means" | 2 | |
| § 3B.3 Abuse of Special Skill | 2 | |
| Total | 20 | (33-41 months) |

Under Booker and other legal authority, the Court is not required to impose such a

---

[1]    Under the Sentencing Guidelines, "tax loss" is determined as 28% of the unreported income.

sentence, but the Court must determine and consider the Guidelines imposing sentence.[2]

## III. THE GUIDELINES ARE DETERMINED ON
## THE BASIS OF ALL "RELEVANT CONDUCT"

The Guidelines for tax convictions are determines on the basis of "relevant conduct."

The Sentencing Guidelines, at § 2T1.1, App. Note 2, requires:

> In determining the total tax loss attributable to the offense (see § 1B1.3(a)(2)), **all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated**. The following examples are illustrative of conduct that is part of the same course of conduct of common scheme or plan: (a) there is a continuing pattern of violations of the tax laws by the defendant; (b) the defendant uses a consistent method to evade or camouflage income, e.g., backdating documents or using off-shore accounts; (c) the violations involve the same or a related series of transactions; (d) * * *; and (e) the violation in each instance involves a failure to report or an understatement of a specific source of income, e.g., interest from savings accounts or income from a particular business activity. These examples are not intended to be exhaustive.

(emphasis added). Frequently, and in this case, the relevant conduct involves a course of conduct

spanning several years and several tax reporting periods.[3]

---

[2]    The Government does not address in this pleading grounds for an upward departure or for a sentence greater than called for by the Guidelines.

[3]    See, e.g., United States v. Feola, 275 F.3d 216, 218 (2nd Cir. 2001) (defendant's guidelines calculated based on tax loss for the entirety of conduct from 1996 through 1999, even though he pleaded guilty to a single count of failure to file a 1998 tax return); United States v. Codner, 2000 WL 373791 (10th Cir., April 12, 2000) at *4 (tax loss determined on the basis of uncharged conduct from 1992 through 1996 in addition to the charged conduct from 1988 through 1991); United States v. Bove, 155 F.3d 44, 46-48 (2nd Cir. 1998) (tax loss determined including uncharged year (1992), in addition to charged year (1993)); United States v. Babcock, 1995 WL 437936 (8th Cir.) (July 7, 1995) at *1 (tax loss included uncharged tax year 1991 in addition to charged tax years 1992 and 1993); United States v. Pierce, 17 F.3d 146, 150 (6th Cir. 1994) (tax loss included conduct from 1981 through 1990, even though the tax evasion charges in the indictment went from 1985-1987); United States v. Meek, 998 F.2d 776, 778-79 (10th Cir. 1993) (tax loss included uncharged tax years 1984-1986 and 1989-1991, in addition to charged tax years 1987 and 1988, for which the defendant was convicted); United States v. Hollier, 321 F. Supp. 2d 601, 602 (S.D. N.Y. 2004) (tax loss included uncharged tax years 1993, 1994 and

## IV. THE FACTS

### A. Introduction.

There are several components of the evaded income in this case. They consist of:

1) payments by Douglas Jemal,[4] through DDC, to Brownell's Potomac Valley Bank (PVB) line

of credit account; 2) miscellaneous checks from DDC to Brownell, typically recorded as "loans"

on DDC's general ledger; 3) payments by DDC to third parties for Brownell's benefit (for

renovation of Brownell's rental property); and 4) miscellaneous payments from other sources to

Brownell (the $10,000 payment that Brownell acknowledged and a $10,000 check from Joseph

Cayre).

As disclosed at the hearing, the total amount of these unreported receipts is between

$315,994.50 to $392,294.50. Tr. 2/13/07 at 84-85; Ex. 1 at 22.[5]  If the "tax loss" were computed

---

1995 in addition to the three years for which defendant was indicted (1996-1998)); United States
v. Rabin, 986 F. Supp. 887, 890 (D.N.J. 1997) (tax loss determined on the basis of entire
conspiracy, spanning 1981 through 1993, rather than charged years of 1990 through 1993). See
also, United States v. Hayes, 322 F.3d 792 801-02 (4th Cir. 2003) (sentence reversed where Court
failed to consider government's contention that tax loss was in excess of $274,000 (based on
non-convicted conduct) where court relied solely on the tax loss of $75,814 based on the counts
of conviction); United States v. Ross, 2005 WL 2185543 (11th Cir., Sept. 12 2005) (sentence of
tax preparer for preparation of false returns reversed where Court failed to take into account
evidence of defendant's tax fraud in relation to non charged events, and limited sentence solely to
the tax loss attributable to two counts of the indictment to which the defendant pleaded guilty).

[4]      Douglas Jemal signed every DDC check at issue in this case.

[5]      The Government provided the Court three sets of exhibits at the hearing. They are
attached as Exhibits to this pleading. Exhibit 1 consists of the various charts and summary
spread sheets. Exhibit 2 consists of the documents reporting Brownell's tax paying history.
Exhibit 3 consists generally of a series of documents in the nature of Brownell's representations
to financial institutions. Exhibit 4 consists of a collection of the documents that were shown to
David Medding. These are set forth in order of their trial exhibit number, with the general ledger
pages at the end. Exhibit 5 consists of copies of some of the checks at issue in this case, and a
few other documents that were not shown to the witnesses.

solely on the basis of these amounts, the tax loss for Guidelines purposes is between $88,478.46 and $109,842.46. Tr. 2/13/07 at 86; Ex. 1 at 22.

