## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
**UNITED STATES**                       )
                                        )
    **v.**           )    **Crim. No. 06-CR-0077 (RMU)**
                                        )
**JOHN E. BROWNELL,**                   )
                                        )
    **Defendant.**    )
_____)

### DEFENDANT BROWNELL'S PROPOSED
### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant John E. Brownell, by counsel, respectfully submits these proposed findings of fact and conclusions of law in connection with the evidentiary hearing in this matter held on February 13-14, 2007, concerning the amount of "tax loss" under the Federal Sentencing Guidelines.

### I.    INTRODUCTION

The issue before the Court is the tax loss to be used for defendant Brownell's Guidelines sentencing calculation. At the conclusion of the evidentiary hearing, the Court asked the parties to submit proposed findings of fact and conclusions of law as to the issues of tax loss addressed at the hearing. That is what we have done herein. The Government's "Memorandum in Support of Guidelines Calculation" addresses other Guidelines-related issues beyond the scope of what the Court requested, such as the "special skill" enhancement and acceptance of responsibility. We will address those issues in the normal course, after the presentence report writer submits her presentence report.

The loss amount set forth in the government's memorandum, which is based on the claim that all of the payments identified by the government were unreported income as to which

Brownell evaded taxes, is vastly overstated and unsupported by the facts, for at least the following reasons:

- The government essentially ignores the compelling and irrefutable evidence elicited at the hearing that Mr. Brownell, DDC *and its outside accountants* regarded the payments at issue as loans and overtly treated them as such in unambiguous contemporaneous records such as accounting workpapers, thereby conclusively establishing that they are loans rather than taxable income for Guidelines purposes.

- No evidence exists contradicting the authenticity of these records or impeaching the testimony of DDC's outside accountants that these payments were loans. The documents from 1993 through 1995 that the government proffers, all of which are outside the time period charged in the indictment and analytically unrelated to the conduct charged in the indictment, cannot begin to outweigh the probative value of the evidence presented.

- The government further ignores the fact that DDC's own recordkeeping, such as the internal accounting coding it used, was further evidence of its unambiguous contemporaneous intent that these payments were loans, rather than nefarious attempts at concealment, as the government alleged in the indictment.

- For example, the evidence directly contradicted the government's contention that the payments to Brownell were hidden among the mortgages on all of DDC's properties. Because DDC holds its assets through partnerships and LLC's, the mortgages on those properties do not show up at all in DDC's books, where Brownell's payments were recorded.

- The evidence demonstrated that making these loans was entirely consistent with the way DDC did business.

- The government's case is based on a fundamental misinterpretation of the nature of the payments to Brownell. Indeed, the government's own actions show that it has repeatedly misunderstood the facts and issues in this matter:

    - In an extraordinary request, shortly before the scheduled trial date, the government moved to dismiss from the indictment allegations regarding 9 different checks to Brownell that the government previously thought were unreported income. The government changed its view of these payments only after reviewing the defense exhibits, all of which had been available to it years before, either via subpoena or through the execution of the multiple search warrants in this case.

    - After defense counsel gave his opening statement at the hearing explaining that the records of DDC's outside accountants treated the challenged payments as loans, the government acknowledged that this was the first time it

was aware of the existence of the conclusive outside accountant workpapers or the testimony of these accounting professionals, despite the fact that this information had been as available to the government as it was to the defense.

- in short, the government failed to meet its burden of establishing that the challenged payments were income on which Brownell intentionally evaded taxes.

## II.     SUMMARY

The government bears the burden of proof with respect to the payments it seeks to include in the tax loss calculation. The challenged payments – primarily payments by Douglas Development Corporation ("DDC") to Brownell's line of credit account at Potomac Valley Bank ("PVB") – were in fact non-taxable because they were loans to him from DDC. Under the law governing tax evasion, the government could prevail only if it established both that the payments were not loans *and* that Brownell lacked the good faith belief that the payments were loans. A review of the testimony and exhibits from the hearing demonstrates that the government has failed to produce the necessary proof, and that the evidence is in fact conclusively to the contrary.

The evidence showed that DDC was an informal, growing and extraordinarily busy company whose small staff struggled to keep up with paperwork. Making and receiving personal loans was a routine part of DDC's business practices. DDC's activities were funded, in part, by the personal credit of its president and other employees, including Brownell, who made a $50,000 loan to DDC from his PVB home equity line of credit. DDC routinely made loans to employees with the understanding that the loans would be repaid when the employees could. Loans were also made between DDC and the partnerships and limited liability companies that held its real estate assets. In line with DDC's informal methods of doing business, these loans, like the loans to DDC employees, were not reduced to writing.

DDC repaid the loan from Brownell by making payments on his line of credit account at PVB. After the loan from Brownell was repaid, DDC continued to make payments into his PVB account. In accordance with the back-and-forth loan relationships that existed between DDC and its employees, Brownell understood that DDC's additional payments were loans to him.

The government asserts that Brownell knew that these payments were actually income, not loans, and further that this knowledge is proved by Brownell's attempts to disguise the payments in DDC's records as DDC business expenditures having nothing to do with him. But the evidence belies this theory. DDC's vendor files contained back-up documentation – *submitted by Brownell himself* – plainly revealing that the payments were to the line of credit secured by Brownell's own home. Contemporaneous workpapers prepared by DDC's outside accountant described these payments as amounts "Due from Jack Brownell." The payments were all contemporaneously recorded in DDC's books in a manner that the outside accountants who testified on Brownell's behalf at the hearing – whose testimony went unrebutted – stated was entirely proper, completely consistent with the status of the payments as loans, did not affect the treatment of the payments for income tax purposes, and showed no intent to conceal.

