## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | : |
| **v.** | :    **Crim. No. 06-077 (RMU)** |
| | : |
| **JOHN E. BROWNELL** | : |

### GOVERNMENT'S REPLY TO DEFENDANT BROWNELL'S PROPOSED FINDINGS OF FACT AND CONCLUSION OF LAW AND PROPOSED REBUTTAL FINDINGS

The United States, by and through its attorney, the United States Attorney for the District

of Columbia, respectfully submits this Opposition to Defendant Brownell's Proposed Findings of

Fact and Conclusions of Law.[1]

## I. INTRODUCTION

The defendant maintains that the monies paid by Douglas Development Corporation

---

[1]    The Government's initial Memorandum followed a similar format as the defendant's pleading: an Introduction setting forth an overview of certain positions, followed by sections advancing legal and factual claims. The factual portions were set forth as fairly discrete factual allegations, cited to the record, and was presented in a way to facilitate the Government's ability to present its position. Nonetheless, in response to the defendant's comments, the Government has included as an attachment a document that corresponds to the defendant's format in setting forth proposed findings. Other than: 1) amending a few of the captions, 2) rearranging the factual assertions with a few necessary style edits, and, 3) adding a few transcript/evidence citations, the government has not altered or added to the substantive content of its initial Memorandum in any substantive way.

Consistent with the order of this litigation, the Government has included some rebuttal findings of fact and law in this pleading. These relate to the defense witnesses and a legal issue raised by the defendant as to the definition of a loan.

Further, though not expressly called for in this litigation, the factual issues associated with the determination as to whether the defendant abused a special skill or used "sophisticated means" was thoroughly covered at the hearing and covered in these pleadings. To reduce the need for subsequent litigation an issue as to where there can be no real dispute, the government took the liberty of addressing it in its initial pleading – even though it was not required to do so. The defense could have easily addressed this issue as well, but has chosen to protract the litigation.

(DDC) to Mr. Brownell's Potomac Valley Bank (PVB) account were in fact loans to Brownell, notwithstanding that: 1) the payments were not recorded in the DDC employee loan account as a loan to Brownell;  2) the payments as recorded in DDC's books give no indication that they were for Brownell's benefit, but appear to be routine payments from DDC to PVB on what appeared to be an outstanding loan;[2]  3) the payments, even if rooted to an actual underlying loan from Mr. Brownell to DDC, persisted on a regular monthly basis from mid-1998 through 2004 – amounting to over approximately $200,000 – long after any purported underlying loan had been extinguished.

The defendant barely addresses the government's evidence demonstrating Mr. Brownell's intent, such as his pattern of dishonesty in his representations concerning his income, his failure to file returns and his use of the PVB account in a way that obscured his receipts of funds – and in so doing using "two checks – not one" to obtain funds from DDC.  Though he mentions that

---

[2]    As Medding testified:

Q.    Is there anything about the way those entries were recorded in that account which would have altered you that those payment were bing made for Mr. Brownell's line of credit?

A.    It would not look any different from any other transaction.

Q.    What do you mean by that?

A.    It would have looked like a normal loan payment to me.

Q.    When you say "normal loan payment", you mean by who or by –

A.    It would look like any other loan payment that he corporation made on any other loans that they had.

Tr. 2/13/2007 at 18-19.

on occasion Douglas Jemal, through DDC, made loans to employees, he fails to mention that in those cases, the transactions were with low-level employees who paid him back promptly – not to a high-level employee who received hundreds of thousands of dollars over a decade.   He barely acknowledges that his own witnesses testified to the impropriety of aspects of the accounting treatment of the payments to PVB and corroborated nearly every part of the government's factual case.  Most importantly, the defendant barely acknowledges that on <u>three</u> occasions he represented to financial institutions that he had no outstanding loans to his employer, DDC – representations profoundly and precisely opposite to his contentions in this case.  The defendant's defense – I commit bank fraud but not tax evasion – is truly a desperate one, and it is a measure of the weakness of his position, especially when the evidence really shows that he commits both sets of offenses as needed..

