**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Crim. No. 06-077 (RMU)** |
| | **:** | |
| **JOHN E. BROWNELL** | **:** | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States, by and through its attorney, the United States Attorney for the District

of Columbia, respectfully submits this Memorandum in Aid of Sentencing:

**I.  GUIDELINES CALCULATION**

For reasons set forth in the Court's Findings, the Pre-Sentence Report, and the

Government's various pleadings in connection with the guidelines calculations, the government

urges the Court determine the Guidelines in this case as set forth below.

Tax Loss.  The "relevant conduct" in this case encompasses over $300,000 in income on

which taxes were evaded, and approximately over $80,000 in "tax loss."  This provides a

Guidelines level of 14.  U.S.S.C. Guidelines (1999 ed.) §§ 2T1.1(a)(1) and 2T4.1(I).

Acceptance of Responsibility.  As the Probation Department has properly determined, the

defendant is not entitled to credit for "accepting responsibility."  The defendant participated in a

extensive criminal course of conduct consisting of numerous dishonest acts spanning a decade.

He caused hundreds of thousands of dollars to be skimmed from company funds and diverted to

his personal use.  He did so in a way to conceal on the company books that he was the true

beneficiary of these monies, and thus evaded taxes on his receipt of these funds.  Notably,

virtually none of the checks on their faces, and none of the accounting entries, revealed that they

were for the defendant's benefit.  He admitted to a single incident amounting to $10,000, and put

the government through substantial litigation burdens – in effect a trial on the merits – to demonstrate the core conduct of which he was accused.

By analogy, it would be as if someone were charged with (and found by the Court to be fully culpable for) stealing $300,000 but admitted to stealing only $10,000 – one thirtieth of the actual conduct. Indeed, far from truly accepting responsibility, Mr. Brownell has, in critical respects, denied responsibility for all but a small fraction of the charged (and proven) conduct.[1]

Moreover, it is the defendant's burden to demonstrate that he is entitled to the sentencing credit for acceptance of responsibility,[2] and he is not automatically entitled to that credit simply because he pleaded guilty. As the Guidelines make clear: "A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right."[3] It is proper to evaluate a defendant's candor concerning the pertinent related conduct in determining whether a defendant is entitled to such credit.[4] In this regard, Mr. Brownell has minimized his culpability beyond all

---

[1]    If an individual, charged with speeding at 90 miles per hour, acknowledged driving his car at 56 miles per hour – one mile per hour over the speed limit – no one would reasonably view that concession as an actual acceptance of responsibility. Rather, it would be properly viewed as a denial of the essence of the offense, even if couched as an admission.

[2]    See, e.g., United States v. McLean, 951 F.2d 1300, 1302 (D.C.Cir.1991).

[3]    U.S.S.C.. Guidelines (1999 ed.), § 3E1.1, Commentary, App. Note 3.

[4]    "[A] defendant who falsely denies *** relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." U.S.S.C.. Guidelines, (1999 ed.) § 3E1.1, Commentary, App. Note 1(a) . "[T]ruthfully admitting or not falsely denying any additional relevant conduct for which he is accountable *** will constitute significant evidence of acceptance of responsibility ***." Id., App. Note 3. See also, United States v. Taylor, 937 F.2d 676, 680 (D.C. Cir. 1991) (acceptance of responsibility credit denied to defendants who pleaded guilty to being a felon in possession of firearm, where the defendants gave incredible stories as to their "related conduct" as to why they were in possession of firearms).

recognition. The defendant's concession to having received a single $10,000 item in light of all the illegal activity, is plainly inadequate to support his claim for "acceptance of responsibility," and he has not met his burden.

Abuse of Position of Trust/Special Skill.   There can be no serious dispute that Mr. Brownell abused his "special skill" as an accountant, as that term is meant in § 3B1.3, and is entitled to a two level increase in the determination of the offense level.

Sophisticated Concealment.   The facts associated with the conviction have been set forth in other pleadings.  For over a decade, Mr. Brownell concealed the distribution of Douglas Development funds to him and for his benefit.  He carefully recorded these checks in the books of the company in a way to minimize the detection of these payments for his benefit, and to optimize his ability to explain away his fraudulent conduct if caught.  Moreover, as the Court noted in its findings, on a monthly basis, the defendant caused DDC checks to be written to his Potomac Valley Bank account and then moved money from that account into his personal account.  The scheme, involving the careful concealment and false accounting of check by check, year after year, and the use of an equity line account to conceal monies drawn on DDC accounts payable to the defendant, was "sophisticated" within the meaning of the "sophisticated concealment" special offense adjustment under § 2T1.1(b)(2).

