**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                              )
**UNITED STATES**                             )
                                              )
  **v.**                                      )        **Crim. No. 06-CR-0077 (RMU)**
                                              )
**JOHN E. BROWNELL,**                         )
                                              )
          **Defendant.**                      )
_____)

<u>**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**</u>

In accordance with _United States v. Booker_, 543 U.S. 220, 125 S.Ct. 738 (2005), 18 U.S.C. § 3553, and Section 6A1.2 of the Federal Sentencing Guidelines Manual, the defendant, John E. Brownell, through counsel, respectfully presents this memorandum to aid the Court in determining an appropriate sentence in this case.

**I.      INTRODUCTION**

Mr. Brownell stands before the Court having pleaded guilty to one count of tax evasion. We acknowledge that this is a serious felony offense, which Mr. Brownell fully understands and deeply regrets. We recognize that Mr. Brownell's 1993 memorandum is a focus of concern, as are some of his personal bank loan applications, as is his accounting degree, as is his failure to file tax returns over a number of years. As the Court has noted in a prior related sentencing, deterrence is important in the context of criminal tax offenses.

Nonetheless, we respectfully but emphatically submit that a sentence of probation, or a term of home confinement at most, is the appropriate sentence for Mr. Brownell. The government approaches this sentencing, as it has the sentencings of Mr. Brownell's colleagues at Douglas Development Corporation ("DDC"), in moralistic terms. We do not. In our view,

Congress appropriately and comprehensively set forth the objectives of sentencing in 18 U.S.C. § 3553, and the Supreme Court courageously defended those criteria, and the judicial discretion their application necessarily entails, in *United States v. Booker*, 543 U.S. 220 (2005). These concepts, when applied here, call for a probationary sentence for at least the following reasons:

- Mr. Brownell is deeply committed to the success of DDC, where he has worked for seventeen years. His life is largely devoted to his work there. And a good part of the reason for this devotion is the extraordinary service that Douglas Jemal and DDC have provided to this community over many years, as presented during the Jemal and Esherick sentencing proceedings. The critical nature of Mr. Brownell's service to DDC, and the decisive and indispensable role he has played in its service to the District of Columbia, is evident from the numerous detailed and heartfelt letters submitted with this memorandum as Exhibit 1. This contribution by Mr. Brownell, as a principal member of the DDC team, must weigh heavily in mitigation of his sentence.

- Mr. Brownell is a person of fundamental decency. He is not the one-dimensional figure portrayed in the government's memorandum. The long pattern of honesty and forthrightness he has brought to his business dealings over his seventeen years at DDC, and even before that when he was a practicing accountant, is clear beyond peradventure from the enclosed letters. This pattern of conduct, established over a lifetime, must receive substantial weight at sentencing.

- Aside from his work at DDC, Mr. Brownell has demonstrated a community consciousness and an openness to members of our community who come from backgrounds different from his own.

- The experience of prosecution has been searing for Mr. Brownell. There can be no question that, as a result of the government's investigation and prosecution of Douglas Jemal, Mr. Brownell, and others at DDC, the company has undergone a fundamental cultural change, from the top down. To ensure that nothing similar to the conduct that brought DDC and Mr. Brownell before the Court occurs again, DDC has made, and continues to make, significant changes to internal processes and procedures. Deterrence of any future misconduct by those at DDC has already been achieved.

- As a matter of basic parity and fundamental fairness, Mr. Brownell should not be sentenced more harshly than Mr. Jemal. He is significantly junior to Mr. Jemal, and to Mr. Esherick for that matter, in his level of authority at DDC. His conduct is not more egregious than theirs, and is in fact less so.

Like any sentencing, this one presents an intricate and subtle portrait of an individual. We respectfully submit that when all of the available information is examined, the following characteristics emerge:

Mr. Brownell is a rather shy, retiring person who is devoted, almost above all else, to his work and to helping DDC thrive. For virtually his entire career, since 1990, he has been employed at DDC, following a brief career in accounting private practice at Grossberg Company. By all accounts he works tirelessly at DDC. He puts in long hours at the office, then typically adjourns to one particular restaurant in Bethesda, Maryland, and then goes home. He is unmarried and his social life is minimal. As the presentence report writer indicates, and the attached letters in support confirm, the only vacation Mr. Brownell ever takes is a yearly trip to visit his 82-year-old parents, who remain unaware of this case.

Mr. Brownell's reputation within DDC and among the numerous professionals at other entities with whom he regularly interacts is extraordinary in its excellence and consistency. Mr. Jemal observes that DDC is a family business and Mr. Brownell is a member of that family. Presentence Investigation Report ("PSI Report") at ¶¶ 58. Mr. Brownell is universally regarded as a nice, honest, diligent person who is nearly exclusively work-directed. One telling example of his honesty is his free and open admission to the presentence report writer concerning his use of marijuana and cocaine in the distant past, despite the fact that his urinalysis was negative and there was no evidence available proving the nature and extent of such use. PSI Report at ¶¶ 52-53.

On a personal level, Mr. Brownell has little in his life other than his work. As the PSI Report notes, his residence is "older and in need of refurbishment." PSI Report at ¶ 49. This is something of an understatement, as the photographs appended to this memorandum as Exhibit 2 demonstrate. Mr. Brownell lives in a remarkably unpretentious manner in an old house badly in need of repair, driving an old truck, and taking virtually no time for recreation of any kind other than a grueling exercise regimen.

The letter written by Lane Potkin, DDC's general counsel, and confirmed by the more than 80 other letters written in support of Mr. Brownell, provides insight into Mr. Brownell's character. It reads:

> I first met Jack almost 20 years ago, when he first began working for Douglas Development, performing in-house accounting and financing functions. At that time Mr. Jemal had just begun expanding his real estate activities, and Jack was chiefly responsible for coordinating the financing for the company's purchases, while performing many other related financing, accounting and administrative activities for the company.
>
> Despite the company's rapid growth, Jack continued to perform many of these same functions, with minimal assistance from new or existing employees, and I

always marveled at his ability to handle as much as he did, without rancor or complaint. Regardless of whether the question I (or others) had was about leasing, property management, financing or vendors, Jack would always either have the information readily available, or would locate it within hours. His selflessness in seeing things through was appreciated by all with whom he worked and unfailingly commented upon by the many lenders and analysts I have worked with on behalf of the company during the last twenty years. Jack has been and continues to be an invaluable asset to the company.