However, the real tax savings accrued to Brownell's employer, who, by virtue of the tax evasion scheme, was spared having to pay more than $180,000 of scarce company funds in the form of tax withholding and related taxes to the federal and state taxing authorities.[6] In this regard, in 2005, when Brownell was under criminal investigation, he received a one time bonus amounting to over $420,000 so that he could "repay" DDC the amounts that had been supposedly "loaned" to him over the past 7 years. From this amount, over $187,000 was paid to the federal and state taxing authorities and $232,000 was paid to Brownell. Tr. 2/13/07 at 86;[7] Ex. 3 at 39. This transaction – the salient features of which are beyond dispute – demonstrates that $187,000 constitutes the actual "tax loss" in this case.

### B. Overview – DDC's Accounts

Most of the checks that are alleged to constitute income to Brownell were falsely recorded in two accounts. One of the accounts was a "loan receivable" account – account 1400 in DDC's general ledger. The purpose of this account was to record loans by DDC to third parties (typically DDC employees) and to record the loan payments by the third parties to DDC. The other accounts at issue were various "mortgage payable" and "loans payable - other"

---

[6]     If an employee takes home, say, $50,000, his gross salary is more on the lines of $80,000, with the difference consisting primarily of monies that are withheld from the salary checks and paid over to the federal and state taxing authorities. An employer who pays his employee $50,000 in funds that are "non-traceable" is spared the "burden" of having to pay $30,000 to the various governmental entities.

[7]     The testimony at the hearing was that the amount was "approximately a hundred and ninety thousand."

accounts – accounts 2500 and 2600. The purpose of these accounts was to record loans to DDC or to Douglas Jemal, typically from lending institutions, and to record the loan payments by DDC on the loans.[8] These accounts – an asset account (loans receivable) and liability accounts (loans and mortgages payable) – were basic accounts whose functions would have been easily understood by the defendant.

### C. Brownell's Receipt of $47,000 to Purchase of 6151 Tuckerman in October 1995

In October 1995, Douglas Jemal issued two checks to Brownell drawn on the DDC payroll account amounting to $47,000 (gross), or $32,992.79 (net). Ex. 1 at 1 ("1995" Chart).[9] Brownell used these funds to purchase a house at 6151 Tuckerman Lane in Rockville. Though Brownell represented to Washington Mutual, the lender for the 6151 Tuckerman mortgage loan, that the $47,000 was a "bonus," see Ex. 3 at 23, this "bonus" was not included in Brownell's 1995 W-2, which reported a total income for 1995 of just $47,500. Moreover, despite claiming to the lender that the $47,000 was a "bonus," one of the two checks, the check for $32,000 (gross), $23,000.62 (net), was recorded on DDC's books as a loan to Brownell and not as a bonus at all. Tr. 2/13/07 at 71-74; Ex. 1 at 21 ("1995 – Example of Bonus Recorded as Loan"). Thus, even though Brownell told Washington Mutual he received a bonus, he characterized this transaction on the DDC books to make it appear he received non-taxable loan proceeds instead of taxable income, and failed to have the income included in his W-2 and failed to file a tax return.

---

[8]    These accounts were described by David Medding, the former DDC Controller. Tr. 2/13/07 at 12-20.

[9]    Check 1213, dated October 6, 1995, was for $15,000 (gross), $9,992.17 (net). Check 1228, dated October 10, 1995, was for $32,000 (gross), $23,000.62 (net).

### D. Brownell's Receipt of $278,616.88 Consisting of Funds Paid by DDC Directly to his Line of Credit

In May of 1996, Brownell applied for and obtained a $60,000 line of credit from Potomac Valley Bank (PVB) secured by his recently purchased residence at 6151 Tuckerman.

After the PVB line of credit account was opened, Brownell wrote a check drawn on that account, payable to DDC, for $50,000. Tr. 2/13/07 at 59; Ex. 5 at 14. This $50,000 check was recorded in DDC's books in the 2600 account – "loans payable (other)" – thus representing a purported $50,000 loan from Brownell to DDC on which DDC was liable.[10]

Starting in June of 1996 and continuing through the end of 2004, Douglas Jemal, through DDC, made payments totaling over $278,000 – not $50,000 – to Brownell's PVB line of credit account. This amount was far in excess of the purported $50,000 loan from Brownell to DDC. DDC made payments to Brownell's PVB account the following amounts in the following years:

1996 - $8,527

1997 - $25,636

1998 - $52,743

1999 - $31,361

2000 - $13,767

2001 - $49,268

---

[10]    It is not clear whether this payment was in fact a loan by Brownell to DDC. It could have as easily constituted a loan repayment by Brownell to Douglas Jemal for the $47,000 that Jemal had provided to him in October 1995.

It makes little difference for purposes of this litigation whether the 1996 $50,000 check was a loan from Brownell to Douglas Jemal (as defense claims), or whether it was a repayment by Brownell to Douglas Jemal/DDC (as appears equally possible). Either scenario reveals Brownell as having dishonestly manipulated the books of DDC to conceal his receipts of income.