Brownell fully acknowledges that he committed tax evasion in connection with a $10,000 check he received in 1999 from a real estate settlement attorney's escrow account. The government attempts to tar Mr. Brownell with his guilty plea, ignoring the fact that it was the government that made the offer Mr. Brownell accepted just a few days before trial, and the government which expressly agreed, in the plea agreement, to the extent of Mr. Brownell's assertions of fact at the plea proceeding.  This admission does not, however, prove in any way that the PVB payments and other payments that the government seeks to include for tax loss purposes were not loans. The non-contemporanous, ambiguous and factually unrelated Rule

404(b)-type evidence on which the government relied to show intent was conclusively outweighed by the direct evidence establishing that the payments were loans. Because the government cannot meet its burden of proof as to its claimed tax loss amounts, Brownell respectfully submits that this Court should base its finding of the amount of tax loss on the $10,000 check that was the basis for Brownell's plea.

### III.    PROCEDURAL BACKGROUND

#### A.    Defendant Brownell's Plea

Defendant Brownell was indicted on one count of conspiracy to commit tax evasion in violation of 18 U.S.C. § 371, and five counts of tax evasion in violation of 26 U.S.C. § 7201. The five tax evasion counts covered tax years 1999 through 2003; each of these counts alleged multiple acts constituting tax evasion.

On February 8, 2007, Mr. Brownell and the government entered into a written plea agreement. Mr. Brownell pled guilty to Count Two of the indictment, for tax evasion in 1999; the government agreed to dismiss all of the remaining counts with prejudice. The plea agreement was predicated on the understanding that Brownell would plead to Count Two, but that he admitted only certain of the allegations in that count, which were nevertheless sufficient to satisfy all of the elements of the offense charged in Count II. *See* Plea Agreement, at 1 ("The parties acknowledge that Mr. Brownell does not agree with every allegation set forth in the Count, but that he agrees there is a sufficient factual basis for the guilty plea.").

At the plea hearing on February 8, counsel for Defendant Brownell advised the Court, in accordance with the language of the Plea Agreement, that Mr. Brownell's plea was based solely on his failure to report as income a $10,000 check he received in 1999 from a real estate settlement attorney's escrow account. *See* Transcript of Status Hearing/Change of Plea ("Plea

Tr.") at 3-4. That check was referenced in Paragraph B of Count Two of the indictment, which

alleged that Brownell committed tax evasion by

> causing a check in the amount of $10,000 to be prepared in the District of
> Columbia by attorneys handling the settlement of a loan related to properties
> owned in whole and in part by Conspirator A; said $10,000 check was payable
> and issued to JOHN E. BROWNELL drawn on the settlement attorney's escrow
> account; this $10,000 payment to BROWNELL was not reported to the IRS . . . .

Indictment, Count Two, Par. B, at 9.

The Court acknowledged, without objection from the government, that Mr. Brownell was

entering his plea based only on Paragraph B of Count Two. S*ee* Plea Tr. at 34-35. Mr.

Brownell's admissions tracked the acts described in Paragraph B:

> THE COURT: Well, Mr. Brownell, did you hear the words used by your attorney
> to express your conduct as it relates to count two and is otherwise described in
> part "B" of count two?
>
> THE DEFENDANT: Yes. I admit to receiving the $10,000-check from Lane
> []Potkin. I admit that it was income and that I knowingly failed to declare it as
> income. I further admit that in 2005, I committed the affirmative act of late filing
> my tax return for the year 1999, and that return did not declare the $10,000 as
> income.

Plea Tr. at 36. Brownell specifically did not admit that any of the loan payments he received

from DDC were taxable income.[1]

---

[1]    Brownell's position was consistent with the verdict in *United States v. Douglas Jemal, et
al.*, Crim. No. 05-0359-1, 3 (RMU). Brownell's colleague Blake Esherick was indicted for
receiving several forms of allegedly disguised income, including loans, and also for taking
improper tax deductions. As the Court is aware, after a full trial Mr. Esherick was convicted of
tax evasion only for the years in which he took improper deductions. The jury refused to find
him guilty of tax evasion for the year in which he was only charged with receiving disguised
income. In addition, Douglas Jemal was acquitted on all three counts in which he was charged
with providing disguised income to Mr. Esherick.

In sentencing Mr. Esherick, the Court based his tax loss amount on the two years for which he
was convicted, and included only the amount of improper deductions and previously unreported
income set forth in the amended W2's filed by Mr. Esherick for the years of conviction. These
amounts did *not* include any of the loan payments from DDC to Esherick.

The Court accepted the plea, finding:

> . . . that there is a factual basis for the entry of the plea and, in fact, finding that the defendant, Mr. John E. Brownell, did commit the offense as he has admitted, as has been alleged, essentially, in count two, paragraph "b" and as has been, otherwise, demonstrated. . . .

Plea Tr. at 39.

### B.    The Tax Loss Hearing

At the conclusion of the plea hearing, the Court granted the government's request for an evidentiary hearing on certain sentencing facts relating to relevant conduct. In discussing the length of the hearing, defense counsel reflected the understanding that the hearing would specifically deal with the amount of tax loss based on relevant conduct: "We, actually, had a large defense case that would have been presented at trial, and a lot of it relates equally to what's the quantum of loss." Plea Tr., at 40.

The evidentiary hearing was held on February 13-14, 2007. The defense's understanding of the subject matter of the hearing was again expressly stated:

> It's my understanding, Your Honor, the purpose of this hearing is, essentially, to aid the Court and provide the Court with some evidence with respect to determining the applicable tax loss attributable to Mr. Brownell under the federal sentencing guidelines.

Transcript of Sentencing Facts Hearing, February 13, 2007 ("2/13 Tr."), at 114. The government did not object to or disagree with this statement in any way.