Mr. Brownell relies almost entirely on the testimony of Jack Minnis and Paul Wilner from DDC's accounting firm, Grossberg and Associates (Grossberg).  First and foremost, these two men know very little of Mr. Brownell's personal circumstances and were unaware of the abundance of incriminating evidence that was presented to the Court.  Moreover, in context, the testimony of the two men affirmatively supported the government's contentions in nearly every critical aspect.

<u>II. GOVERNMENT'S PROPOSED FINDINGS RELATING TO THE DEFENSE WITNESSES</u>

A. <u>Proposed Findings Related to the Testimony of  Jack Minnis</u>

1.      The <u>entirety</u> of the defendant's "fact witness" proof on the issue of the DDC payments to the defendant's Potomac Valley Bank (PVB) line of credit was that one individual – Jack Minnis of Grossberg – had knowledge of a minimal amount of such payments as of calendar

year <u>1999</u>. This was at a point in time long prior to the bulk of the payments taking place

(between 2000 and 2004). As Mr. Minnis clearly stated: "After the year 1999, I wasn't involved

in the account." Tr. 2/14/2007 at 36. Similarly, he testified:

> Q.    Do you know how much money was provided to Potomac Valley
>
> Bank subsequent to 1999?
>
> A.    No. <u>Id</u>. at 36.

2.    Mr. Minnis had no explanation as to why DDC made payments Mr. Brownell's

PVB account and not to Brownell personally:

> Q.    [T]he loan was purportedly – it says:  Loan from John Brownell.
>
> Why weren't the loan repayments to John Brownell [and not to PVB]?
>
> * * *
>
> A.    I don't know.  <u>Id</u>. at 41.

3.    Mr. Minnis confirmed the irregularity of Brownell's accounting for the "interest"

portion of the payments to PVB as a deductible DDC business expense:

> Q    To your knowledge, is there any sound accounting reason why
>
> Douglas Jemal – Douglas Development should be paying interest to Potomac
>
> Valley Bank after the first $50,00 is paid back?
>
> A.    No. <u>Id</u>. at 43
>
> * * *
>
> Q.    Was there any basis for Douglas Development to take a tax
>
> deduction on those payment to Potomac Valley Bank starting for the interest
>
> payments starting with the point that the first $50,000 was supposedly repaid?

-4-

   A.  No. <u>Id</u>. at 44.

4.  Mr. Minnis undermined the defendant's contention that it was routine for DDC to

simply continue to make payments on Brownell's purported loan to DDC, even after the

purported loan had been extinguished:

   Q.  In the 2600 account [where the payments to Brownell's PVB

   account were recorded], however, there was never ever any other, quote, contra-

   balance where Douglas Development had paid out more than it supposedly had

   borrowed, was there?

   A.  Not that I remember, no. <u>Id</u>. at 40.

5.   Mr. Minnis had no knowledge of how Mr. Brownell handled his personal

financial affairs, his numerous false applications, his disavowal to financial institutions of having

debts to DDC, his failure to file, his" non-traceable income" memo, and even the facts that lead

to his guilty plea. <u>Id</u>. at 37-38.  For example, Mr. Minis was that Mr. Brownell's used the PVB

account as a means of running monies to his own personal account.  Again, Mr. Minnis's

testimony was unequivocal.

  Q.  Do you know how he handled the Potomac Valley Bank line of credit?

  A.  No. <u>Id</u>. at 37;

* * *

   Q.  [A]re you aware what Mr. Brownell did with the money as soon as

   it hit – as soon as those payments hit the Potomac Valley Bank account?

   A.  No. <u>Id.</u>  at 44..

6.  Mr. Minnis was unaware of the bulk of the evidence bearing on Mr. Brownell's

-5-

intent.  He would have had no reason to believe that the relatively minimal DDC payments to PVB account (in excess of any purported $50,000 loan) through 1999 were a part of an evasion scheme that would persist for the next five years and amount to several hundred thousand dollars.

7.      The fact that Mr. Minnis kept track of a modest amount of the payments in excess of $50,000 that was paid by DDC to PVB for Mr. Brownell's benefit has no relevance to the defendant's actual intent.   Mr. Minnis kept track of what he believe to be modest overpayment by DDC to PVB.  He did so on his own initiative, with no input or direction from the defendant, as "part of our procedures." Id. at 44-45.  Furthermore, the only known records of the modest overpayment that existed as of 1999 was in accountant work papers in Bethesda. Id. at 36.  (The records were not produced by DDC pursuant to a subpoena, so it is clear that DDC did not possess similar or parallel records.)  After 1999, there is no evidence that anyone else in a responsible position was aware that DDC was making payments directly to the defendant's PVB account until the criminal investigation commenced.