Request for Upward Departure.   This represents the defendant's first felony conviction. Ordinarily, the defendant would be sentenced at Criminal History Category I.

However, Criminal History Category I understates the defendant's true criminal history. The evidence at the hearing and other evidence that this Court has heard in other proceedings has convincingly demonstrated Mr. Brownell's ability, willingness and determination to use

dishonest and fraudulent means to obtain from financial institutions monies for himself and others.

The record in front of the Court has demonstrated the following:

- 1995 Washington Mutual Loan Application.   In his 1995 application to Washington Mutual for a mortgage loan to purchase 6151 Tuckerman Lane, Mr. Brownell represented his wages as $117,612.17 (for 1993) and $135,673 (for 1994), when, in truth and in fact, Brownell's income as reported to the IRS on his W-2s for those years was $48,891,38 and $45,673.  Mr. Brownell also included a purported (and fraudulent) 1994 tax return when, in fact, no such return was filed with the IRS.   Ex. 3 at 21-22.

- 1996 Potomac Valley Bank Application.  In his 1996 loan application to Potomac Valley Bank to obtain to obtain a line of credit, Mr. Brownell submitted, among other materials, a purported 1994 tax return.  This purported to be a return representing his 1994 wages as $135,673 when, in truth and in fact, Mr. Brownell's income as reported to the IRS on his 1994 W-2 was $45,673, and no 1994 return was filed.  Ex. 3 at 4-10;

- False 1996 W-2.  A 1996 W-2 for Mr. Brownell was found on the DDC network server in a Brownell "folder"; the document represented that the defendant's 1996 income was $134,315,92 when, in truth and in fact, Mr. Brownell's1996 income was reported to the IRS as $54,316.  Ex. 3 at 2.   It is not known whether this W-2 was actually submitted to a lender, but there is little other plausible explanation for this document other than that it was intended to be used to support false

representations of income.

- 1998 Crestar Overdraft Line Application.  In 1998, Mr. Brownell submitted, an overdraft line application to Crestar, reporting income of $120,000 plus rental income of $1,250 per month, when, in truth, Brownell's reported income to the IRS for 1998 was $54,316.  Ex. 3 at 26;

- 1993 Memo.  Mr. Brownell, in a memo to his supervisor, described certain bonus that he had prepared for signature:  "Payment in this matter is 100% non-traceable as compensation, thereby eliminating tax burdens on both sides."  Ex. 3 at 1.  The clear import of this document – as to which there can be no serious doubt in light of other the other evidence – is that Mr. Brownell had concealed certain income for the benefit of himself and his employer.

- Mr. Brownell failed to file timely federal income tax returns from 1994 through 2003, ten years, and actively evaded taxes during nearly each of these years.

- Mr. Brownell was an active participant in the process that resulted in the convictions of others for Wire Fraud.  Mr. Brownell's primary role in the company was to handle the lending relationships with financial institutions, and he was instrumental in dealing with Morgan Stanley (in connection with the proceeds of the 77 P Street refinancing), the lender on the 111 Massachusetts Avenue purchase for which funds were needed, and even Mr. Cayre.

Mr. Brownell wrote the November 2002 letter to Mr. Cayre falsely representing that the funds of the "tenant improvement reserve" were to go to "outside" brokers and was substantially involved in the transferring of the $400,000 from the MTD

bank account at Adams Bank to the attorney who handled the settlement on 111 Massachusetts Avenue.

The term "first offender" generally connotes someone who, for the first time in his life, has lost his moral compass, strayed, and transgressed the criminal laws.  It is a somewhat charitable term, and in some contexts may suggest a someone who has made an isolated mistake – perhaps a crime of impulse or a youthful indiscretion – and has thus become entangled in the criminal justice system.   This is far from the case with Mr. Brownell.  By no reasonable stretch can he be referred to as a "first offender" as that term is typically used;  rather, after the commission of a crime spanning many years of careful planning and secrecy, he was finally caught and held accountable.  Indeed, he is a multiple, repeat offender, whose dishonest activities have occurred over a substantial portion of his adult life.  Even the offense of conviction – tax evasion in this case – was accomplished by numerous transactions, on a near monthly basis, over the course of a decade.