My relationship with Jack, by necessity, has evolved over the years, although most of our initial dealings were confined to business, since Jack was by nature a loner who was not married, and I was immersed on the family track, with my two children and wife being my primary focus. However, in 2003 I started training for the Marine Corps Marathon and discovered that Jack was a runner, though his focus then was primarily fitness. Since January of 2005 we, occasionally joined by one to three other runners, have done our long runs together on most weekends, and during these runs, ranging from 8 to 18 miles, I have gotten to know Jack on a more personal level.

Jack, unlike many other people who have come before this Court, to my belief is neither motivated by greed, power nor notoriety. Jack is very content with a simple, unobtrusive lifestyle, with large emphasis placed on routine and order. He is committed to running three times a week (with the highlight being his ascent of the "Exorcist" stairs in Georgetown which he completes ten times each Thursday morning and keeps meticulous records on), and working out in the gym three other days a week. In discussing his need for maintaining routine (it is difficult for me to alter our weekends running route for a little change), Jack related how his father, who is a retired Army colonel, ran into his 60's, always followed the same route, and kept a detailed log of his runs, including temperature and humidity.

Jack's lifestyle is also austere by choice, and contrary to the allegations by the prosecutor in this case, I cannot fathom that Jack's motivation with respect to some of the complained conduct was money. Jack's day to day living expenses are minimal, he has no immediate family to support, and has never exhibited any interest in attempting to impress third parties with material possessions. Given the choice, I have no doubt that Jack would prefer keeping his fifteen year old non-descript and somewhat run down truck rather than trading it in for a newer vehicle, an option which would be readily available to him if he chose.

Jack also disdains attention, whether at work or with his friends and acquaintances, and will always defer credit to others rather than accept it himself. Consistent with this, Jack always has worked, and continues to work, behind the scenes with various charitable organizations associated with the company, and

often times he is both the impetus and organizer of the company's (and its principals) many charitable undertakings.

In short, the Jack Brownell I know is an intelligent, honest and essentially selfless person who bears no resemblance to the calculating and greed motivated individual that the government paints him out to be. And while Jack certainly has made some errors in judgment, especially with respect to the timely filing of his tax returns (an error that in my mind was exacerbated by his adherence to routine) he continues to be a positive asset to the company and the community as a whole, well deserving of a lenient sentence by this Court.

July 22, 2007 Letter from Lane H. Potkin.

Explaining why Mr. Brownell engaged in the conduct at issue requires more than the good-versus-evil rubric urged by the government or the statement that he was motivated by "greed." If Mr. Brownell were a greedy person, he would not work as he does or live as he does. As we have come to know him over the many months we have worked with him, it has become evident to us that he is an unusual person in a number of ways. Not filing tax returns for ten years is not exactly a crafty methodology for avoiding detection of tax fraud. It is roughly equivalent to standing in front of the offices of the Internal Revenue Service holding up a large arrow pointing at oneself.

The reality here is that Mr. Brownell is not the larger-than-life personality that Mr. Jemal is, or in fact that Mr. Esherick is. He has worked hard to maintain his status as a valued member of the DDC team, and in so doing he engaged in some excesses that are the subject of this case. Even the government has recognized that, in Mr. Brownell's case, "the real tax savings accrued to Mr. Brownell's employer, who, by virtue of the tax evasion scheme, was spared having to pay more than $180,000 of scarce company funds in the form of withholding and related taxes to the federal and state taxing authorities." Government's Proposed Findings of Fact and Conclusions

of Law, ¶ 54.  Viewed in context – in the context of his employment at DDC, in the context of

his colleagues there, and in the context of his life as a whole – a just sentence is one of probation.

## II.      SENTENCING GUIDELINES ISSUES

### A.      **Mr. Brownell Should Receive Credit for Acceptance of Responsibility**

Mr. Brownell is deeply sorry for his criminal conduct at issue in this case.  As the

presentence report writer acknowledges, he fully and completely admitted during his plea

proceeding, and admitted to her, his guilt as to Count Two of the indictment, the offense to

which he pleaded guilty.

While the probation officer's acceptance of the government's position concerning an

adjustment for acceptance of responsibility is perhaps understandable, we respectfully submit

that it is plainly in error and should be rejected by the Court.  It is highly unusual to deny a

defendant who has pleaded guilty two points' credit for acceptance of responsibility pursuant to

U.S.S.G. § 3E1.1.  We should all be concerned about the deterrent effect that such a denial could

have for any defendant considering a guilty plea, particularly since, under the Guidelines, those

two points are one of the scant items of credit for such a defendant that the Guidelines allow.

Under certain circumstances, defendants can receive credit for acceptance of

responsibility even if they go to trial and thus engender a substantial expenditure of resources by

the prosecution and the Court.  *See, e.g., United States v. Kellum*, 372 F.3d 1141 (9th Cir. 2004).

Here, in contrast, Mr. Brownell is in the extraordinary position of having – ***with the***

***government's consent, pursuant to a written plea agreement*** – admitted his guilt concerning

one item of tax evasion relating to a $10,000 check.  *See United States v. Beserra,* 967 F.2d 254,

256 (7th Cir. 1992) (the framers of the sentencing guidelines created the acceptance of

responsibility adjustment because they "wanted to encourage the guilty to plead guilty in order to

save the government and the judiciary the costs of trial").    Nonetheless, he now faces the potential of sentencing on a loss amount many multiples higher than that, based on the Guidelines' doctrine of relevant conduct, based on facts to which he did not plead guilty and which have never been adjudicated by a jury.    As the presentence report writer aptly observes, in rejecting the government's request for an upward departure:

> **The Court determined the defendant's relevant conduct was far in excess of the amount for which the defendant admitted responsibility.    Consequently, the defendant's guideline range is substantially higher than contemplated by the defendant and his counsel.    It appears that the guideline sentence range the defendant faces is sufficiently punitive.    Additionally, the government has not provided specifically grounds or U.S.S.G. authority for an upward departure.**

PSI Report (Addendum at p. 19) (emphasis added).    Is Mr. Brownell really to be denied two points for acceptance of responsibility, following his plea of guilty, under these circumstances?