2002 - $41,975

2003 - $26,770

2004 - $28,570

The DDC payments to PVB in 1996 through mid-1998 were recorded in DDC's "loan payable"

accounts. However, even assuming the initial June 1996 $50,000 payment by Brownell to DDC

was a loan, this "loan" was extinguished as of mid-1998. Ex. 1 at 19.

Nonetheless, from mid-1998 (when any "loan" was paid in full) through December 2004,

approximately 66 checks totaling approximately $220,000 were issued by DDC directly to PVB

(not Brownell) and deposited into Brownell's PVB account. Even though no loan was in

existence and any conceivable loan had been repaid, Brownell continued to direct that the DDC

checks to his PVB account be recorded in DDC's loans payable accounts, falsely implying that

these checks constituted payments on a valid loan. Indeed, even subsequent to mid-1998,

Brownell continued to record a portion of the amount paid to PVB in the DDC interest account,

when, in truth and in fact, any interest payments made to PVB were not obligations of DDC, they

were not costs of doing business of DDC, and they were not proper deductible expenses of

DDC.[11] Each of the checks to PVB was signed by Douglas Jemal.

Brownell was intimately involved in directing the issuance of the checks to his PVB

account. Medding identified numerous "check request forms" written by Brownell where

Brownell directed the preparation of the checks to PVB and provided instructions to code the

---

[11]    The recording of the checks to PVB in the general ledger for 2001 is typical. This
was shown to Mr. Medding and is attached to this pleading. Tr. 2/13/07 at 15; Ex. 4 at 22-28.

checks in the loan payable and interest accounts. Tr. 2/13/07 at 20-24.[12] Almost immediately

after almost each and every payment, Brownell wrote a check on the PVB account of an amount

closely approximating the DDC deposit and deposited the funds in one of his personal checking

accounts. Ex. 1 at 11-18 ("Money Movement Charts" for 1998 through 2004).

There was nothing in the DDC general ledger to give notice that these checks to PVB

were for the benefit of Brownell and were not routine loan payments on actual company or Jemal

debts. The information that was recorded in the DDC accounting system and which appeared on

DDC's general ledger consisted of the DDC check number, the date of the check, the name of the

payee ("Potomac Valley Bank"), and the amount of the payment. David Medding, DDC's

Controller, was unaware of these payments.[13] In most instances, the checks to PVB were falsely

described as "mortgage" payments.

### E. Brownell's Receipt of Other Checks Issued Directly to Him or for His Benefit

Brownell received other funds that were income to him.

1. Two $20,000 checks. Douglas Jemal signed checks to Brownell personally, including

two $20,000 checks dated December 30, 1999 and October 30, 2000, respectively. These checks

were recorded in the "loan receivable account" – i.e., purportedly as a loan from DDC to

Brownell on which Brownell purportedly owed the company. Ex. 5 at 3, 4.

---

[12]    See, e.g., Ex. 4 at 4 ("Pay $2500 principal"); Ex. 4 at 5 ("Sue next time code to 2600"); Ex. 4 at 8 ("Sue [-] pay $10,000 principal" and instructing that the check be recorded in the 2600 and 6360 accounts); Ex. 4 at 12 (directing preparation of $6,788.38 check to PVB and instructing that it be recorded in 2600 and 6360 accounts); Ex. 4 at 15 (directing preparation of $8,500.40 check to PVB and instructed that it be recorded in 2600 and 6360 accounts).

[13]    Brownell was responsible for paying banks and lenders and did not disclose to Medding that DDC was funding his account.

2. <u>Checks for Brownell's rental property renovation</u>. Jemal also signed check in 2002 payable to two construction companies – "Construction by Design" for $9,000, Ex. 5 at 7-9, and "Tex-Mex Construction" for $8,700. Ex. 5 at 10-12. The Construction by Design check was, at Brownell's direction, recorded in account 1400 as a purported "loan" from DDC; the Tex-Mex Construction check was recorded, also at Brownell's direction, in account 2600, purportedly as a "loan payment" from DDC. These checks were for renovation work at Brownell's rental property, and do not mention Brownell by name.

3. <u>Other checks</u>. Brownell received a check dated December 23, 1998, from Joseph Cayre for $10,000. Ex. 5 at 1. Brownell also received the $10,000 check from the settlement proceeds dated November 18, 1999, the single transaction that Brownell acknowledged as forming the basis for his criminal culpability. Ex. 5 at 2.

F. <u>No Documentation Exists to Support the Contention These Payments were Loans</u>

In January 2005, the Grand Jury subpoenaed from DDC all supporting records in the nature of loan agreements, loan schedules, repayment plans or similar documents. No supporting documents were provided. See Ex. 5 at 24-25 (subpoena without attachment); Ex. 5 at 22-23 (affidavit by DDC records custodian reporting no responsive documents). Moreover, even though the first known check to Brownell recorded in the loan account occurred in October <u>1995</u>, Brownell made no payments credited to the loan receivable account until close to a decade later, after the criminal investigation commenced, in the summer of 2005.

G. <u>Brownell's Tax Filing Status</u>

Starting with calendar year 1994 until April of 2005, Brownell did not file tax returns.

H. <u>The Actions of Brownell and DDC after the Tax Investigation Commenced</u>

The first Grand Jury subpoenas to DDC were issued in August of 2004. In late 2004 and early 2005, the Grand Jury issued subpoenas that focused on the loan receivable and loan payable accounts and in early 2005, the investigation turned to Brownell. In February of 2005, a search was executed at Brownell's house.