At the conclusion of the hearing, the Court discussed the written submissions to be made by the parties on the issue of relevant conduct:

> . . . since you all have made this a fact-finding process to aid the Court for sentencing purposes and understanding whether or not there's relevant conduct that should be factored into the sentencing decision, I could recommend to you to submit proposed findings of fact and conclusions of law so that you would have time to collect your thoughts, organize them, and put them before the Court in a

way that i[s] more easily digestible than hearing something at the last moment that relates to the sentencing decision. . . .

Transcript of Sentencing Facts Hearing, February 14, 2007 ("2/14 Tr."), at 98. The Court further noted that the probation officer's guideline calculations could "await the Court's ruling on what the Court decides should be computed in as relevant conduct." 2/14 Tr., at 101.

On March 14, 2007, the government submitted the Government's Memorandum in Support of Guidelines Calculation ("Gov't's Memo"). The government's memorandum is not in the format of proposed findings of fact and conclusions of law as contemplated by the Court, which makes the defendant's task of submitting proposed findings and conclusions significantly more difficult. More importantly, the government's memorandum goes well beyond the issue of relevant conduct for tax loss purposes that was the subject of the hearing, and addresses additional enhancements to the guidelines calculation. In effect, the government has submitted a sentencing memorandum.

The Court plainly did not contemplate that the parties would address all of the sentencing issues raised by the government at this point in the proceedings, prior to completion of even a draft presentence report. Accordingly, this submission will not address the sophistication of the scheme, abuse of special skill or acceptance of responsibility. The defendant hereby submits proposed findings and conclusions regarding the tax loss issue, and reserves his right to address all additional matters in subsequent sentencing filings.

## IV.    DEFENDANT'S PROPOSED FINDINGS OF FACT

### A.    Payments to Brownell's PVB Line of Credit

1.    In 1996, Brownell obtained a home equity line of credit in the amount of $60,000 from Potomac Valley Bank ("PVB").

2.      On May 9, 1996, Brownell wrote a check in the amount of $50,000 on his PVB line of credit, payable to DDC. The memo line on the check indicated "loan." Gov't. Ex. 74, at 2 (copy attached at Tab A).[2] This payment was a $50,000 loan by Brownell to DDC.

3.      Brownell's intent to lend money from his credit line to DDC was reflected in a memorandum he wrote to Douglas Jemal in 1996. *See* Def. Ex. 1-B, p. 28 (Tab B).

4.      Brownell's loan to DDC was consistent with DDC's business practices. DDC's president, Douglas Jemal, routinely loaned money to DDC that he obtained by borrowing against his personal properties. 2/14 Tr. at 10. Other employees and individuals also provided loans to DDC at various times.

5.      Although there was no written loan agreement reflecting Brownell's loan to DDC, this was consistent with DDC's typical business practices. DDC operated more informally than many other companies, and DDC and Jemal routinely made loans to employees that were not reduced to writing. 2/13 Tr. at 42; 45; 2/14 Tr. at 51-52.

6.      For example, Jemal bought Andrew Foster, a carpenter who worked for DDC, a $379,000 house on the understanding that Foster would make the mortgage payments and pay back the $70,000 down payment made by Jemal when he could – all without any written agreement between Jemal and Foster. *See* 2/14 Tr. at 55-60.

7.      In addition, DDC acquired real estate through numerous other entities (LLC's and partnerships). 2/14 Tr. at 43-44. DDC and these entities routinely loaned money back and forth among themselves without written loan agreements. *See id.* at 44-45.

8.      For accounting purposes, Brownell's $50,000 loan to DDC was a "loan payable" by DDC. In DDC's general ledger, loans payable appeared under the "2600" account. 2/13 Tr. at

---

[2]      Copies of the exhibits referenced are attached for the Court's convenience, identified by tab letter.

13. Loans receivable were coded as "1400," and interest expense as "6360." 2/13 Tr. at 13, 15. Brownell's loan to DDC was coded to the 2600 account in DDC's general ledger. *See* Gov't Ex. 74, pp. 90-91 (Tab C).

9.      Brownell's loan to DDC was also reflected in the work papers prepared by Brownell in connection with DDC's 1996 tax returns.  Def. Ex. 117-1996, pp. 91, 95 (Tab D).

10.      DDC repaid Brownell's $50,000 loan by issuing checks payable to PVB. These payments were recorded in the 2600 account in DDC's general ledger. 2/13 Tr. at 39.

11.      As the evidence showed, DDC made payments to Brownell's PVB line of credit in the total amount of $8,527.17 in 1996; $25,636.30 in 1997; and $52,743.03 in 1998. By mid-1998, DDC had repaid the $50,000 loan made to it by Brownell from his PVB line of credit.

12.      After Brownell's loan to DDC had been repaid by DDC, DDC continued to make payments to Brownell's PVB line of credit. In line with the informal, back-and-forth lending relationships that existed between DDC and its employees, Brownell understood that these payments were now loans to him from DDC.

13.      Brownell did not conceal the fact that the payments related to his personal line of credit secured by his own home. DDC's "vendor file" for PVB, which contained copies of checks issued by DDC and back-up documentation for those checks, included copies of Brownell's home equity line statements for every payment made by DDC to PVB. *See, e.g.,* Def. Exs. 1A and 1B, pp. 1-2 (7/9/98 check; Brownell's home equity line statement is attached)(Tab E); 5/1/03 check stub for Potomac Valley Bank payment (check stub contains explicit reference to "J. Brownell" and "6151 Tuckerman Lane," which is Brownell's home address; Brownell's home equity line statement is attached)(Tab F); Gov't. Ex. 67(b) (2/28/03 check stub references

"6151 Tuckerman Lane"; Brownell's home equity line statement is attached)(Tab G); *see also* Gov't. Exs. 62(a), 62(d), 62(f), 62(g), 65(d), 65(f), 65(h), 66(b)(collected at Tab H).