                           C. <u>Proposed Findings Related to Mr. Wilner's Testimony</u>

7.      Mr. Wilner's testimony made it clear that Mr. Brownell would have reasonably understood and believed that there was but a remote chance that he would ever be held accountable for payments to him or on his behalf in the various accounts of DDC.  His testimony was simply that the accounts would "ultimately" have to be reconciled, a time frame that could be decades, though sometime less than "forever" or "never:"

A.      * * * At some point, that account has to be reconciled because you have to ultimately deal with that dollar amount that sits on the book.

Q.      Fair enough.  And that could be 20 years from now, correct?

A.      I can't possible answer that question.

* * *

Q.      You're ultimately saying that there are running balances and amounts which are being owed and amounts which are being owed to Douglas Development and that, ultimately, they have to be reconciled, correct; that was your word?

A.      Yes, correct.

Q.      That could be five years, 10 years, 15 years, or never, correct?

A.      No.  Not never.  I don't agree with the word "never."  You ultimately liquidate the company.  You ultimately do something.  You ultimately pay all other liabilities off, and you have a deficit balance in that account that ultimately someone will have to deal with.  It does not go away forever.  The word "forever" is not correct.  Id. at 83-84.

8.      Consistent with such testimony, Mr.. Wilner confirmed that the DDC financial transactions for calendar years 2000, 2001, 2002, 2003 and 2004 – the years when the bulk of the criminal activities occurred – were in fact not subject to outside scrutiny until the criminal investigation commenced:

Q.      *** Prior to the tax investigation and the execution of search warrants [late 2004 and 2005][,] from 1995 to 2004, do you know of anybody who attempted to reconcile the *** loan receivable account, 1400 or the loan payable accounts?

A.      I don't know the date of all of those events you're referring to.

Sometime in early 2005, I believe, we did the 2003 [DDC] tax return, and that's

when those amounts were reconciled by us. How that date corresponds to the

events you were referencing, I don't know. Id. at 85.

Similarly, Mr. Wilner stated:

> Q.    You gave a long, long answer to a very simple question before, but

starting in – from 2000 to 2004, to you knowledge, nobody scheduled out and

kept track of the payments going to the Potomac Valley Bank account, correct?

* * *

> A.    To my knowledge from my review of the files, I saw no

reconciliation schedules. Id. at 81.

9.    Thus, Mr. Wilner confirmed that from at least prior to 1995 through 2005, there

was in fact no "reconciliation" of the loan accounts; and, from 1999 through 2004, there were no

outside observers looking at the DDC books, let alone performing even the most basic

accounting functions.

10.    Like Mr. Minnis, Mr. Wilner confirmed the general inappropriateness of

recording payments for Mr. Brownell's benefit in DDC's "loan payable" account. Mr. Wilner

was unable to provide any legitimate explanation as to why a check to a contractor (Tex-Mex

Construction) for Mr. Brownell's benefit was recorded in the books of DDC in the "loan

payable" account. Mr. Wilner could not provide a straight answer on this topic, thus his

testimony on this topic is lengthy:

> Q.    [W]hen there's a check written to Tex-Mex as loan repayment,

doesn't that imply that there is a preceding loan from Tex-Mex to Douglas

-8-

Development? Wouldn't that be a natural inference?

A.      With regard to Tex-Mex, for example, there was a description of the property it related to. The natural thing to do would have been to question what it was because the property would not have been on the [DDC] balance sheet. So again, if you were trying to obfuscate, you would not have listed the property address which would have immediately prompted some one when they reconciled to go back and ask what is that related to; see that it wasn't; go look at the invoice file and see Mr. Brownell's name on the invoice file. That was apparently in their files because it's in the records you're showing me.[3]

Q.      And that would have been just as easy I take it, as writing a check from Mr. Brownell for the exact amount that the Tex-Mex invoice was and putting that in the loan receivable account to Mr. Brownell; is that correct?