Thus, Criminal History Category I substantially understates Mr. Brownell's criminal history.  The Guidelines specifically contemplate departures where the criminal history score does not accurately reflect the defendant's history.  See, e.g., United States v. Perez, 160 F.3d 87, 89 (1st Cir. 1998) ("Far from being a forbidden factor, departures for atypical criminal history are specifically encouraged under U.S.S.G. § 4A1.3." (citation omitted)).  In this regard, § 4A1.3 of

-6-

the Guidelines (1999 ed.) provides, in part:

> Section 4A1.3.  Adequacy of Criminal History Category (Policy Statement)
>
> If reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the court may consider imposing a sentence departing from the otherwise applicable guideline range.  Such information may include, but is not limited to, information concerning:
>
> * * *
>
> (e) prior similar adult criminal conduct not resulting in a criminal conviction.

As to the extent of the departure, the Guidelines further provide:

> For example, if the court concludes that the defendant's Criminal History Category of III significantly under-represents the seriousness of the defendant's criminal history, and that the seriousness of the defendant's criminal history most closely resembles that of most defendants with Criminal History Category IV, the court should look to the guideline range specified for a defendant with Criminal History IV to guide its departure.

Thus, the task for the Court is to determine the "criminal history category" that "most closely resembles" the defendant's actual criminal history.  See generally, United States v. Bridges, 175 F.3d 1062, 1065-68 (D.C. Cir. 1999).  The Court is not required to engage in a calculation of defendant's "hypothetical" criminal history score or proceed "step-by-step" to determine the appropriate criminal history level.  Id.  See also, e.g., United States v. Goshea, 94 F.3d 1361, 1365 (9th Cir. 1996) (extent of departure not required to be determined by "mechanical calculations").[5]

_____

[5]     The offenses at issue are certainly "similar" for the purposes of this analysis. They involve the use of false documents to conceal income.  The fact that in one instance, the

The Government proposes an exceptionally conservative methodology as a guide for the exercise of the court's discretion in determining the extent of an upward departure. Thus, for purposes of this case, one way to analogize the defendant's criminal history is to treat it as akin to four "no-jail" misdemeanors. This is generous – the actual prior conduct is much worse. Nonetheless, the Guidelines (1999 ed.) provide, in § 4A1.1(c), for purposes of calculating

_____

victim is the Internal Revenue Service (false tax documents such as W-2s to understate income) and in another it is financial institutions (false tax documents to overstate income) do not make them "dissimilar." Indeed, in one instance, the payment from Mr. Brownell's employer to Mr. Brownell was characterized as a loan for IRS purposes and income for purposes of a bank loan. In United States v. Mayo, 14 F.3d 128 (2d Cir. 1994), the sentencing court departed upward in connection with a mail fraud conviction based on two prior uncharged arsons. This was affirmed by the Second Circuit, which held that the prior conduct "need not have been of an identical type." Id. at 131-132. As the Second Circuit reasoned: "All that § 4A1.3(e) requires is that the prior conduct be 'similar.' Plainly, the court viewed the prior arsons as fraudulent conduct designed to disadvantage financial institutions in their loan dealings with Mayo, and concluded that that conduct was sufficiently similar to the frauds prosecuted in the present case to warrant an upward departure in [the criminal history score]. We agree. The difference between a fraud designed to obtain loans in the first place and a fraud designed to avoid their repayment is a variation that does not bespeak dissimilarity." Id. at 131.