A careful analysis of the law relating to U.S.S.G. § 3E1.1 demonstrates that Mr. Brownell should receive a two-point adjustment pursuant to that Section.    The presentence report writer correctly used the Guidelines version applicable in 1999 in light of the *ex post facto* clause.[1]    *See* PSI Report at ¶ 28.    The Application Notes of Section 3E1.1 of that version of the Guidelines provide as follows:

> 1.  In determining whether a defendant qualifies under subsection (a), appropriate considerations include, but are not limited to, the following:
>
> > (a) truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting ***or not falsely denying*** any additional relevant conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct).    ***Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a).    A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this***

---

[1] This was the Federal Sentencing Guidelines Manual effective November 1, 1998.

> **subsection.** However, a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility. . . .

> 3. Entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which he is accountable under §1B1.3 (Relevant Conduct) (see Application Note 1(a)), will constitute significant evidence of acceptance of responsibility for the purposes of subsection (a). . . .

U.S.S.G. § 3E1.1 (Application Notes 1-3) (emphasis added).

The foregoing language, which is not referenced by the presentence report writer, conclusively shows that Mr. Brownell should receive a two-point downward adjustment. He pleaded guilty and forthrightly admitted the elements of Count Two, the offense to which he entered his plea. He has never – not to the Court, the probation officer or anyone else – ever denied any aspect of his guilt of this offense; rather, he has forthrightly admitted it. As to relevant conduct, he has remained silent, which, according to the above-quoted Application Note, is precisely what he needed to do to retain his eligibility for a downward adjustment. We, his counsel, as part of our advocacy for him, have urged the Court to find that he did not possess the necessary criminal intent with respect to the relevant conduct, and that he was otherwise not guilty of it. The Guidelines, however, do not make Mr. Brownell responsible for the tactical choices of his counsel. We are aware of no authority for the proposition that litigation positions taken by a defendant's counsel can influence his eligibility for a downward adjustment for acceptance of responsibility. No such authority is cited by the probation officer. *Compare Elliott v. United States*, 332 F.3d 753, 766 (4th Cir. 2003) (overtly false denial of relevant conduct *by the defendant herself* can disqualify her for downward adjustment for acceptance of responsibility).

9

The overwhelming weight of authority suggests that a downward adjustment is appropriate here. In *United States v. Kellum,* the defendant put the government to its proof and went to trial on one indictment, while entering a guilty plea on another closely related indictment. 372 F.3d at 1146. The Court of Appeals affirmed a downward adjustment for acceptance of responsibility on these facts, noting:

> The acceptance of responsibility provision of the Sentencing Guidelines, in light of its purposes, should permit Kellum to receive an acceptance of responsibility adjustment because he pleaded guilty to the charges in the Buss indictment, saving the government and judiciary the time and expense of proceeding to trial on that indictment. These benefits to the government are not wholly negated by Kellum's prior venture in trial on the Fidelity indictment, nor are the benefits insubstantial. We hold that it is not clear error for a district court to grant a defendant charged in two separate indictments later grouped for sentencing a downward adjustment for acceptance of responsibility if the defendant pleads guilty to all charges in one indictment, save for those dismissed agreeably by the government, even if the defendant goes to trial on the charges in the other indictment.

*Id*. at 1146. *See also United States v. Middleton*, 246 F.3d 825, 845 (6th Cir. 2001) (defendant entering *Alford* plea not categorically barred from receiving acceptance of responsibility credit), *accord, United States v. Kathman*, 2007 WL 1754492 (6th Cir. June 20, 2007); *United States v. Ruggiero*, 100 F.3d 284 (2nd Cir. 1996) (district court could find that defendant involved in string of kidnappings, and convicted of racketeering, clearly demonstrated acceptance of responsibility for his offense, warranting reduction of offense level under Sentencing Guidelines, even though defendant denied involvement in additional kidnappings which were found to be relevant conduct for sentencing, based on defendant's remorse, his guilty plea, and his confession to one incident of relevant conduct on stand), *cert. denied*, 522 U.S. 1138 (1998); *Cf. United States v. Hakley*, 101 Fed. Appx. 122 (6th Cir. 2004) (improper to consider defendant's conduct prior to entry of guilty plea in determining appropriateness of downward adjustment for

acceptance of responsibility). Given Mr. Brownell's forthright and complete acceptance of responsibility for the offense of conviction, and his silence concerning the alleged relevant conduct, he should receive a downward adjustment for acceptance of responsibility.

**B.**     **The Court Should Not Apply the Special Skill Enhancement**

Mr. Brownell respectfully submits that the "special skill" enhancement under Section 3B1.3 of the Sentencing Guidelines should not be applied in determining his sentence.

**1.     U.S.S.G. § 3B1.3**

Section 3B1.3 provides: "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." U.S.S.G. § 3B1.3. The application notes further provide as follows:

> "Special skill" refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts.

U.S.S.G. § 3B1.3, Application Note 4.

**2.     The Presentence Investigation Report**

In the PSI Report, the probation officer determined to apply the special skill enhancement here, based on the following:

> The defendant, an accountant by trade, held the position of Chief Financial Officer at Douglas Development. He had access to the company's financial ledgers and in the course of his criminal conduct he: (1) directed DDC issued checks to pay towards his Potomac Valley Bank line of credit; and (2) recorded false information to the DDC ledgers (accounting system). The defendant used his special skill to successfully facilitate the commission of the offense. Pursuant to U.S.S.G. § 3B1.3, the offense is increased two levels.

PSI Report, at 7.

11

In response to Mr. Brownell's objections to this enhancement, the probation officer stated as follows:

> . . . Clearly, the defendant, the head of financial services at Douglas Development, was in a position that provided him access to the financial workings and accounting of the company. Whether he is currently licensed as an accountant or not, he had the background and skill of one. The defendant managed the financial ledgers of the company as well as his private accounts and/or loans. These tasks, with their concealment, were easier to facilitate by someone with an accounting background, than a layman. There have not been any revisions to the report concerning this issue which remains unresolved.