The following actions occurred during and subsequent to these events associated with the investigation:

- In January 2005 – just a few weeks after the subpoenas had been issued related to the compensation of Brownell (and Esherick and Millstein), Jemal increased Brownell's salary to $300,000. Ex. 5 at 20. (At the same time, Jemal increased Esherick's salary from $70,2000 to $300,000, and Millstein's salary from $168,000 to $350,000);

- In April 2005 (after the February 2005 searches of DDC and Brownell's and Esherick's houses), Brownell filed returns for 1999 through 2004 – the years within the criminal statute of limitations. Accompanying these returns were amended W-2s, prepared by Grossberg & Co., that reported additional income for those years.

- In June 2005, Jemal issued Brownell a one time bonus in the amount of $420,683.07 (gross). From that amount, over $187,000 was withheld and paid to the federal and state taxing authorities, yielding a "net" check, after taxes of $232,847.48. Brownell then wrote a check to Douglas Development for $232,846.47 – purportedly repaying years of loans.

## V.  ARGUMENT — THE LOSS IS BETWEEN $88,478.46 AND $187,000

### A.  Introduction

The facts and related evidence demonstrate that the payments to PVB and the other specified payments to or for the benefit of the defendant constituted unreported taxable income on which the defendant evaded taxes by not filing returns and by not paying what he owed, and that the tax loss for Guidelines calculation purposes is in excess of $80,000.  Indeed the actual loss, relying on documents prepared by the defense in 2005 after the investigation, is over $187,000.  The evidence supporting this conclusion is overwhelming, and is set forth below.

### B.  Brownell is a Convicted Tax Evader

First, Brownell has admitted he has committed tax evasion:  the only issue now is how much he evaded.  This Court knows to a certainty that the defendant possessed the ability to form the willful intent to evade taxes.

### C.  The 1993 "Non-Traceable Income" Memo Anticipates the Facts of This Case

In 1993, Brownell wrote a memo to Douglas Jemal which bluntly discussed the incentives for both of them to evade personal income taxes.  The memorandum, referring in context to bonus checks for Brownell that Douglas Jemal needed to sign, stated:

> "1)    Payment in this matter is 100% non-traceable as compensation, thereby eliminating tax burdens on both sides."

Ex. 3 at 1. This Memorandum reveals: 1) Brownell's intent to evade taxes – by making income "non-traceable" – and his demonstrated willingness to perpetrate acts to effectuate this intent, and, 2) Brownell's understanding that the payment of compensation in ways that are "non-traceable" "eliminat[es] tax burdens" for the employer (Jemal) as well as the employee

-12-

(Brownell).

### D.  Brownell Willfully Failed to File Returns for 10 years

Brownell failed to file returns for ten years – a stunning course of conduct (by an accountant no less) that reflects a fundamental disregard for the requirements of tax compliance. (There is no question he knew of this obligation:  original W-2s were found at his house, he prepared false returns to submit to banks, and he is an accountant who worked at a tax preparation firm.)  Moreover, his failure to file evidences an intent to evade.  Rather than file honest returns (which would require him to report concealed income and potentially implicate the tax withholding failures of his employer), Brownell failed to file at all, thus evading the payment of taxes due and owing by him and his employer.

### E.  In 1995, Brownell Recorded a Bonus as a Loan

In 1995, Brownell received funds – $47,000 – that were clearly bonus payments, a fact he disclosed to Washington Mutual.  To avoid paying taxes, he failed to include these amounts in his W-2, and, furthermore, he falsely recorded a portion of these funds on the books of DDC as a "loan."  This transaction illustrates Brownell's false recording of income as a loan in the books of DDC – a pattern that occurs in connection with other monies paid to him.

### F.  The Recording of the DDC Payments to PVB Demonstrates Brownell's Intent to Conceal

On a near monthly basis, for eight and a half years, Brownell caused $278,616.88 to be paid from DDC to his PVB line of credit.  In nearly every instance, Brownell used the funds almost immediately after they were deposited into the PVB account.  The payments were used by Brownell to pay for expenses associated with the affairs of daily living – not for any sort of

"special" or unusual expense for which loans are typically obtained. It was as if Brownell received an extra paycheck, month after month, year after year. Indeed, in 1998 and 1999, Brownell received nearly as much (if not more) through the payments to PVB as his net take-home pay from DDC.

There is abundant evidence that these payments were deliberately concealed in the "loan payable" account.

- First and foremost, subsequent to August of 1998, DDC issued over 60 checks, amounting to over approximately $220,000 to PVB that were recorded in the "loan payable accounts. These checks, under any interpretation, cannot be characterized as "loan repayments" to Brownell or PVB;

- The checks were written to "Potomac Valley Bank" instead of Brownell personally, thus concealing the true beneficial recipient of the funds. David Medding, for example, DDC's Controller, was unaware of these payments;

- The checks appeared in the DDC accounts to be nothing other than routine payments by DDC on an outstanding loan by PVB to DDC or to Douglas Jemal;[14]

- The defendant made these payments appear to be bona fide DDC loan repayments (and not loans to himself) by personally instructing that the payments be broken up into two components – principal and interest – for accounting purposes. By recording the checks in this fashion, the defendant: 1) made the check appear to be a legitimate loan payment by DDC on which DDC was entitled to deduct the

---

[14]    In fact, Jemal had other banking relationships with Potomac Valley Bank, so these payments would readily appear to be Jemal-related.