14.     DDC's payments to Brownell's PVB line of credit continued to be recorded in the 2600 account in DDC's general ledger (or on occasion in the 2500 account for mortgages payable). *See*, *e.g.*, Def. Ex. 14B, p. 3 (Tab I).

15.     The government's assertion that Brownell was attempting to conceal the PVB payments by having them recorded in DDC's books among mortgages on the many properties owned by DDC was directly contradicted by testimony establishing that DDC itself did not purchase properties and so did not record property mortages in its books:

> Q.     . . .  Now, DDC is properly considered essentially a management company, right?
>
> A.     Yes.
>
> Q.     Does Douglas Development Corporation buy and sell real estate itself?
>
> A.     No.
>
> Q.     It never does, right?
>
> A.     No.
>
> Q.     And so in the 2600 account or the 2500 account or elsewhere, there would be no transactions at all reflecting payments on mortgages that DDC itself took out, right?
>
> A.     Correct.
>
> Q.     Because it never does that, right?
>
> A.     Right.

2/13 Tr. at 42-43 (testimony of David Medding, DDC's former controller).

16.     David Medding, DDC's former controller who was called as a witness by the government, acknowledged that all of the material in the PVB vendor file was available for him

to review. 2/13 Tr. at 33. Medding reviewed and initialed at least one check request to which Brownell's home equity line of credit statement was attached. 2/13 Tr. at 25.

17.     Jack Minnis, of Grossberg Company, DDC's outside accountant, was responsible for preparing DDC's tax returns for tax years 1997, 1998, and 1999. *See* 2/14 Tr. at 11, 36.  The accounting workpapers prepared by Jack Minnis for 1997 show the loan payable by DDC to Brownell. Def. Ex. 117-1997, pp. 120[3], 124 (Tab J). Minnis's workpapers for 1998 show that the loan payable from Brownell began the year with a $23,400 balance, and ended the year with a negative balance of <$23,900>. Def. Ex. 117-1998, pp. 235, 240 (Tab K). The workpapers describe the <$23,900> amount as "**Due from Jack Brownell**." *Id.* (emphasis added).

18.     Mr. Minnis explained this entry in his testimony at the hearing: "So the loan switched from a payable to Jack Brownell to a receivable from Jack Brownell as evidenced by the brackets showing the contra-balance in the credit account." 2/14 Tr. at 15. The term "contra-balance" means the "opposite of the usual balance in the account." *Id.* In other words, Minnis's contemporaneously-created workpapers unequivocally showed that these payments were now a loan to Brownell.

19.     Brownell's receipt of these loan amounts without a written loan agreement was consistent with DDC's practices in making loans to employees and loans among various DDC entities, as discussed in paragraphs 4-7 above.

20.     Mr. Minnis explained why Brownell's loan to DDC was not recoded from the 2600 "loan payable" account to the 1400 "loan receivable" account after its status switched from a loan from Brownell to DDC to a loan from DDC to Brownell:

---

[3]     The date at the top of page 120 of the 1997 workpapers prepared by Minnis incorrectly reads 12/31/96.  This is an apparent clerical error, as this was one page out of the 1997 workapers, all others of which correctly read 12/31/97.

> It had always been in this account. We were doing this work nine months later, so payments in the future year had been coded to the accounts they had always been coded to, and it just would have been a reclassification item that wasn't needed for the tax return.

2/14 Tr. at 16.

21.    Paul Wilner, an expert accountant from Grossberg Company, testified that presenting the amounts due from Mr. Brownell in the 2600 account in DDC's general ledger was an acceptable way of presenting a loan to Brownell:

> If it was a payable and it converted to a negative payable, which means a receivable, it's just a contra-liability account. It reflects exactly the same thing. Wherever it sits, it tells me as an accountant that there's an amount of money due from. There's a receivable. If it's in 2600, and it's a negative, that means it's a receivable ....

2/14 Tr. at 74.

22.    It was a common practice at DDC for accounts to have contra-balances and not to be re-classified in the general ledger. 2/14 Tr. at 78-79.

23.    Coding Brownell's loan from DDC as a contra-balance in the 2600 account made no difference for income tax purposes. 2/14 Tr. at 16-17; 74.

24.    The loan to Brownell was also recorded as a contra-balance in Minnis' work papers for the 2600 account for 1999, this time in the amount of <$50,600.30>. Def. Ex. 117-1999, p. 247 (Tab L).

25.    For tax year 2000 forward, a new outside accountant worked on the DDC account. 2/14 Tr. at 80-81. This accountant did not create work papers in the same manner that Jack Minnis did. *Id.*

26.    The loan payments to Brownell's PVB line of credit continued to be entered in DDC's general ledger. All of the information necessary to determine the total amount of the loan from DDC to Brownell appeared in DDC's books. 2/14 Tr. at 95.

27.     Recording the loan payments to Brownell in this manner did not reflect an intent to conceal the nature of these payments, because amounts recorded as payables or receivables are subject to reconciliation and examination:

> If you put something into a receivable or payable, year after year after year, an accountant who would look at it would have to ask the question what is that; who does it relate to; has it been repaid or not been repaid and would have to reconcile the account. So **if I was trying to put something somewhere where no one would try to understand what it was, I would never put it in a balance sheet account**.

Q.     And is that where these payments were?

A.     Absolutely.

Wilner testimony, 2/14 Tr. at 66 (emphasis added).