A.      Writing the check directly to the vendor is easier [than] writing a check to Mr. Brownell and Mr. Brownell then writing a check to the vendor, it's

---

[3]      This answer is, in itself, a master of obfuscation. The witness did not answer the question as to the natural interpretation of DDC's accounting records: "[W]hen there's a check written to Tex-Mex as loan repayment, doesn't that imply that there is a preceding loan from Tex-Mex to Douglas Development? Wouldn't that be a natural inference?" The truthful, straight-forward answer would have been: "Yes."

However, Mr. Wilner could not bring himself to answer the obvious, so he addressed questions that were not asked. For example, he explained how a person would find out the purpose of the payment, what a smart criminal would or would not do, and concluded with a comment that points out that the government, after all, was able to figure out who the beneficiary was: "[The Tex-Mex invoice] was apparently in their files because it's in the records you're showing me." The inability of the witness to provide candid testimony and his desire to score points reveals his bias for Mr. Brownell as opposed to his detachment as a neutral expert. Such a conclusion is obvious from this and similar exchanges.

two checks instead of one. ***.    Id. at 86-87 (emphasis supplied).[4]

11.    Like Mr. Minnis, Mr. Wilner confirmed the irregularity of accounting for the "interest" portion of the payments in DDC's interest payment account as a deductible interest expense:

> Q    And is it your testimony that was a proper interest payment for Douglas Development to make?
>
> A.    No.  That was compensation. ***.  Id. at 89-90.

12.    In conclusion,  Mr. Wilner's testimony established that:  1) starting in 2000, the underlying financial records related to DDC's loan accounts were not subject to outside scrutiny; 2) there was no reasonable prospect or likelihood that the loan accounts would ever be scrutinized in any meaningful time-frame; and, 3) payments to Mr. Brownell or for his benefit spanning almost a decade were only reconciled when Mr. Brownell was subject to a federal tax investigation.  Mr. Wilner also made clear the difficulties in actually identifying Mr. Brownell loans in the books of DDC, indicating that such reconciliation required an intensive year by year review of all the various loan accounts, and a review of the underlying payment files.  Id. at 94-

---

[4]    Thus, though Mr. Wilner's testimony was that "one check, not two" made sense when Mr. Brownell was causing DDC to write checks to a contractor doing work for him, Mr. Wilner insisted that "two checks, not one" made sense when Mr. Brownell obtained funds from DDC by first causing a check to be written to his PVB line of credit and then accessing those funds by check.

In each instance, Mr. Wilner endorsed the practice where:  1) Mr. Brownell was not the named payee on the check; and 2) Mr. Brownell's name does not show up in the books of DDC as the recipient of the funds; and 3) the check is not recorded as a loan to Mr. Brownell in DDC's books.  Thus, according to Mr. Minnis, the preferred way to account for the transactions is the way the provides the least relevant information to a person who thereafter looks at the accounts. In contrast, Mr. Minnis agreed that:  "[T]he fundamental principal of accounting [is] that the books should accurately reflect the substance of the transaction?"  Tr. 2/14 at 47.

96.  Finally, like Mr. Minis, Mr. Wilner confirmed the overall impropriety of central aspects of

Mr. Brownell's recording of the monies paid to his -benefit – an impropriety which is best

explained by Mr. Brownell's attempts to conceal the payments in the books of DDC.

    III.  PROPOSED REBUTTAL AND SUPPLEMENTAL FINDINGS OF LAW[5]

    13.       A bona fide loan or advance is not taxable income.[6]  "However, merely calling a

transaction a loan is not sufficient to make it such."  United States v. Wick, 34 Fed. Appx. 273,

276 n. 4 (9th Cir. 2002), and, indeed, in this case, the bulk of the alleged income was not even

"called a loan."

    14.       Whether a transactions constitute loans for income tax purposes is a factual

question involving several considerations.[7]  A number of factors are relevant in assessing

whether a transaction is a true loan, such as:  (1) whether the promise to repay is evidenced by a

note or other instrument; (2) whether interest was charged; (3) whether a fixed schedule for

repayments was established; (4) whether collateral was given to secure payment; (5) whether

---

[5]      The Government does not disagree with the defendant's discussion of the elements of tax evasion and the government's need to prove relevant conduct by a preponderance of the evidence.  The Government addresses and supplements the defendant's proposed findings as to legal issues associated with loans for tax purposes.