Section 4A1.3 has also been interpreted to permit a departure even where the prior criminal conduct is not "similar." See, e.g., United States v. Cox, 299 F.3d 143, 147 (9th Cir.2002) (upward departure based on drug offenses that did not result in convictions in sentencing for theft); United States v. Brewster, 127 F.3d 22, 26 (1st Cir.1997) (prior uncharged domestic abuse considered in sentencing defendant for felon in possession of firearm conviction); United States v. Schweihs, 971 F.2d 1302, 1319-20 (7th Cir.1992) (court considered reversed conviction for possession of wire communication intercepting device in sentencing for extortion: "Section 4A1.3 expressly provides that the list is not exhaustive."); United States v. Breasted, 127 F.3d 22 (1st Cir. 1997) (rejecting claim that prior dissimilar criminal conduct (beating wife) could not justify departure: "After all, [§ 4A1.3] states explicitly that the list of five illustrations is not intended to be exhaustive. What is more, to infer that the guideline's explicit authorization to consider similar misconduct as a basis for departure precludes any consideration of dissimilar misconduct for that purpose not only would frustrate the 'included, but not limited to' caveat that the Sentencing Commission deliberately inserted in the text of section 4A1.3, but also would run counter to a fundamental principle of departure jurisprudence: that, in the absence of an explicit proscription, courts generally should not reject categorically any factor as a potential departure predicate." (citation omitted)).

criminal history, that a defendant is to be given "l point" for each offense that involved a sentence of less than 60 days – up to a maximum of 4 points. Attributing to the defendant four criminal history points would result in an upward departure from Criminal History Level I to Criminal History III. The government thus requests that this Court depart upward from Criminal History Category I to Criminal History Category III, as the category that "most closely resembles" the defendant's actual criminal background.

      <u>Summary</u>. If the Court were to adopt the findings of the Pre-Sentence Report – with no other adjustments urged by the parties – the defendant would be at level 16, Criminal History Category I, for a sentence in the range of 21 to 27 months.

      If the Court were to adopt the additional findings proposed by the Government – "sophisticated means"and "upward departure" – the applicable guidelines would be calculated as follows:

- If upward departure under § 4A1.3, and no sophisticated means: 27-33 months (level 16, Criminal History III);

- If no upward departure, but enhancement increase for sophisticated means: 27-33 months (level 18, Criminal History I);

- If upward departure under § 4A1.3 and enhancement for sophisticated means: 33-41 months (level 18, Criminal History III).

## II.  <u>SECTION 3553(e) FACTORS</u>

      In considering the factors set forth in Title 18, United States Code, § 3553(e), there is nothing to suggest that the Guidelines sentence in this case is not appropriate. The defendant has come from a good family and received a good education. He knows right from wrong and should

be held to a high standard.  There is nothing "exceptional" in his past that would suggest leniency.

Moreover, the crime of conviction is the sort of crime for which deterrence is a necessary component of the sentence.  The tax system, in particular, relies on voluntary compliance, and tax crimes, in particular, demand punishment to promote respect for the law and provide adequate deterrence to other potential tax cheats.  "Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.'"  United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (citation omitted).  Courts have noted time and again, that prison sentences in white collar cases are essential, otherwise white collar defendants face little in the way of consequences for their crimes other than being forced to repay their monetary debts.  As the First Circuit stated:

> 'One of the goals of the entire guidelines regime was to minimize discrepancies in the treatment of "white collar" and "blue collar offenses." *** From the outset of the guideline regime, the Sentencing Commission determined that the penalties for white collar crime had to be increased because of the inequity in the pre-guideline sentencing practice of 'punishing economic crimes less severely than other apparently equivalent behavior.' *** In recent years, Congress has expressed concern that punishments for white collar offenses were too lenient.  In 2002, Congress enacted the White Collar Penalty Enhancements Act which, inter alia, instructed the Sentencing Commission to consider whether the sentencing 'guidelines and policy statements ... are sufficient o deter ... [white collar] offenses' and to 'modify the sentencing guidelines' accordingly. *** In response, the Commission increased the penalties and enhancements for certain white collar offenses.

United States v. Thurston, 456 F.3d 211, 218 (1st Cir. 2006) (citations omitted) (reversing a

departure from 60 months to 3 months).[6]

Indeed, the guideline sentences for Mr. Brownell would be more stiff if he were sentenced under the post-2001 versions of the Guidelines.