PSI Report, at 20.

Mr. Brownell respectfully submits that the conclusions in the PSI Report are misplaced for a number of reasons, including that they define the offense at issue too broadly and rely merely on access to the means of committing the crime to connect the special skill to the offense, rather than whether the special skill facilitated the offense as required by Section 3B1.3. Moreover, the PSI Report does not find that that the special skill *significantly* facilitated the offense, and the facts of this case do not support such a finding.

### 3.    Applicable legal standards

In *United States v. Young*, 932 F.2d 1510 (D.C. Cir. 1991), the D.C. Circuit explained that

> the § 3B1.3 enhancement applies only if the defendant employed a "special skill" in the form of a pre-existing, legitimate skill not possessed by the general public to facilitate the commission or concealment of a crime.

*Id.* at 1513 (rejecting the government's claim that a defendant who had learned how to manufacture PCP had a "special skill" within the meaning of Section 3B1.3.)

Section 3B1.3 requires that the special skill "significantly facilitate" the commission or concealment of the crime. According to the D.C. Circuit in *Young*,

12

> The use of the word "facilitate" – which means "to make easier," . . . is important
> in this context.  It indicates to us that the Sentencing Commission assumed that
> the defendant knows how to commit the offense in the first place and that he uses
> a "special skill" to make it *easier* to commit the crime.  Thus, the "special skill"
> necessary to justify a § 3B1.3 enhancement must be more than the mere ability to
> commit the offense; it must constitute an additional, pre-existing skill that the
> defendant uses to facilitate the commission or concealment of the offense.

*Id.*

Under the express language of Section 3B1.3, moreover, it is not enough if the special skill merely facilitates the offense – it must "*significantly*" facilitate it.  *See United States v. Gandy*, 36 F.3d 912, 915 (10th Cir. 1994).  "Significant" is defined in *The American Heritage Dictionary of the English Language* (2000), in relevant part, to mean "having or likely to have a major effect; important," and as "fairly large in amount or quantity."  Thus, a special skill does not *significantly* facilitate an offense if its effect is small or incidental.  *See United States v. Holt*, 170 F.3d 698, 704 (7th Cir. 1999) (rejecting government's argument that enhancement for abuse of position of trust under § 3B1.3 applied to defendant convicted of illegal gun sale who was a licensed firearms dealer; position furthered crime only "incidentally;" fact that it gave defendant access to gun show where transaction was initiated was not enough).

Thus, as summarized by the Tenth Circuit,

> before a sentencing court may properly enhance the defendant's sentence under
> §3B1.3, it must find that the defendant: (1) possessed a special skill; and (2) used
> that special skill to significantly facilitate – *i.e.,* make easier – the commission or
> concealment of the offense.

*Gandy*, 36 F.3d at 914.

> ### 4.    Even if Mr. Brownell possessed a special skill within the meaning of Section 3B1.3, it did not facilitate the offense of conviction.

The conclusion in the PSI Report that Mr. Brownell is an "accountant by trade" is not accurate.  Mr. Brownell was an accounting major in college, and was employed for 5 years in

public accounting, but left that field in the 1990's. He is not a CPA and has no other accounting license or graduate degrees. Mr. Brownell's job at DDC during the relevant time period focused on finance, not accounting, and he has not handled DDC's accounting since the mid-90's.

Even assuming that Mr. Brownell has the special skill of accounting within the meaning of Section 3B1.3, having a special skill alone "is not enough to warrant his sentence being enhanced under Guideline 3B1.3." *Gandy*, 36 F.3d at 915. Instead, there must be a "*direct* use" of the special skill in connection with the offense. *United States v. Hickman*, 991 F.2d 1110, 1113 (3d Cir. 1993).

In this case, Mr. Brownell pled guilty to one count of tax evasion based on his receipt of a $10,000 check from a real estate settlement attorney in 1999. The defendant fully acknowledges that for purposes of determining the tax loss applicable to Mr. Brownell's Guidelines calculation, the Court found that he received a substantial amount of additional unreported income by means of checks from DDC, primarily payable to his Potomac Valley Bank line of credit account. But we respectfully submit that while relevant conduct may be taken into consideration for tax loss purposes, it should not be considered for purposes of determining whether the special skill enhancement should apply. Instead, the enhancement should apply only if it is directly connected to the offense of conviction. *See United States v. Barakat*, 130 F.3d 1448, 1455 (11th Cir. 1997) (in context of Section 3B1.3, "offense" must be read as "offense of conviction" to maintain consistency with the definition of relevant conduct in the Guidelines). In *Barakat*, the court found that the district court should not have applied the abuse of position of trust enhancement to a government official convicted of tax evasion, because the abuse of his position related only to the means by which he obtained the income, not his evasion of taxes. *Id.* at 1455-56.

14

Here, the PSI Report found that Mr. Brownell used his special skill to direct the issuance of checks from DDC to his Potomac Valley Bank account and to record false information in DDC's ledgers. Even assuming these facts could otherwise support application of the enhancement, they have nothing to do with Mr. Brownell's receipt of the $10,000 settlement check, which came from an outside source and was payable directly to Brownell. Accordingly, the 2-level enhancement should not apply.

### 5.    Mr. Brownell's special skill did not significantly facilitate the offense of tax evasion.

Even considering Mr. Brownell's actions with respect to all of the payments found by the Court to be unreported income, the conclusion that he used a special skill to significantly facilitate the commission or concealment of the offense of tax evasion is not warranted by the facts of this case.