-14-

accompanying interest expense;[15] and 2) permitted DDC to evade taxes by claiming a false interest deduction for tax purposes. There was no basis whatsoever to record the interest paid to PVB in the interest account and even the defense cannot defend the interest payments as being other than as income to Brownell;

- Brownell caused another check in 2002 – to "Tex-Mex Construction" – to be recorded in the "loan payable - other" account (account 2600) even though there was no outstanding DDC liability to "Tex-Mex Construction" (or Brownell) at that time. This transaction, unquestionably misleading, reflects Brownell's intentional misuse of the loan payable accounts to disguise DDC payments for his benefit.

If, as the defendant claims, the DDC payments to PVB were intended to be loans to Brownell:  1)  DDC could have issued checks payable directly to Brownell, and 2) these checks could have been recorded in the "loan receivable" account (account 1400) or some other account to clearly identify Brownell's obligations to DDC. The opposite inference is warranted: the fact that the checks were not issued to Brownell and not recorded as loans to Brownell is evidence that they were not intended to be loans to Brownell.

Indeed, there is really no other warranted inference other than that Brownell deliberately ran the money through the PVB account <u>for years</u> to purposely conceal his beneficial receipt of

---

[15]     The defense cannot seriously contend that Brownell knew and intended that the "principal" payments to the PVB line of credit would constitute loans (under the concept that he intended they be recorded as "negative liabilities"), while, at the same time, he knew and understood that the "interest" components of the payments constituted income.

-15-

the funds. For years Brownell rigorously avoided the creation of negotiable instruments and accounting documents that would openly reflect his receipt of the funds from DDC that went through the PVB account. The DDC accounting records reveal only payments to PVB – not to Brownell; Brownell's personal accounts show only deposits from his own PVB account, not checks from DDC as the ultimate source. The concealment is obvious. .

G.  In any Event, Brownell has Denied Receiving Loans from DDC

Moreover, any question – and there is none – as to whether the payments to PVB and the other checks to Brownell recorded in DDC's loan receivable account were intended to be loans is put to rest by Brownell's own representations.

- In October 2000, Brownell applied for credit from PVB to purchase 6155 Tuckerman Lane. In his credit application, in the liability section, he did not disclose any liabilities to DDC, Ex. 3 at 12, and did not disclose that he owed his employer approximately over $132,000. Tr. 2/13/07 at 76.

- In February 2002, Brownell prepared a personal financial statement in connection with his seeking an increase in a line of credit account. In the portion of the statement in which he was required to list liabilities, Brownell did not disclose that he owed his employer approximately $194,000. Tr. 2/13/07 at 77-79; Ex. 3 at 34, 36.

- Similarly, in October 2000, Brownell prepared a line of credit/overdraft application for a checking account at Adams National Bank. Again, in the portion of the form that required him to disclose liabilities, he failed to disclose what he

-16-

now claims were debts to his employer. See Ex. 5 at 15.[16]

Simply put, if Brownell owed his employer more than $100,000 or close to $200,000 for what he now claims were loans, he would have reported this debt on the loan applications. He reported no such loans because, in truth, he did not owe Douglas Jemal or DDC a penny.

Indeed, on two of these documents – the PVB and Adams loan applications – Brownell wrote in hand that his PVB line of credit account was "PAID BY BUSINESS (Douglas Development Corp)" and "paid by Douglas Development" respectively. Ex. 3 at 12; Ex. 5 at 16. These representations are consistent with the reality of the tax evasion scheme: namely, that in Brownell's mind the PVB line of credit account was nothing more than a means for Brownell to receive funds from his employer as a pass-through – from his employer's account to his personal use – and, as he himself admitted, it was not an account on which he had actual liability.

Moreover, Brownell's representation that DDC was responsible for the line of credit reveals the true value of the scheme to Brownell. In total, Brownell drew over $375,000 from the account – but, as he noted, he was not really liable on that account. In fact, he paid only a few payments (amounting in total to $14,498) to PVB.[17] (The first of the few occasions that Brownell made payments occurred in December 2000.) DDC, as noted paid $278,616 to PVB, and, at the end of 2004, the PVB account had a balance of $125,674.35.

---

[16]    This exhibit – the third such instance of Brownell's failing to report what he now claims were bona fide loans – was not introduced at the hearing.

[17]    Tr. 2/13/07 at 63. The witness testified to "approximately $14,000." This amount overstates Brownell's payments. In one instance, Brownell simply ran personal monies through the account in a manner consistent with his hiding income.