28.     Wilner was questioned about DDC's payment of the interest amounts due on Brownell's PVB line of credit after the initial $50,000 loan from Brownell had been repaid. Wilner acknowledged that the interest payments should have been treated as income to Brownell. "It was [an] accounting mistake from our perspective that the disbursements were made at all because they weren't keeping up for accounting for these things properly." 2/14 Tr. at 90. When Mr. Brownell filed tax returns for 1999 through 2004, the interest payments for each year were included in his taxable income for the respective year. 2/14 Tr. at 90.

29.     Wilner also acknowledged that Grossberg had not properly analyzed the below market rate nature of the loans to Brownell and other DDC employees. 2/14 Tr. at 91-92. The imputed interest associated with the loan to Brownell was included in his taxable income when his 1999-2004 returns were filed.

30.     DDC's payments to Brownell's line of credit account at PVB from 1996 to 2004 totaled $278,616.88 (including interest payments). 2/13 Tr. at 62. Less the $50,000 loaned by Brownell to DDC, this total equals $228,616.88.

31.    In 2005, Mr. Brownell received a bonus from DDC, from which he repaid $232,846.98 to DDC. 2/13 Tr. at 79-80.

### B.    Payments to Construction Contractors

32.    In late 2000, Mr. Brownell purchased a house at 6155 Tuckerman Lane, Rockville, Maryland, next to his residence, to use as a rental property.

33.    Brownell hired construction contractors to do necessary work on the house, and made multiple payments to them from his accounts.  But when Brownell needed additional money to pay the contractors' bills, he obtained loans from DDC for this purpose.  One loan came in the form of a check dated March 1, 2002, payable to Construction by Design Inc. in the amount of $9,000. Gov't. Ex. 81, at 1-2 (Tab M). The invoice accompanying this check is addressed to Jack Brownell. *See id.* at 2. The check stub reflects that this payment is coded to general ledger account "1400," *id.* at 1, which is DDC's loans receivable account. *See* 2/14 Tr. at 71-72.

34.    DDC also wrote a check to Tex-Mex Construction, Inc., dated June 21, 2002, in the amount of $8,700.00. Gov't. Ex. 71 (Tab N). This check was accompanied in the vendor file by an invoice to Brownell reflecting that the work was being done at 6155 Tuckerman Lane. *Id.* at 2. The check stub similarly reflects that the check relates to 6155 Tuckerman Lane. *Id.* at 1. This check was coded into the 2600 account. *Id.*

35.    It made no difference for income tax purposes that this payment, like the loans to Mr. Brownell paid through his PVB line of credit, was coded in the 2600 account. 2/14 Tr. at 74. Because the documentation made it clear that this payment related to Mr. Brownell's property, on reviewing those documents and the general ledger, an accountant "would have understood

that as other expenditures were reflected in 2600 so was this as just an acknowledgment of Mr. Brownell's obligation back to the corporation." 2/14 Tr. at 75.

### C.     Other Payments

36.     In addition to the PVB payments and the payments to the construction contractors, the government alleges that Mr. Brownell received other payments that constituted unreported income on which Mr. Brownell evaded taxes.

37.     Two of these payments are DDC checks from 1995: one in the amount of $9,992.17 and the other in the amount of $23,000.62. These payments were made well before the tax years for which Brownell was charged, and well before he opened the PVB line of credit that is at the heart of this case.

38.     The government also includes two $20,000 checks from DDC to Brownell, one dated December 30, 1999 and one dated October 30, 2000. These checks were coded in DDC's general ledger under the 1400 account for loans receivable, indicating that they were loans to Brownell.

39.     Moreover, as the government concedes, one of these $20,000 payments is offset by a $20,000 payment made by Brownell to DDC in 1999. *See* Gov't. Ex. 70, at 2 (5/14/99 check, stating "loan" on memo line)(Tab O).

40.     The government also includes a $2,984.83 check dated June 26, 2001 from DDC to Brownell's "business loan" account at PVB, rather than to his home equity line of credit. The government has not established that this check should be treated any differently than the checks written to Brownell's PVB line of credit account.

41.     The government also includes as allegedly unreported income a $10,000 check from Joseph Cayre dated December 23, 1998. This check is outside the time period covered by

the indictment. The government offered no proof concerning the nature of this payment or establishing that it constituted taxable income.

### D.     Checks Withdrawn from the Indictment

42.     Shortly before the trial in this case was scheduled to start, the government filed a motion seeking to strike from the indictment allegations relating to 9 different checks to Brownell. *See* Government's Motion to Dismiss Specific Allegations from Count One of the Indictment.

43.     These checks were not included in the government's hearing exhibit purporting to identify unreported income. 2/13 Tr. at 89. Robert Jodoin, an auditor employed by the U.S. Attorney's office, testified that the checks were not included because the government had only recently learned that the checks were reimbursements, 2/13 Tr. at 89, which are not taxable income.

44.     The government misunderstood the nature of these checks despite the fact that it had obtained the relevant documents through subpoenas and search warrants, and had also been provided with the documents as part of the defense's exhibits for trial.

### E.     Other Allegations

45.     The government sought to establish that Brownell had the intent to evade taxes by pointing to other financial transactions and documents of Brownell's. But this evidence failed to prove that Brownell did not have a good faith belief that the challenged payments were loans.

46.     The government relies on transactions relating to three $1,000 traveler's checks deposited by Brownell into his checking account at Adams National Bank in 2003. 2/13 Tr. at 69-70. In its memorandum, the government describes this payment as either the security deposit

or rent on the rental property owned by Brownell. Gov't Memo, at 23. In fact, this payment was a non-taxable security deposit, and was unrelated to any of the challenged payments to Brownell.

47.    The government introduced evidence regarding checks written between Brownell's accounts at Adams National Bank and Eagle National Bank. 2/13 Tr. at 67-68. However, these checks did not relate in any way to the government's allegations of tax evasion.