[6]      "[T]he proceeds from a bona fide loan do not constitute income because whatever temporary economic benefit the borrower derives from the use of the funds is offset by the corresponding obligation to repay them."  Moore v. United States, 412 F.2d 974, 978 (5th Cir. 1969).  "For this rule to apply, however, the loan must be an existing, unconditional, and legally enforceable obligation for the payment of a principal sum."  Milenbach v. Comm'r, 318 F.3d 924, 930 (9th Cir. 2003) (internal quotation marks omitted) (citation omitted).

[7]      "Whether a certain transaction constitutes a loan for income tax purposes is a factual question involving several considerations, but a distinguishing characteristic of a loan is the intention of both parties that the money advanced be repaid."  Moore, 412 F.2d at 978 (5th Cir. 1969).

repayments were made; (6) whether the borrower had a reasonable prospect of repaying the loan; and (7) whether the parties conducted themselves as if the transaction were a loan. Although the factors are non-exclusive and no single factor is dispositive, they provide a way to distinguish a bona fide loan from a sham loan or a loan in name only.[8] Courts have applied these standards in concluding that even transactions that were actually recorded as loans were not in fact loans.

See, e.g., United States v. Pomponio, 563 F.2d 659, 663 (4th Cir. 1977) (on remand):[9]

> For example: although the advances were treated as loans on the books of the Pomponio corporations, it is undisputed that no date was fixed for repayment, and no notes were executed by the Pomponios as evidence of indebtedness; neither was any security given to guard against the contingency of default, nor was interest charged or paid with respect to the advances. *** [T]he jury here was entitled to conclude on the basis of such factors that the loans, approximately in the aggregate 2.5 million dollars, in the three pertinent years, were not made as loans in these circumstances.

15.    In this case, as with Pomponio, there is virtually no evidentiary support for the bona fides of these transactions as loans.

---

[8]    "Courts have therefore considered a number of factors to be relevant when determining whether or not funds received constitute a loan, such as: (1) whether the promise to repay is evidenced by a note or other instrument, (2) whether interest was charged, (3) whether a fixed schedule for repayments was established, (4) whether collateral was given to secure payment, (5) whether repayments were made, (6) whether the borrower had a reasonable prospect of repaying the loan and whether the lender had sufficient funds to advance the loan, and (7) whether the parties conducted themselves as if the transaction were a loan." Welch v. Comm'r, 204 F.3d at 1230. "Although the factors are non-exclusive and no single factor is dispositive, these indicia of a bona fide loan form a general basis upon which courts may analyze a transaction." Id. See also, Crowley v. Comm'r, 962 F.2d 1077, 1079 (1st Cir. 1992) (similar criteria).

[9]    The Fourth Circuit in Pomponio originally reversed the conviction on the grounds of an improper instruction. The Supreme Court reversed the Fourth Circuit, and the conviction was reinstated. Pomponio, thus constitutes a clear example where a scheme involving the recording of income as loans was held to violate the tax laws. As noted, in the instant case, the bulk of the income charged was not even recorded in the employee loan account.

16.    In addition, the abundance of other evidence associated with Mr. Brownell's conduct and intent supports the government's position.

* * *

WHEREFORE, as to tax loss, the Government requests that the Court find the "relevant conduct" to encompass a scheme with a tax loss in excess of $80,000.[10]

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY

By:    _____/s/_____
Mark H. Dubester, D.C. Bar No. 339655
Assistant United States Attorneys
555 4th Street, NW
Room 5917
Washington, D.C. 20530
(202) 514-7986

---

[10]    As noted, it would be a great service to the parties if the Court would make rulings as to "sophisticated means" and "abuse of position of skill or trust." As to the latter, there is simply no question that Mr. Brownell, abused his special skill – using his accounting background as a force to commit crime, not for proper professional purposes. As to the former, Mr. Brownell's sprinkling of payments for his behalf among the books of DDC, concealing payments for his benefit as "loan repayments" to PVB, and using the PVB account as a conduit for his receipt of funds, easily constitutes "sophisticated means." These issues are fairly joined by the arguments on the factual issues.

-13-