### III.  SUPERVISED RELEASE

In imposing terms of supervised release pursuant to 18 U.S. C. § 3583(d), this Court should consider "the nature and circumstance of the offense and the history and characteristics of the defendant," the "need for the sentence imposed *** to provide respect for the law" and to "protect the public from further crimes of the defendant."[7]  It is thus a standard condition of

------

[6] The legislative history of the Sentencing Reform Act of 1984, which created the United States Sentencing Commission, made clear that one of the goals of the legislation was to correct what Congress saw as a significant problem in the criminal justice system:  the fact that "some major offenders, particularly white-collar offenders . . . frequently do not receive sentences that reflect the seriousness of their offenses." U.S.C.C.A.N., 98th Congress, 2nd Sess. (1984) at 3260.

As Justice Breyer, one of the Sentencing Commission's original members, explained:

> The Commission found in its data significant discrepancies between pre-Guideline punishment of certain white-collar crimes, such as fraud, and other similar common law crimes, such as theft. The Commission's statistics indicated that where white-collar fraud was involved, courts grant probation to offenders more frequently than in situations involving analogous common law crimes; furthermore, prison terms were less severe for white-collar criminals who did not receive probation.  To mitigate these discrepancies, the Commission decided to require short but certain terms of confinement for many white collar offenders, including tax, insider trading, and antitrust offenders, who previously would have likely received only probation.

Breyer, "The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest," 17 Hofstra L. Rev. 1, 20 (1988) (emphasis added).

[7]    18 U.S.C. § 3684 cross-references, in particular, the factors of 18 U.S.C. §3553(a) related to the imposition of sentence.  The factors cited include 18 U.S.C. § 3553(a)(1) and 2(A) and (C).

supervised release that a convicted felon (the defendant) not be permitted to associate with other

known felons.  As set forth in the Guidelines, §5D1.3(c)(9), it is a standard condition of

supervised release that "the defendant shall not associate with any person *** convicted of a

felony unless granted permission to do so by the probation officer[]."

This term has particular applicability when the crime at issue stems from the unique

relationship between individuals, and will serve to separate Mr. Brownell from the circumstances

that enabled him to commit the crime of conviction.  For almost a decade, Mr. Brownell – with

Mr. Jemal's assent – has participated in a tax evasion scheme.  This was perpetuated in the

course of Mr. Brownell's employment, as the Chief Financial Officer for Mr. Jemal's business.

In 2005, when the tax evasion conduct came under scrutiny, Mr. Jemal paid Mr. Brownell a one-

time "bonus" check of approximately over $400,000 – supposedly to repay the years of "loans"

and the accompanying taxes.  In addition, in 2005, Mr. Jemal increased Mr. Brownell's salary

from approximately $125,000 to close to $300,000 per year.  This Court also knows that

Mr. Brownell was instrumental in the "MTD fraud" of which Mr. Jemal and Mr. Esherick were

convicted.  See, e.g., United States v. Bortels, 1993 WL 101445 (6th Cir., Apr. 6, 1993) at *1

(defendant convicted of harboring a fugitive prohibited, under the terms of supervised release,

from having contact with known felons including that same fugitive).[8]        The Government

_____

[8]        See, e.g., United States v. Sharp, 931 F.2d 1310, 1311 (8th Cir. 1991) (approving
term of supervised release subjecting defendant to warrantless searches for drugs and alcohol:
"the district court may order conditions of supervised release which are 'reasonably related to
*** the nature and circumstances of the offense and the history and characteristics of the
defendant, and *** to protect the public from further crimes of the defendant.'" U.S.C.G. §
5D1.3(b); see also 18 U.S.C. § 3583(d)."); United States v. Phaneuf, 91 F.3d 255, 262-63 & n. 10
(affirming terms of supervised release  limiting defendant's power to make purchases over $100
and obtain credit (citing cases)).  In United States v. Mills, 959 F.2d 516 (5th Cir. 1992), a
defendant convicted of odometer tampering was forbidden under the terms of supervised release

urges the Court to impose standard conditions of supervised release designed to sever the ties

between the defendant and Mr. Jemal, among others.

**<u>CONCLUSION</u>**

WHEREFORE, the Government requests the Court sentence the defendant at Level 18,

Criminal History Score III, and impose standard conditions of supervised release.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY


By:     _____/s/_____
        Mark H. Dubester, D.C. Bar No. 339655
        Assistant United States Attorneys
        555 4th Street, NW, Room 5917
        Washington, D.C. 20530
        (202) 514-7986

---

to go into the used car business.  Here, the government is simply requiring that the defendant not
work for one specific company.