Mr. Brownell's ability to cause DDC to write checks and to direct how they would be coded for purposes of DDC's general ledger arose as the result of his job with DDC, not because of his accounting background. The case law makes it clear that the fact that a defendant's job or profession involves a special skill and gives him access to the means of committing an offense is *not* enough to qualify for the special skill enhancement. *See United States v. Scungio*, 255 F.3d 11, 19 (5th Cir. 2001) (finding that district court erred in applying special skill enhancement to attorney convicted of making false statements to FBI about bribes paid to tax review board members in proceedings in which he was involved); *United States v. Hemmingson*, 157 F.3d 347, 359-60 (5th Cir. 1998) (affirming trial court's decision not to apply special skill enhancement to attorney convicted of money laundering who created a sham legal engagement as a conduit for illegal campaign contributions); *United States v. Weinstock*, 153 F.3d 272, 281 (6th Cir. 1998)

(affirming trial court decision not to apply enhancement to podiatrist convicted of mail fraud for billing for procedures he had not performed); *United States v. Garfinkel*, 29 F.3d 1253, 1261 (8th Cir. 1994) (affirming decision not to apply special skills enhancement to psychiatrist convicted of mail fraud and false statements for false data submitted in drug study within the FDA's jurisdiction).

In each of the cases cited above, the defendant could not have carried out the crime as he did were it not for his professional status, but the government's request for application of the special skill enhancement was nevertheless rejected by the court because the special skill did not facilitate the offense. *See also Holt*, 170 F.3d at 704 (fact that position of trust created access used for offense was not enough). Similarly here, the fact that Mr. Brownell's accounting background qualified him for his position as CFO of DDC, and thereby gave him access to DDC check requests and books, is not a sufficient basis for imposition of the special skills enhancement.

Further, the facts do not support the conclusion that the commission or concealment of the offense was significantly facilitated by Mr. Brownell's accounting background. Mr. Brownell did not use any accounting strategies or schemes to conceal the fact that Potomac Valley Bank payments were going to his personal line of credit account. As was demonstrated at the tax loss hearing, every check request for a payment to Potomac Valley Bank was accompanied by a copy of Mr. Brownell's home equity line statement. Similarly, when Mr. Brownell caused DDC to write checks to his construction contractors, the supporting invoices revealed that the work was for Mr. Brownell's personal residence and therefore his benefit.

The manner in which the payments were recorded in DDC's ledgers was the result of Mr. Brownell's knowledge, learned on the job, of DDC's business practices, and not of any outside

knowledge of accounting that he possessed. Mr. Brownell was aware that Douglas Jemal had made a loan to DDC from a credit line on his house. Mr. Brownell made a similar loan to DDC from his Potomac Valley Bank line of credit account, and had the payments recorded in the same way that payments to Mr. Jemal's account had been. When the initial loan was repaid, the payments simply continued to be recorded in the same manner.

Mr. Brownell acknowledges that the Court has found that these facts were not sufficient to demonstrate that the payments in question were loans to Mr. Brownell and not unreported income. But defendant respectfully submits that, nevertheless, they go to the question of whether Mr. Brownell used a special skill to significantly facilitate the offense of tax evasion. Plainly one does not need to be an accountant to commit tax evasion, and the Guidelines do not provide that an accountant who commits tax evasion automatically gets a 2-level increase. Here, the facts on which the PSI Report relies to impose the increase are traceable to the circumstances and practices of DDC, not Mr. Brownell's accounting background. These facts do not support the finding that his accounting background significantly – that is, to a major or even fairly large degree – facilitated the commission or concealment of the offense. Accordingly, Mr. Brownell respectfully submits that the special skill enhancement should not be applied.

### C.    The Court Should Not Apply the "Sophisticated Concealment" Enhancement

The Court should reject the government's contention that this offense involved sophisticated concealment and instead find, as the Probation Office has, that the "sophisticated concealment" enhancement is not warranted in this case. *See* PSI Report (Addendum at p. 18).

### 1.    U.S.S.G. § 2T1.1(b)(2)

Under U.S.S.G. § 2T1.1(b)(2), a defendant's base offense level may be increased by two levels, "[i]f the offense involved sophisticated concealment." The commentary to U.S.S.G. § 2T1.1(b)(2) instructs:

> For purposes of subsection (b)(2), "sophisticated concealment" means **especially complex** or **especially intricate** offense conduct in which deliberate steps are taken to make the offense, or its extent, difficult to detect. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore bank accounts ordinarily indicates sophisticated concealment.

U.S.S.G. § 2T1.1 (App. Note 4) (emphasis added).

### 2.    The Government's Position

The government contends that Mr. Brownell engaged in a sophisticated scheme because he:

> falsely account[ed] for the payments - strewing them among various accounts of Douglas Development Corporation in a way to minimize the detection of these payments and to optimize his ability to explain away his fraudulent conduct if caught. Moreover, as the Court noted in its findings, on a monthly basis, the defendant caused DDC checks to be written to his Potomac Valley Bank account and then moved money from that account into his personal account.

June 18, 2007 letter from the government to Probation Officer Moses-Gregory. Mr. Brownell respectfully submits that the government's contention should be rejected for several reasons.

Mr. Brownell did not, in fact, have the payments "strewn among various accounts" of Douglas Development Corporation in a way to minimize their detection. On the contrary, the payments at issue were recorded in **two**[2] accounts. The vast majority of payments to Mr. Brownell were received via his Potomac Valley Bank home equity account and recorded in the same loans payable account month after month, year after year, despite the fact that Mr.

---

[2] Some payments were recorded in an alternate loan account until 2001, but as the Court heard at the loss hearing, these were all reclassified into the primary loan payable account at the end of each year, well before any investigation of Mr. Brownell or DDC commenced.

18

Brownell had a choice of books for over 100 entities to choose from, corresponding to various DDC properties, in any of which the payments could have been concealed. The Potomac Valley Bank payments were recorded right on the books of DDC itself, where they were subject to review by anyone inspecting DDC's books, and easily traced to Mr. Brownell through the documents that remained physically attached to each of the related check requests in DDC's files, all of which were produced to the government.

Moreover, almost immediately following each payment by DDC to the Potomac Valley Bank home equity account in Mr. Brownell's own name, Mr. Brownell wrote a check on his Potomac Valley Bank account to transfer approximately the same amount to a personal checking account, also in his own name. The transfer of funds to Mr. Brownell in this manner was hardly an "especially complex" or "especially intricate" attempt to conceal the monies received by Mr. Brownell.