### H. Brownell's Annual Income Pattern Supports
### The Conclusion He Received Unreported Income

Brownell's income pattern is consistent with his receipt of additional concealed unreported income. The following table sets forth Brownell's wages, and other monies he received, from 1994 through 2005.

| BROWNELL'S W-2 WAGES AS REPORTED TO IRS | | OTHER FUNDS FROM DDC | | |
|---|---|---|---|---|
| YEAR | REPORTED WAGES | DDC PAYMENTS TO PVB LINE OF CREDIT | OTHER | |
| 1994 | $45,673.00 | | | |
| 1995 | $47,499.92 | | $47,000 | checks to defendant for use in purchasing 6151 Tuckerman |
| 1996 | $54,315.92 | $8,527.17 | | |
| 1997 | $54,315.92 | $25,636.30 | | |
| 1998 | $55,229.38 | $52,743.03 | $10,000 | check from Jos. Cayre |
| 1999 | $54,315.92 | $31,360.65 | $10,000 | check from real estate settlement |
| | | | $20,000 | check from DDC |
| 2000 | $152,363.99 | $13,766.83 | $20,000 | check from DDC |
| 2001 | $124,875.76 | $49.267.73 | $2,984.83 | check to PVB |
| 2002 | $124,875.76 | $41,974.71 | $9,000 | check to "Construction by Design" |
| | | | $8,700 | check to "Tex-Mex" |
| 2003 | $124,875.76 | $26,770.47 | | |
| 2004 | $125,284.98 [ORIGINAL W-2] | $28,569.99 | | |
| **LATE 2004 - TAX INVESTIGATION COMMENCES** **FEBRUARY 23, 2005 - BROWNELL'S HOUSE SEARCHED** | | | | |
| **2005** | **$759,844.64** | | | |

This income pattern further supports the conclusion that the "other funds from DDC" were income. First, as noted, Brownell received hardly any salary increases, raises or bonuses from 1994 through 1999. Second, Brownell's reported income went up in 2000 and, in that year, the unreported compensation (the payments to PVB) decreased.. Furthermore, even when Brownell received the salary increase in 2000, he did not commence "repaying" what he now contends to have been the "loans" of the prior years.[18]

Third, Brownell purportedly made less than David Medding – his subordinate. Thus, when Medding was hired in or about February 2001 at a salary of $150,000, Brownell received an immediate $10,000 payment to PVB (March 17, 2001), and thereafter, the amount of the DDC payments to PVB increased – from $13,000 in 2000 to over $50,000 in 2001 – as if he received a salary increase. Otherwise, from 2001 through 2004, Brownell received no salary increase and no bonus, despite having been responsible for huge loans that had dramatic impact on Douglas Jemal's business (77 P street, 111 Massachusetts Avenue). Fourth, a true measure of the worth of Brownell to Douglas Jemal is found in the fact that when the investigation commenced, Brownell's salary dramatically increased, and the concealed compensation came to an end.

I. Numerous of the Payments were at the End of the Year

Many of the checks at issue occurred at year end, consistent with the payments being bonuses, not loans. These include the following:

_____

[18]  In 2000 Brownell commenced looking to purchase an investment rental property. He knew that he would need to have pay stubs or a W-2 to show a salary at a rate of more than $54,000 per year. (He was issued a $26,000 bonus check through the payroll system in October 2000, at about the same time he was purchasing a property. That is why calendar year 2000 is greater than the following years.) Moreover, Brownell would have known that it was not feasible that as the Chief Financial Officer for DDC, dealing with high-level bankers and putting together multi-million dollar loans, he would be paid only $54,000 per year.

December 23, 1998 - $10,000 check from Joseph Cayre

December 29, 1998 - $10,392 check to PVB

November 23, 1999 - $10,000 from real estate settlement

December 30, 1999 - $20,000 check from DDC – subsequently recorded as a loan

October 30, 2000    - $20,000 check from DDC – subsequently recorded as a loan.[19]

Each of these checks has an "end of year bonus" feel, and is consistent with the representations that Brownell made to lenders that his compensation included a bonus.[20]  For example, in connection with his 1995 mortgage loan application, Brownell provided the lender a letter signed by Douglas Jemal that represented: "Mr. Brownell is paid both a base salary and bonuses. This is our current arrangement, this has been our arrangement for the past several years, and I expect this arrangement to continue in the future." See Ex. 5 at 18. Notwithstanding the specific representations of the letter, no bonuses were ever reported to the IRS from 1994 through 2004, but for a single bonus in calendar year 2000.

### J. Brownell Has No Regard to the Truth When Reporting his Income

This Court may properly take into account that Brownell in other contexts has falsely represented his financial situation (including his income) to serve his personal financial goals. He has gone so far as to use forged and fraudulent W-2s, and fictitious and unfiled Form 1040s in loan applications. Nothing that he puts down in writing – be it in DDC's books or on a loan application – can be believed on his say-so alone; it is necessary to examine the surrounding facts

---

[19]    This check was used by Brownell to purchase a rental property. Notably, in 2000, Brownell did not receive an end of the year bonus – this check clearly constituted the bonus.