48.    The evidence is unambiguous that Brownell's and DDC's conduct with respect to the payments at issue was entirely overt and that careful, detailed and accurate records were kept as to their fact and their nature.  Mr. Brownell used multiple checking accounts because there were credit lines attached to each of them, and he was taking advantage of available credit on different accounts.  There is no evidence that he used these accounts to conceal anything, or that these transactions are probative of anything at all in this case.

49.    The government's evidence regarding the pattern of Brownell's reported wages and the challenged payments did not establish that the payments were not loans. Among other things, the government's claim that the payments to the PVB account were intended to provide Brownell with a steadily increasing income is belied by the total payments in 2003, which were significantly lower than the total payments the government claims were income to Brownell in 2000, 2001 and 2002. *See* Gov't Memo, at 18.

50.    The government's claim that certain of the checks to Brownell had "an 'end of year bonus' feel" (Gov't Memo, at 20) relies on a selective listing of a few of the payments to Brownell, and does not establish that these payments were not loans. Among other things, the timing of the $20,000 payment in October 2000 was related to Mr. Brownell's purchase of a rental property at that time, and not to the approach of the end of the year.

51.    The government claims that the payments to Brownell could not have been loans because Jemal would have known that Brownell could not pay a debt in that amount. Gov't Memo, at 25. But Jemal would have known that Brownell owned two homes in suburban Maryland, giving him sufficient equity to be able to repay the loans.

52.    The government also relies heavily on a 1993 memorandum purportedly written by Brownell to Douglas Jemal. But the 1993 memo is far more ambiguous than the government acknowledges. The government offered no evidence that this memo was ever finalized or sent to anyone by Brownell, much less that it was ever acted on. Although the memo references a bonus check, it does not say who the check was for. Mr. Brownell was DDC's chief financial officer, and had responsibilities relating to compensation of employees other than himself.

53.    Moreover, the memo was written in 1993, almost five years before the first act alleged in the indictment. It does not relate to PVB or Brownell's home equity line of credit, nor does it relate in any way to loans to Brownell or to the payments at issue in this matter.

54.    The government also relies on statements and documents in certain loan and credit applications prepared by Brownell as evidence of his intent. Even if Brownell made false statements to financial institutions about his financial situation for the purpose of obtaining credit, this does not establish that the payments he received from DDC were not loans or that Brownell did not believe them to be loans.

55.    The government focuses in particular on Brownell's description of his PVB credit line, in certain of his loan applications, as being paid by DDC. *See* Gov't Memo, at 17. But these statements accurately reflected that the payments on that line of credit did come from DDC – directly contradicting the government's theory that Brownell was attempting to conceal this fact.

### F.     2005 Loan Repayments and Tax Filings

56.     In January 2005, DDC increased Brownell's salary to $300,000, and in June of 2005, Brownell received a bonus from DDC in the amount of $420,683.07.  2/13 Tr. at 86.  The government asserts that the salary increase and bonus were motivated by the government's investigation and tend to show that the payments to Brownell were not actual loans.

57.     However, the facts contradict this assertion. In March of 2004, well before the government's investigation of DDC or Brownell, DDC initiated the sale of six of its major assets to Brascan Corp. *See* Declaration of William M. Collins (Tab P). DDC was historically a property-rich but cash-poor company that rarely sold assets; as a result, this sale was the major liquidity event in its history. Id., ¶ 19. The sale took place at a time when commercial real estate prices in the Washington, D.C. area had reached historic highs, following a nine-year run of ever increasing prices.  Id., ¶ 4. The closing dates for sales of the six properties ranged from February to October 2005.  Id., ¶ 18.  This evidence shows that DDC's 2005 salary increases and bonuses were likely due to DDC's atypical liquidation of assets in that year, a process that DDC initiated prior to the commencement of the government's investigation.

58.     Of the $420,683.07 amount of the bonus, about $187,000 was withheld for taxes. 2/13 Tr. at 86. Brownell then wrote a check to DDC in the amount of $232,846.98 (2/13 Tr. at 79-80), to repay his outstanding loans to DDC.

59.     Although the government's investigation of DDC and Brownell was underway at that time, Brownell did not alter his position that the payments to his PVB line of credit and other payments from DDC had been loans. Brownell filed back tax returns for 1999 through 2003, and a timely tax return for 2004, treating the principal amount of the payments as loans. He also paid taxes on the interest components of the payments.  Accordingly, there is nothing

about Brownell's tax filings in 2005 that is remotely suggestive of the proposition that the payments at issue were not loans.

60.    At the hearing, the government contended that the approximately $187,000 withheld from Brownell's 2005 bonus check represented the true amount of the tax loss in this case. Its fall-back position was that the tax loss should be based on the payments that the government contends constitute includable unreported income: either $392,294.50 or, with certain credits to Brownell, $315,994.50. Gov't. Ex. 1, at 22. Applying the 28% assumed tax rate from the Sentencing Guidelines to these figures results in a tax loss of either $109,842.46 or $88,478.46. *Id.* In its Memorandum, the government now appears to use the $315,994.50 income amount and the $88,478.46 tax loss figure as its fall-back position. *See* Gov't. Memorandum, at 26.

61.    Even assuming that all of the challenged payments constituted unreported income, which Brownell vigorously disputes, the government's claim that the actual tax loss here is $187,000 is unsupportable.

62.    The government has offered no proof as to how the $187,000 withheld from Brownell's bonus check was calculated. It has not shown that the taxes due on the $420,683.07 bonus payment are equal to the amount of taxes that DDC allegedly avoided by treating the payments to Brownell as loans instead of income. Among other things, the government's assertion ignores the fact that if DDC had treated the payments to Brownell as salary or bonuses, as the government contends they were, Jemal, as the owner of DDC, a Subchapter S corporation, would have been entitled to take deductions for those payments if there were taxable income to offset, or to carry over the deductions to future years.