### 3.  Mr. Brownell's Conduct Was Not Especially Intricate or Especially Complex

The Court has found that Mr. Brownell evaded income tax for several years when he accounted for payments by DDC in such a manner as to have his income underreported to the IRS by his employer, while at the same time failing to file his own personal income tax returns. Receiving income in a manner so as not to have it reported to the IRS does not amount to sophisticated concealment, for in order to commit tax fraud at all, one must either receive unreported income or claim improper deductions or credits. "[F]raud is by nature self-concealing - its success depends on its being hidden from the victim. The average criminal tax fraud thus involves some concealment; 'sophisticated' tax fraud must require more." *United States v. Kontny*, 238 F.3d 815, 820-21 (7th Cir. 2001).

19

Mr. Brownell's conduct was not of the same level of sophistication as the examples of sophisticated concealment provided in the application note. While this case involves a number of transactions over a period of time, not only did Mr. Brownell fail to utilize any fictitious entities, corporate shells, or offshore bank accounts, he failed to file tax returns from 1994 through April 2005. Mr. Brownell's failure to file tax returns for 10 years was most certainly not a component of "especially complex" or "especially intricate" offense conduct. Rather, it belies the notion that Mr. Brownell undertook to conceal his receipt of funds through a complex or intricate scheme. Failing to file one's tax returns for 10 years is akin to requesting that the IRS initiate an audit. Even a superficial audit of Mr. Brownell would have revealed large steady transfers from Mr. Brownell's Potomac Valley Bank account to his personal checking account and the preceding payments into the Potomac Valley Bank account by DDC.

Moreover, Mr. Brownell did not use an accounting scheme to conceal the fact that payments were being made to his Potomac Valley Bank line of credit account; instead, the documents attached to every check request made it plain that payments were being made to his personal home equity account. Mr. Brownell did not use an accounting scheme to "hide" the payments in DDC's general ledger; instead, the payments were recorded in the same fashion as the payments on a loan made by Douglas Jemal to DDC from a personal home equity line on his own house. The payments then continued to be recorded in the same account after Brownell's initial loan to DDC was repaid. The other payments made to Mr. Brownell on which the government relies were either made to him directly or were made based on invoices to Brownell that were submitted with the check requests. As the court noted in its Findings of Facts, one of the largest of these checks even contained the description "bonus pay" on its face. *See* Findings

20

of Facts & Conclusions of Law, ¶ 1.  The recording of the payments in this manner does not

reflect an "especially intricate" or "especially complex" scheme to conceal the payments.

### 4.  Case Law Does Not Support the Sophisticated Concealment Enhancement in This Case

The single D.C. Circuit case in which this issue appears to have been directly addressed

is *United States v. Hunt*, 25 F.3d 1092 (D.C. Cir. 1994).  In *Hunt,* a former IRS employee

defrauded the IRS of almost $2.5 million using false tax credits.  The court of appeals upheld the

district court's application of the sophisticated concealment enhancement, under the clearly

erroneous standard, noting that the district court had "expressly found that appellant's schemes

were 'sufficiently sophisticated that to this day neither the probation officer nor the government

nor apparently [defense counsel] can figure out exactly what he did.'"  *Id.* at 1097.  That is not

the case here, where Mr. Brownell simply received unreported income from his employer.

In another tax fraud case, *United States v. Lewis*, 907 F. Supp. 683 (S.D.N.Y. 1995), the

government argued that the sophisticated concealment enhancement was appropriate because of

the length and size of the scheme utilized by the defendant, who over eight years wrote 178

checks totaling $154,839.07 to 26 different accounts opened in fictitious names as cover for

fraudulent deductions on his tax returns.  *Id.* at 688.  Even in that case, involving 26 different

fictitious accounts, the court did not apply the sophisticated concealment enhancement, finding

that nothing Lewis did was meant to conceal his identity and that the scheme was "relatively

unsophisticated."   It was even easier to determine that Mr. Brownell was the recipient of

unreported income in this case; the documentation attached to each of the checks to Potomac

Valley Bank, all preserved by DDC, reflected that the Potomac Valley Bank invoices were sent

to Mr. Brownell and that the PBV account was held by Mr. Brownell.  Mr. Brownell did nothing

to conceal this documentation, which was preserved in DDC's files and then produced to the government.

A review of the case law shows just how sophisticated tax fraud schemes can be, and why Mr. Brownell's conduct was anything but "especially intricate" or "especially complex." *Lewis* contains a survey of tax fraud cases that deal with the sophisticated concealment question. *See Id.* at 687.  Courts have applied the sophisticated concealment enhancement in the following tax fraud cases:  *United States v. Veksler*, 62 F.3d 544 (3d Cir. 1995) (defendant used a "daisy chain"-a series of paper transactions through numerous companies, some of which were largely fictitious-to conceal taxable sale of diesel fuel oil); United States v. Hunt, 25 F.3d 1092, 1097 (D.C. Cir. 1994) (defendant devised "tax-favored" investments that were so sophisticated that "to this day neither the probation officer nor the government ... can figure out exactly what he did"); *United States v. Pierce*, 17 F.3d 146 (6th Cir. 1994) (taxpayer exempted himself from withholding by providing false information to employer; failed to file tax returns; used several mailing addresses to impede discovery by the IRS; and directed his wife to file misleading returns); *United States v. Hammes*, 3 F.3d 1081, 1083 (7th Cir. 1993) (bookie concealed gambling income from computerized clearinghouse by using aliases and bettor code numbers, repeatedly moving his wire room, destroying records, and establishing offshore accounts); *United States v. Charroux*, 3 F.3d 827, 836-37 (5th Cir. 1993) (defendants structured elaborate transactions to hide their revenues from complicated land flips); *United States v. Ford*, 989 F.2d 347, 348 (9th Cir. 1993) (defendant set up Canadian corporations to generate fraudulent foreign tax payments which he then claimed on his domestic income tax return); *United States v. Jagim*, 978 F.2d 1032, 1041-42 (8th Cir. 1992), *cert. denied*, 508 U.S. 952, 113 S. Ct. 2447 (1993) (defendants "extensively planned and executed" cattle breeding tax shelter scheme and lured

potential participants); *United States v. Becker*, 965 F.2d 383, 390 (7th Cir. 1992) (doctor eliminated all bank accounts in his name and deposited income in a numbered account at a warehouse bank), *cert. denied*, 507 U.S. 971, 113 S. Ct. 1411 (1993). All of these cases involved schemes far more sophisticated than receiving unreported income from an employer as Mr. Brownell did and then failing to file tax returns.