[20]    It is also consistent with Brownell's receipt of the 1995 $47,000 bonus, a portion of which he recorded on DDC's books as a loan.

to determine whether the representations are true or the extent they are true. The false

representations and documents include the following:

- **Purported 1994 personal return**, submitted to Washington Mutual to purchase 6151 Tuckerman, reporting Brownell's wages as $117,612.17 (for 1993) and $135,673 (for 1994), when, in truth and in fact, Brownell's income as reported to the IRS on his W-2s for those years was $48,891,38 and $45,673. Ex. 3 at 21-22;

- **Purported 1994 tax return**, submitted to PVB in 1996 to obtain the $60,000 line of credit, reporting Brownell's 1994 wages as $135,673 when, in truth and in fact, Brownell's income as reported to the IRS on his 1994 W-2 was $45,673, and no 1994 return was filed. Ex. 3 at 4-10;

- **October 1995 credit application** submitted to Washington Mutual to purchase 6151 Tuckerman, reporting $10,000 per month base income, $2805 per month bonus; when, in truth and in fact, Brownell's income as reported to the IRS on his 1995 W-2 was $47,499.92. Ex. 3 at 13-20;

- **October 1995 "Verification of Employment"** form submitted to Washington Mutual, reporting Brownell's income as of that date as $120,000 plus $47,000 bonus, income for 1993 of $117,612 and 1994 of $135,673 (to match the false returns), when, in truth and in fact, as noted above, Brownell's reported income to the IRS on his W-2s was $48,891, $45,673 and $47,500 for 1993, 1994 and 1995. Ex. 3 at 23.

- **January 24, 1996 credit card application**, reporting $120,000 annual salary, when DDC reported Brownell's income to the IRS for 1995 and 1996 as $47,500 and $54,316. Ex. 3 at 3;

- **1996 W-2**, found on the DDC network server in a Brownell "folder"; the document represented that Brownell's 1996 income was $134,315,92 when, in truth and in fact, Brownell's1996 income was reported to the IRS as $54,316. Ex. 3 at 2;

- **May 1998 overdraft line application**, submitted to Crestar, reporting income of $120,000 plus rental income of $1,250 per month, when, in truth, Brownell's reported income for 1998 was $54,316. Ex. 3 at 26;

- **February 2002 Personal Financial Statement**, hand-written, to PVB, to support an increase in line of credit, falsely representing that the "[l]ast year for which income taxes have been filed" was 1999. Ex. 3 at 34-37.

These documents include calculated and well-designed forgeries – such as realistic W-2s that were never issued but correspond to tax returns that he submitted to lenders but never filed.

## J. Brownell is an Accountant

Brownell is an accountant who has done tax work. He knows the difference between assets and liabilities, and knows that company records should accurately characterize the substance of a transaction. There is no reason to conclude that any representation is by accident or mistake.

## K. The Payments to Brownell's Construction Contractors were Concealed

In 2000 Brownell purchased 6155 Tuckerman Lane. He had to undertake substantial renovations. In 2002, he needed to pay two contractors – "Construction by Design" and "Tex-Mex Construction" and caused DDC checks, signed by Jemal, to be issued to both companies. Even though the defendant has now claimed that these checks were really loans to him, neither check was made payable to him, and it would require actual knowledge by some DDC employee (long in the future, if the loan receivable and loan payable accounts were ever reconciled) to know that 6155 Tuckerman was Brownell's property in order to link those checks as for Brownell's benefit.

Thus the DDC check to "Construction by Design" check was recorded in the DDC "loan receivable"account (1400) as if this check constituted a loan, though the check did not indicate on its face that it was for Brownell or who the loan recipient was. The check to "Tex-Mex Construction" was recorded in the "loan payable – other" account (2600), though there was no loan payable outstanding to Tex-Mex for which this payment could constitute a payment.

L. Brownell Has Used Multiple Accounts to Conceal Income and Assets

Two additional incidents illustrate Brownell's use of multiple accounts to conceal his financial affairs.

1. May - June 2002 Check Kite. First, this Court heard evidence of a check kite that occurred in 2002. At the end of May, 2002, Brownell was overdrawn by $689.57 in his Eagle account, and overdrawn by $2,415.65 in his Adams account.

At that time, Brownell wrote a $6,000 Eagle check which he deposited into his Adams account. (This would leave a negative balance of $6,689.57 in the Eagle account). To keep the Eagle check from bouncing, Brownell then wrote a $7,000 Adams check which he deposited into his Eagle account. To keep this Adams check from bouncing, he wrote a $6,500 Eagle check which he deposited into the Adams account, and to keep this last check from bouncing, he deposited a $6,500 Adams check into the Eagle account. Tr. 2/13/07 at 82; Ex. 1 at 20 ("Selected Bank Transactions – May-June 2002[;] Brownell's Adams and Eagle Checking Accounts").

2. June 2003 Concealment of Income. In June 2003, Brownell received $3000 in the form of three $1000 Traveler's Checks. (This payment appears to be either the security deposit or the first months rent for his rental property.) Brownell – who had not filed income tax returns and was now receiving rental income – undertook the following efforts to conceal even this small amount of income. He deposited the $3000 in Traveler's Checks into his Adams account; he then wrote a $2,800 check drawn on the Adams account which he deposited into his PVB line of credit account, and then wrote a $3,000 check drawn on the PVB account which he deposited into his Eagle account. From there, he purchased a $2,800 cashier's check to pay a construction

-23-

vendor. Tr. 2/13/07 at 69-70; Ex. 1 at 17 ("2003 Brownell [Money Movement Chart]").

These incidents reflect Brownell's use of his multiple accounts as means of obscuring his financial circumstances and concealing the sources of income. These incidents are consistent with his actions in moving funds through the PVB line of credit so as to conceal his beneficial receipt of DDC funds.

M. Virtually no Evidence Exists that the Payments were Intended to be Loans

Finally, there are no loan agreements, no payments (prior to 2005), no interest charged, really nothing to suggest an actual understanding or acknowledgment of indebtedness. Brownell did not make payments to DDC for the purported loans of previous years in 2000 when his salary increased, he did not tell banks of these loans, and he affirmatively disavowed liability for the PVB line of credit through which he received the funds.