## V.    DEFENDANT'S PROPOSED CONCLUSIONS OF LAW

1.    The Federal Sentencing Guidelines are advisory, not mandatory. *United States v. Booker*, 543 U.S. 220 (2005). In determining a sentence, a federal court "must calculate and consider the applicable Guidelines range but is not bound by it." *United States v. Dorcely*, 454 F.3d 366, 375 (D.C. Cir. 2006).

2.    The issue before the Court at this time is the amount of tax loss to be used in calculating the Guidelines range applicable to defendant Brownell. Possible enhancements relating to sophistication of the scheme, abuse of special skill and acceptance of responsibility are not at issue now. These matters will be addressed later after further submissions by the parties.

3.    Pursuant to Section 2T1.1 of the Guidelines, in cases of tax evasion, the tax loss attributable to the offense is used to set the base offense level. *See* § 2T1.1(a).

4.    For the offense of tax evasion, "the tax loss is the total amount of loss that was the object of the offense (i.e., the loss that would have resulted had the offense been successfully completed)." § 2T1.1(c)(1).

5.    The Application Notes provide as follows:

> In determining the total tax loss attributable to the offense . . ., all conduct
> violating the tax laws should be considered as part of the same course of conduct
> or common scheme or plan unless the evidence demonstrates that the conduct is
> clearly unrelated. . . .

§ 2T1.1, Application Note 2.

6.    For purposes of this case, tax loss equals 28% of any unreported income associated with tax evasion, unless a more accurate determination of the loss can be made. *See* § 2T1.1(c)(1), Note (A).

7.     Defendant Brownell pled guilty to tax evasion in connection with a $10,000 check he received from a real estate settlement attorney's escrow account in 1999, as described in paragraph B of Count Two of the indictment. This amount is, therefore, established for sentencing purposes.

8.     In order for any other amounts to be included in the tax loss calculation, the government bears the burden of proving that they arose from conduct violating the tax laws.

9.     The government must prove the additional conduct by a preponderance of the evidence. *See United States v. Dorcely*, 454 F.3d 366, 372 (D.C. Cir. 2006).

10.     *Dorcely* notes that the Supreme Court has "left open the question whether a higher standard of proof might be necessary if relevant conduct dramatically increased the sentence." 454 F.3d at 373 n.2 (citing *United States v. Watts*, 519 U.S. 148, 156-57 (1997)). In *United States v. Pimental*, 367 F. Supp.2d 143, 153 (D. Mass. 2005), the court applied the beyond a reasonable doubt standard to a loss amount determination, noting that "Certain facts like the amount of loss continue to assume inordinate importance in the sentencing outcome. So long as they do, they should be tested by our highest standard of proof."[4] As further set forth below, the Court finds that the government has failed even to meet its burden of proving relevant conduct by a preponderance of the evidence, and therefore need not reach the question of whether a higher standard of proof should apply.

11.     The elements of tax evasion are (1) for the specific calendar year, there existed a tax deficiency related to income taxes due and owing from the defendant; (2) the defendant committed an affirmative act or acts constituting evasion or attempted evasion of the tax; and (3) the defendant acted willfully. *See Sansone v. United States*, 380 U.S. 343, 351 (1965).

---

[4]     *But see United States v. Edwards*, 427 F. Supp.2d 17, 25-26 (D.D.C. 2006)(refusing to apply reasonable doubt standard).

12.     In order to prove willfulness, the government must prove that the defendant voluntarily and intentionally violated a known duty. *See Cheek v. United States*, 498 U.S. 192, 201 (1991). If the defendant had a good faith belief that he was not liable for a tax, his actions were not willful, even if his belief was objectively unreasonable. *Id.* at 202.

13.     In this case, the defendant asserts that the challenged payments were non-taxable because they were loans. The question of whether a payment is a loan turns on intent: "[T]he sina qua non of a bona fide non-reportable loan is the taxpayer's own intention to repay." *United States v. Pomponio*, 563 F.2d 659, 662 (4th Cir. 1977). *See also Estate of Taschler v. United States*, 440 F.2d 72, 75 (3d Cir. 1971); *Livernois Trust v. Commissioner of Internal Revenue*, 433 F.2d 879, 882 (6th Cir. 1970); *Commissioner of Internal Revenue v. Maransky*, 321 F.2d 598, 600 (3d Cir. 1963).

14.     In order to meet its burden, therefore, the government must show that the payments were not loans and that Brownell lacked the good faith belief that the payments were loans or were otherwise non-taxable.

15.     At the hearing, the defendant produced a substantial amount of evidence establishing that the challenged payments to his PVB line of credit were loans. This included evidence of DDC's standard business practice of making loans to employees without written loan agreements; explicit references to the loans in the contemporaneous workpapers of DDC's outside accountant Jack Minnis; the contemporaneous treatment of the payments in DDC's general ledger, as described by expert accountant Paul Wilner; Brownell's continued treatment of the previously-made payments as loans even after the criminal investigation had commenced; and Brownell's repayment of the loans in 2005.

16.    Brownell also produced a substantial amount of evidence refuting the government's claim that his alleged intent to evade taxes was shown by his attempts to disguise these payments as standard DDC business expenditures unrelated to him. This included evidence of DDC's files on the PVB payments, which included copies of Brownell's PVB account statements; the express references to the loans in the accounting workpapers prepared by Jack Minnis; the fact that the payments were not, as the government had contended, hidden in accounts containing mortgages on all of DDC's properties; and the treatment of the payments in DDC's general ledger, which Paul Wilner credibly explained did not show any intent to conceal.

17.    The evidence further showed that Brownell did not attempt to conceal the fact that the checks to Construction by Design, Inc. and Tex-Mex Construction related to the rental home he owned, since the back-up documentation for those checks expressly referenced Brownell and the address of his rental property.