After 1999, the year of Mr. Brownell's offense of conviction, the "sophisticated concealment" enhancement became the "sophisticated means" enhancement. The commentary now defines "sophisticated means" as:

> especially complex or especially intricate offense conduct pertaining to the **execution or** concealment of an offense. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means.

U.S.S.G. § 2T1.1, 2006 ver. (App. Note 4) (emphasis added). While it would be inappropriate for the Court to apply anything other than the 1998 Guidelines Manual in this case,[3] cases involving the new, somewhat broadened "sophisticated means" enhancement are nevertheless instructive.[4] Recent cases reinforce the conclusion reached in *Lewis;* the new enhancement is still principally applied in tax fraud cases where defendants utilize offshore accounts, corporate shells, or false documents. *See, e.g., United States v. Roush*, 466 F.3d 380 (5th Cir. 2005) (defendant's issuance of stock, which he received as compensation, to six shell companies warranted application of

---

[3] As the PSI Report notes, pursuant to the *ex post facto* principles articulated in *Miller v. Florida*, 482 U.S. 423 (1987) and U.S.S.G. § 1B1.11(b)(1), the Court must use the Guidelines Manual in effect on the date that the offense of conviction was committed. Mr. Brownell's offense of conviction occurred in 1999. The 1998 edition of the Guidelines Manual was in effect until November 2000.

[4] Because the 1998 edition of the Guidelines Manual governs Mr. Brownell's advisory Sentencing Guidelines calculation, the more recent, broadened interpretation of the 2T1.1(b)(2) enhancement complicates the analysis of recent cases addressing this issue.

two-level enhancement for use of "sophisticated means," in sentencing taxpayer for tax evasion based on failure to report the stock as income); *United States v. Aragbaye*, 234 F.3d 1101, 1108 (9th Cir. 2000) (defendant owned tax preparation businesses, prepared W-2 forms for fictitious employees, used a false name and social security number to apply for an identification number with the IRS, and used names and social security numbers of unknowing indigents and children to file fraudulent tax returns); *United States v. Madoch*, 108 F.3d 761, 765-66 (7th Cir. 1997) (Defendant, who was certified public accountant, impeded discovery of his tax evasion by creating false W-2 Forms[5], bogus itemized deductions and false employment records, filing false forms under Social Security numbers of various persons, and arranging to have refund checks mailed to five different addresses).

Contrary to the government's position, Mr. Brownell's conduct did anything but "optimize his ability to explain away his fraudulent conduct if caught." June 18, 2007 Letter from the government to Probation Officer Moses-Gregory. DDC's approach of accounting for the Potomac Valley Bank payments as contrabalances in a previously existing accounts payable account, if they were indeed bona fide loans, has long been a central theme of the government's argument that the payments were not in fact loans. The government has now turned this argument on its head.

---

[5] As the Court is aware, over the relevant period, Mr. Brownell submitted several loan applications to banks, some of which the government presented to the Court as evidence of Mr. Brownell's intent to commit tax fraud. These loan applications, and the false W-2's associated with some of them, in no way facilitated the tax fraud in this case and therefore cannot warrant the sophisticated concealment enhancement. If anything, the admissions on these applications, by Mr. Brownell, that DDC paid his Potomac Valley Bank line of credit, indicate a lack of intent to conceal by Mr. Brownell, weighing against the enhancement.

24

Moreover, even when a tax fraud defendant's conduct involves extensive fraudulent accounting of the payments at issue, courts have declined to apply the sophisticated concealment enhancement, because again, all tax fraud cases necessarily involve concealment. For example, in *United States v. Kaufman*, 800 F. Supp. 648, 654-656 (N.D. Ind. 1992), the defendant directed clients to write checks to him personally rather than to his firm, and then directed his firm's bookkeepers to show the debt as a "write off" or used dummy deposit slips. The court agreed with the government that the defendant's dummy deposit ticket system was somewhat like keeping a second set of books, but found that it was not marked by the sophistication that distinguishes the examples in the commentary. *See id.*

Similarly, in United *States v. Bhagavan*, 911 F. Supp. 351 (N.D. Ind. 1995), the defendant, like Mr. Brownell, pled guilty to a violation of 26 U.S.C. § 7201 and then contested the loss amount. The court declined to impose the sophisticated means enhancement despite the fact that the defendant's scheme involved having his office manager change client account cards and invoices to reflect discounts or credits. The court held that this conduct:

> amount[ed] to "some planning," but not to "unusually sophisticated efforts to conceal the evasion. [The defendant] did not hide money in bank accounts belonging to others or bearing arbitrary (as opposed to identifying) numbers. *See United States v. Becker*, 965 F.2d 383, 390 (7th Cir. 1992). He did not use aliases, code names, or portable bank accounts. *See United States v. Hammes*, 3 F.3d 1081, 1083 (7th Cir. 1993). He did not use multiple mailing addresses and change his method of lying to the IRS to avoid detection. *United States v. Pierce*, 17 F.3d 146, 151 (6th Cir. 1994).

*Id.* at 354-55. Like the defendants in these cases, Mr. Brownell did not undertake the kind of unusually sophisticated efforts to conceal his conduct that warrant application of the sophisticated concealment enhancement. Accordingly, Mr. Brownell respectfully submits that the sophisticated concealment enhancement should not be applied.

**D.**    **To Apply Both the Special Skill and Sophisticated Concealment Enhancements Would Result in Inappropriate Double Counting**

Were the Court to conclude that Mr. Brownell used his special skills as an accountant to conceal his tax evasion, and therefore increase his offense level pursuant to U.S.S.G. § 3B1.3, the application of an additional two-point enhancement pursuant to U.S.S.G. § 2T1.1(b)(2) would result in inappropriate double counting. The government contends that Mr. Brownell's special skill as an accountant enabled him to conceal the offense. The government also contends that Mr. Brownell engaged in sophisticated concealment by falsely accounting for the payments he received. These are merely two ways of looking at the same conduct. "A district court may not characterize the same conduct in two different ways to arrive at two separate sentence enhancements that result in an upward adjustment of the sentencing range." *United States v. Hankton*, 432 F.3d 779, 795 (7th Cir. 2005) (citing *United States v. Schmeilski*, 408 F.3d 917, 919 (7th Cir. 2005)).