N. The 2005 Conduct Evidences that the Funds Paid to Brownell in Prior Years Constituted Income all Along.

The circumstances of the post-investigation financial activities in 2005 clearly reveals that the funds at issue were income to Brownell all along.

Although the defense points to the 2005 "loan repayment" to support the contention that the years of payments to Brownell were in fact loans, the transaction illustrates precisely the opposite: Brownell never paid a penny out of his pocket to repay any of the hundreds of thousands of dollars of the so-called "loans." Instead, all that happened in 2005 was that in response to criminal tax investigation, $232,846.47 of DDC funds did a round-trip through Brownell's personal account before returning to DDC (corresponding to $420,683.07 gross income) in an attempt to make a decade's worth of sham loans disappear.

-24-

Indeed, the notion that Brownell was actually in debt to Jemal in 2004 to the tune of

$240,000 (and growing), when Jemal knew he was only paying Brownell $125,000 per year – is

not believable. Jemal would have known that Brownell could never actually pay such a debt (if it

were real); and Brownell knew that he could not pay such a debt (if it were real). In fact, that

purported debt was growing. Thus, in 2005, the debt was extinguished just like that. The

increase of Brownell's salary from about $125,000 in 2004 to $300,000 in 2005 – after the

investigation – provides additional evidence to conclude that $125,000 was not Brownell's true

salary.

### O.  The 2005 Conduct Demonstrates the Tax Loss was $187,000

In 2005, DDC paid Brownell a one-time check of over $420,000; from that amount over

$187,000 was withheld and paid (by his employer) to the taxing authorities. Brownell thus

received a "net" payment of over $232,000 that he used to "repay" DDC for the purported prior

loans. The income taxes that had been long due and owing – over $187,000 – were finally paid.

This transaction evidences the "tax burdens" Brownell had strived to "eliminate' by

arranging for years of compensation in ways that were "non-traceable" and not reported to the

IRS. It was only after the commencement of this investigation that the "tax burden" – $187,000

that Brownell had for years attempted to "eliminate" for DDC had to be paid and was in fact

paid.[21]

---

[21]    When Brownell filed amended returns, he also filed amended W-2s disclosing
additional income from DDC for calendar years 1999 through 2004. According to the defense
expert, some portion of this additional income relates to interest payments made by DDC for
Brownell, or the value of below market loans to Brownell. The total amount of these increases is
about $50,000.

### P. Even if the Court Computes "Tax Loss" on the "Net Pay," The Loss is in Excess of $80,000.

Even if the Court were to simply add up the amounts received by Brownell as disclosed at the hearing, give him credit for two payments he made to DDC,[22] the amount he received that is discussed in this pleading still amounts to over $315,000, and yields a tax loss in excess of $88,000.

### Q. The Scheme was Sophisticated and the Defendant Abused his Special Skill

The sophistication of the scheme is, to some extent, evidenced by the abundance of circumstantial evidence necessary to expose it and the defendant's intent.

### R. The Defendant has Not Come Close to Accepting Responsibility

Finally, the defendant failed to own up to his true culpability. Either the defendant minimizes, makes excuses, rationalizes, or has simply pursued a litigation strategy to avoid punishment. However, the defendant has not accepted any real and meaningful responsibility for his years of dishonesty and tax fraud.[23] The evidence demonstrated careful concealment of

---

[22]     Brownell made the $50,000 payment in 1996 that is discussed. It is either a loan from the defendant to DDC, or a loan payment to DDC. A copy of the check is attached at Ex. 5 at 14.

Brownell also made a single $20,000 payment to DDC dated May 14, 1999. Ex. 5 at 13. The proximate source for the bulk of the funds was a $12,500 withdrawal from the PVB line of credit, Ex. 1 at 12, and the source of the funds in the line of credit was DDC (including a $10,000 payment to PVB on May 7, 1999). In essence, the $20,000 that Brownell paid DDC in 1999 were funds of DDC that went from DDC, to the PVB line of credit, to Brownell's personal account, then back to DDC. The precise purpose of this transaction (which has no economic substance) is unknown. The $20,000 payment was not treated as a loan repayment by Brownell to DDC.

[23]     At the time of sentencing, the Government will also ask the Court to consider the fact that the defendant has provided numerous false documents to financial institutions.

income and wholesale, routine, and flagrant dishonesty – designed to enrich himself and his employer and defraud the honest, law abiding and tax paying citizens of this country. As is his right, the defendant has put the government through its proof on this; however, the defendant is not entitled to leniency.

CONCLUSION

The evidence demonstrates beyond any real doubt – let alone by a simple preponderance – that: 1) the tax loss in this case is in excess of $80,000; 2) the defendant used sophisticated means; 3) he abused his special skill and 4) he has not accepted responsibility.

WHEREFORE, we request the Court consider this pleading in finding the appropriate Guidelines range in this case, and consider this pleading in imposing sentence.

Respectfully submitted,
JEFFREY A. TAYLOR
UNITED STATES ATTORNEY

By:

Mark H. Dubester, D.C. Bar No. 339655
Assistant United States Attorneys
555 4th Street, NW
Room 5917
Washington, D.C. 20530
(202) 514-7986