18.    The government failed to establish by a preponderance of the evidence that the payments to Brownell's PVB line of credit (including the $2,984.83 payment in 2001 to his PVB business loan account) were not loans. The government offered no evidence rebutting the fact that Minnis's contemporaneous workpapers expressly referred to the payments as amounts due from Brownell, nor did it rebut Paul Wilner's testimony concerning the propriety of the contemporaneous treatment of the payments in DDC's general ledger. Further, the government did not rebut the evidence showing that DDC routinely made loans to its employees and related entities that were informally handled and not reduced to writing, a business practice consistent with the loans to Brownell.

19.    The government also failed to establish by a preponderance of the evidence that Brownell lacked a good faith belief that the challenged payments were not loans.

20.    The 1993 memorandum on which the government relies as evidence of Brownell's intent is too ambiguous, too remote in time, and too dissimilar to the act to which Brownell pled guilty to have sufficient weight to establish Brownell's intent here.

21.    The government also points to certain statements and documents in loan and credit applications submitted by Brownell as evidence of his intent. But even if Brownell made false statements regarding his financial situation to financial institutions in an attempt to obtain credit, this does not establish that DDC's payments to Brownell were not loans.

22.    The government's evidence regarding Brownell's handling of a $3000 security deposit and checks written between two of his bank accounts does not establish that Brownell had the intent to evade taxes. Security deposits are not taxable income in any event, and neither of these transactions has any bearing on the allegations concerning the challenged payments to Brownell.

23.    In short, the government's indirect, non-contemporaneous, ambiguous evidence of intent was outweighed by the irrefutable direct evidence, including contemporaneous documentation, showing that the payments were loans.

24.    For similar reasons, the government also failed to prove by a preponderance of the evidence that the other challenged payments (those not made to PVB) were unreported taxable income.

25.    The evidence established that the two checks to Brownell's construction contractors were loans to Brownell.

26.    The evidence established that the two $20,000 checks dated December 30, 1999 and October 30, 2000 were loans to Brownell. Further, these amounts are in part offset by the $20,000 payment made by Brownell to DDC on May 14, 1999.

27.     The government also seeks to include in the loss calculation two 1995 payments that the government describes as bonus checks and a $10,000 check from Joseph Cayre in 1998. These payments were not charged in the indictment.

28.     Although a court may consider acquitted conduct for Guidelines purposes, it is not required to do so. *See United States v. Safavian*, 461 F. Supp.2d 76, 83 (D.D.C. 2006)("The holding in *Dorcely* . . . does not mandate consideration of acquitted conduct under the Guidelines, stating only that 'we believe [*Booker's*] language is broad enough to allow consideration of acquitted conduct so long as the court 'deems [it] relevant''"). For the same reasons, the court should not be required to consider dismissed or uncharged conduct, particularly where it has not been shown to be relevant to the conduct admitted by the defendant as part of his guilty plea.

29.     The two 1995 payments that the government seeks to include in its loss calculation were not included in the indictment. These payments, which were made before Brownell even opened his PVB line of credit, are remote in time and unrelated to the conduct to which Brownell pled guilty.  The government has failed to meet its burden of proof with regard to these payments, which the Court will not include as relevant conduct for purposes of calculating the tax loss attributable to Brownell.

30.     The government, which bore the burden of proof, failed to produce any evidence regarding the nature of the $10,000 payment made by Joseph Cayre to Brownell in 1998. Accordingly, it should not be taken into account for purposes of the loss calculation here.

31.     Based on the evidence at the hearing and for all of the reasons set forth above, the government has failed to prove by a preponderance of the evidence that any payments to

Brownell beyond the $10,000 payment to which he pled guilty should be considered for purposes of the tax loss calculation here.

32.    Even if the government had met its burden of proof by a preponderance of the evidence, for the reasons set forth above the government has not proved its allegations of relevant conduct beyond a reasonable doubt.

33.    Even if the government had met the applicable burden of proof, under the principles of *United States v. Safavian*, 461 F. Supp.2d at 83, the court would consider for sentencing purposes only the conduct to which Brownell pled guilty.

34.    Because the government has failed to prove the alleged relevant conduct by a preponderance of the evidence, the government's contention that the applicable tax loss is either $88,478.46, based on 28% of the allegedly unreported income, or $187,000, based on the amount of tax withheld from Brownell's bonus check in 2005, is rejected. The Court accordingly rejects the government's assertion that the appropriate offense level is 16 (which is the applicable level for either loss amount asserted by the government). In any event, the Court further rejects as unsupported the government's claim that the $187,000 amount withheld from Brownell's 2005 bonus payment would be an accurate measure of the tax loss even if the government were correct that the challenged payments should be treated as unreported income.

35.    The tax loss on the $10,000 payment is $2,800, which corresponds to an offense level of 8. The probation officer is directed to use this level in preparing the pre-sentence report.

36.    The parties will file memoranda in aid of sentencing to address all other issues pertaining to the Guidelines calculation and sentencing, on a schedule to be set by the Court.

Respectfully submitted,

JOHN E. BROWNELL

By Counsel:


/s/ Barry Coburn_____
Barry Coburn (D.C. Bar #358020)
Gloria B. Solomon (D.C. Bar #358880)
Jeffrey C. Coffman (D.C. Bar #493826)
TROUT CACHERIS, PLLC
1350 Connecticut Avenue, N.W.
Suite 300
Washington, D.C.  20036
Phone: (202) 464-3300
Fax: (202) 464-3319

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of April, 2007, I served a copy of the foregoing Defendant Brownell's Proposed Findings of Fact and Conclusions of Law, with attached exhibits, by ECF.


/s/ Barry Coburn_____