**E.**    **The Court Should Reject the Government's Request for an Upward Departure**

We of course strongly agree with the presentence report writer's conclusion that no basis exists for an upward departure in this case. In this regard, we note *United States v. Concepcion*, 983 F.2d 369 (2nd Cir. 1992), in which a remand was ordered for consideration of the appropriateness of a *downward* departure when the defendant received a harsh sentence based in large part upon conduct of which he had been acquitted. Here, particularly in light of the enormous increase in Mr. Brownell's total offense level based upon relevant conduct, no basis exists for consideration of an upward departure.

## III.     THE SENTENCING DETERMINATION

As this Court well knows, the *Booker* decision, as interpreted in *United States v. Coles*, 403 F.3d 764 (D.C. Cir. 2005), rendered the Sentencing Guidelines advisory, to be considered by a sentencing court along with the other factors in 18 U.S.C. § 3553(a) in arriving at an appropriate sentence.  *Coles*, 403 F.3d at 764-67 (citing *United States v. Crosby*, 397 F. 3d 103, 107-10 (2d Cir. 2005)).  These factors are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed--
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant;  and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the Sentencing Guidelines
>
> (5) pertinent policy statements issued by the Sentencing Commission
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;  and
>
> (7) the need to provide restitution to any victims of the offense.

*See* 18 U.S.C. § 3553.

Upon consideration of these factors, the court is to impose a sentence that is ***sufficient but not greater than necessary*** to comply with the goals of 18 U.S.C. § 3553.  *See* 18 U.S.C. § 3553(a) (emphasis added).

This Court displayed courage in making its own independent evaluation of the § 3553 factors in the sentencings of Messrs. Jemal and Esherick, despite the rigid dictates – now, fortunately, purely advisory – of the Guidelines.  We seek the same sensitivity to the requirements of justice, as opposed to Guidelines arithmetic, for Mr. Brownell.  When the 18 U.S.C. § 3553 factors are weighed, we respectfully submit that a sentence of probation is clearly appropriate.  Probation and the collateral consequences of a felony conviction are a sufficient deterrent and just punishment in this case.

The nature and characteristics of Mr. Brownell, as evoked in the appended letters to the Court, are an especially important factor.  He is, by all accounts, a selfless, hardworking man who lives an austere lifestyle and has devoted the last 20 years of his life to helping his employer, DDC, benefit the community.  As reflected in the dozens of letters written in support of Mr. Brownell, there can be no question that Mr. Brownell's extraordinary efforts have been critically important to the success of DDC and its contributions to this area.  Mr. Brownell's presence is even more crucial at this time, as DDC continues to incorporate the KPMG study and recommendations into its business practices in order to remake the company and continue to revitalize and support the Washington, D.C. community.

Incarceration is not necessary to deter Mr. Brownell from committing tax evasion or other offenses in the future.  This prosecution has been a traumatic, life-changing event for Mr. Brownell.  He will have to live for the rest of his life with the stigma and other consequences of a

federal felony conviction. He knows that the pattern of conduct he fell into previously was inexcusable and can never be repeated.

To the extent that Mr. Brownell's behavior was influenced by the business practices of DDC, the investigation of DDC and the prosecutions of Mr. Brownell and his colleagues have already resulted in important and meaningful changes to DDC's culture and procedures. For the first time, DDC has an in-house general counsel to oversee its business conduct. While DDC, with Mr. Brownell's assistance, continues to pursue its mission of developing underserved areas of the community, DDC's internal financial and accounting practices are being significantly modified as the result of the KPMG analysis and report submitted in connection with Mr. Jemal's sentencing. Mr. Brownell understands the need for these changes and has been deeply involved in implementing KPMG's recommendations. Among other things, DDC's salary structure has been regularized and the practice of making informal loans between the company and its employees has ended. Given all of these circumstances, the Court should not be concerned that Mr. Brownell will repeat the conduct that underlay this prosecution.

Moreover, a probationary sentence is needed to maintain parity between Mr. Brownell and other DDC personnel who have been prosecuted, a factor expressly set forth in § 3553.

We respectfully submit that the Court should find that incarceration is not necessary to achieve the goals of 18 U.S.C. § 3553.

## IV.    CONCLUSION

Mr. Brownell is a fundamentally good and hard-working man who made a serious error in judgment and committed a felony offense. He fully appreciates the seriousness of his conduct and already has made significant strides to accept responsibility for his actions. While Mr. Brownell understands that he will have to confront the consequences of his felony conviction for

the rest of his life, those consequences should not include a period of imprisonment. Pursuant to the advisory Guidelines and the sentencing scheme laid out in 18 U.S.C. § 3553, a period of probation fully meets the interests of justice.

Wherefore, Mr. Brownell respectfully asks the Court to sentence him to a term of probation with such other conditions as the Court deems appropriate.

We respectfully request the opportunity to present live testimony at Mr. Brownell's sentencing hearing. Further, we are exploring the possibility of presenting expert testimony at the time of sentencing, and will keep the Court and the government apprised should it appear that such testimony would aid the Court's sentencing determination.

Respectfully submitted,

JOHN E. BROWNELL

By Counsel:


/s/ Barry Coburn_____
Barry Coburn (D.C. Bar #358020)
Gloria B. Solomon (D.C. Bar #358880)
Jeffrey C. Coffman (D.C. Bar #493826)
TROUT CACHERIS PLLC
1350 Connecticut Avenue, N.W.
Suite 300
Washington, D.C. 20036
Phone: (202) 464-3300
Fax: (202) 464-3319


## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of July, 2007, I served a copy of the foregoing Defendant's Memorandum in Aid of Sentencing, by ECF.


/s/ Barry Coburn_____