**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES** | ) | |
| | ) | |
| **v.** | ) | **Crim. No. 06-CR-0077 (RMU)** |
| | ) | |
| **JOHN E. BROWNELL,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT BROWNELL'S**
**SUPPLEMENTAL EXPERT DISCLOSURE**

Defendant John E. Brownell, by counsel, respectfully submits the following Supplemental Expert Disclosure.

Respectfully submitted,

JOHN E. BROWNELL

By Counsel:

/s/ Barry Coburn_____

Barry Coburn (D.C. Bar #358020)
Gloria B. Solomon (D.C. Bar #358880)
Jeffrey C. Coffman (D.C. Bar #493826)
TROUT CACHERIS PLLC
1350 Connecticut Avenue, N.W.
Suite 300
Washington, D.C.  20036
Phone: (202) 464-3300
Fax: (202) 464-3319

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of September, 2007, I served a copy of the foregoing

Defendant Brownell's Supplemental Expert Disclosure by ECF.


/s/ Barry Coburn           

**LONG ISLAND PSYCHIATRIC, PLLC**
2 Main Street – Suite 8
Roslyn, New York 11576
(516) 626-2182

**Name: John E. Brownell**

DOB: 10/08/61
DOE: 8/01/07

REFERRAL

Mr. John E. Brownell is a 45 year old, single male who has been employed as CFO at Douglas Development Corp., where he has worked for seventeen years.  Mr. Brownell resides in his home at 6151 Tuckerman Lane in Rockville, Maryland.  At the time of this evaluation, Mr. Brownell was awaiting sentencing after pleading guilty to one count of tax evasion.

Mr. Brownell was referred for a diagnostic evaluation because in the process of gathering background information, there were many references, comments and observations sighting Mr. Brownell's "odd" or "excessively regimented" behavior.  Several years ago, a friend of Mr. Brownell had suggested he read a book on Asperger Syndrome because he "seemed to have the condition".

This evaluation consisted of an extensive interview and observation of Mr. Brownell, a review of legal documents and more than 80 letters of reference written by colleagues, acquaintances and family members, testifying to Mr. Brownell's character and behavior. Additionally, there was a visit to Mr. Brownell's workplace at Douglas Development Corp. in Washington, DC, where I had the opportunity to conduct several face-to-face interviews with Mr. Brownell's associates and his sister Eileen.  I spent an entire day with Mr. Brownell which included a visit and observation of Mr. Brownell at *Caddies* (his favorite bar and restaurant), a tour of his running routes, a visit to his home and a meeting with Clare Marie Leigh, a woman who has had a fragile and irregular relationship with Mr. Brownell for the past 8 years.

HISTORY

Mr. Brownell is a 45 year old single man, who rigidly, almost religiously, adheres to ritualized behavioral patterns.  His need for sameness and routine markedly interferes with his social and interpersonal functioning.  Supporting history provided by comments from colleagues and acquaintances suggests that Mr. Brownell is "odd" in the sense that he spends almost all of his time either working on financing projects with Douglas Development Corp. or on his obsessive "machine like" work-out routines.  Even colleagues and acquaintances that are avid runners and exercise enthusiasts marvel at Mr. Brownell's intensity and exercise habits and agree that Mr. Brownell goes well beyond exercise fanaticism.

Like many runners, Mr. Brownell keeps records of his performance.  However, Mr. Brownell's pages of detailed spread sheets (spanning several years) document every aspect of his running schedule, including dates, times, distances, commentary regarding temperature, humidity, road conditions and personal physical factors.  Advances in pace are celebrated moments in Mr. Brownell's life.  Others that know Mr. Brownell have described his routines as "shocking" in terms of their intensity and inflexibility.  One example of this is Mr. Brownell's fixation with the infamous "Exorcist stairs" in Georgetown.  Mr. Brownell has run these notoriously grueling, steep set of stairs over 87 times since August 2005 with extraordinary intensity; exactly 10 times (up and down) without resting, each and every time.  His meticulous records of these occasions, as well as his equally elaborate regular running records dating back to 2002, document his strict and rigid adherence to routine.  Mr. Brownell's running schedule is rarely, if ever modified and rigidly unaffected by weather conditions or fluctuations in his health (i.e., flu, fever or injury).

Mr. Brownell lives a predominately solitary existence in a dilapidated home.  Mr. Brownell has acknowledged his anxiety in social situations but desires and values friendship. While initiating and maintaining conversation remain a lifelong challenge, Mr. Brownell has, throughout time, learned to model and follow standard rules of social interaction.  Within his extremely rigid social calendar, Mr. Brownell's persistent and regular attendance has earned him recognition and respect at *Caddies* (his favorite restaurant bar) where he is well known for being

trustworthy, dependable and a 'good listener'. However, despite his affability at *Caddies*, Mr. Brownell feels 'forced' when invited to social gatherings and has been known to either refuse or, simply not show up for group gatherings, parties or events. Mr. Brownell is content with spending his time alone when not working, or at *Caddies*. Many who know Mr. Brownell have expressed concern about his reclusive style and have tried to encourage him to become more social. In fact, Mr. Brownell's social repertoire began when his boss, Douglas Jemal, troubled by his isolative tendencies, took him out a few times to *Rock Bottom* and personally introduced him to the bartender. Mr. Brownell frequented *Rock Bottom* until the bartender he grew accustomed to, changed jobs and moved to *Caddies.* The first several months at *Caddies*, Mr. Brownell kept mostly to himself. Mr. Brownell's apparent serious and reticent demeanor was recognized by another regular patron who eventually approached him and asked if he was a police officer. After several years, Mr. Brownell now considers many of the regulars in the bar to be his friends. Mr. Brownell's incredible persistence and routine was acknowledged and celebrated by the bartender and owner at *Caddies* for an astounding attendance record of seven nights a week, 128 days in a row. Although he still remains somewhat restricted and uncomfortable in conversation, Mr. Brownell has noticed that he has an easier time discussing topics of his own interest, such as sports. Mr. Brownell is also fortunate in that many of his friends are much more socially dominant and adept at conversation, which allows him to 'blend in' socially and remain out of the conversational spotlight.

As a child and young adult, Mr. Brownell remembers being told he had difficulty with making eye contact. Presently, Mr. Brownell states that he feels extremely uncomfortable in places where making eye contact is expected and unavoidable. Mr. Brownell also reported hypersensitivity to sound, finding loud conversation and meaningless chatter "irritating". Mr. Brownell also describes being easily distracted and irritated by background noises (fans, loud clocks).

With regards to intimacy, Mr. Brownell determines the significance and the personal importance of a relationship according to his willingness to alter his rigidly adhered to schedule. Mr. Brownell also acknowledges having trouble understanding and negotiating his way around courtship, dating and sexual relationships. Mr. Brownell's last "serious" relationship lasted two

years and ended in 1993.  When asked about why he hasn't been able to initiate or sustain a significant relationship since 1993, Mr. Brownell stated that it is extremely important for him to maintain his "routines" and that his adherence to routine has usually been the cause for abruptly terminating or, not pursuing relationships in the past.  Mr. Brownell is also somewhat uncomfortable with touch and public displays of affection.  Mr. Brownell's hypersensitivities and avoidance of touch have also become obstacles and cause for conflict with relationships in the past.

Mr. Brownell has acknowledged having trouble putting thoughts into words and communicating his emotions to others.  In addition, Mr. Brownell states that people are often frustrated with his reticent demeanor and are frequently encouraging him to talk and show emotion.  Mr. Brownell however, is more content being a quiet listener and does not necessarily agree with those who view his taciturn nature as a problem.  Mr. Brownell states that throughout his life "people often ask me if I'm okay and tell me I should smile more, even when I'm feeling fine".

When questioned regarding his expression and range of emotions, Mr. Brownell reported that he notices difficulty expressing feelings of anger or frustration.  Also, Mr. Brownell struggles with asserting himself and expressing his own preferences.  Particularly within a business context and when excessive demands are placed, Mr. Brownell has difficulty saying "no".  With regards to the excessive level of demands at work, Mr. Brownell states, "I am always thinking about work.  I can't stop working until I find a solution.  If I can't find a solution, I feel as though I've failed."

Mr. Brownell sees himself as somewhat particular when it comes to personal preferences. His interests and preferred activities are typically straightforward with predictable outcomes.  He has expressed a lifelong difficulty dealing with abstract and convoluted scenarios and prefers activities and people that "make sense".  Consistent with his predominately 'literal' thinking style, Mr. Brownell has developed an aversion to fiction novels, preferring facts to fantasy.

With regards to travel and vacation, Mr. Brownell takes one week off a year to see his 82 year old parents in Clearwater, Florida.  He has not taken a personal vacation for himself since 1991 which was reluctantly taken to satisfy the request of his then girlfriend.  Mr. Brownell found the trip from Washington, D.C. to New York for the purpose of this interview "worrisome" which he related to fear of getting lost.  Mr. Brownell rarely leaves the D.C. area and "only when it is absolutely necessary".

### Excerpts from Douglas Jemal's letter to Judge Urbina

"I first met Jack 20 years ago.  There was a characteristic of Jack that we all began to notice as time went by.  He ALWAYS came to work.  I do not recall him taking a sick day-ever.  Most people would read this and assume this is an exaggeration, meant to describe someone who rarely takes sick days.  But it is not.  I am not saying he is never sick, although he rarely is, but even if he does have the flu or a sore throat, he chooses to come to the office and work through it rather than staying home to try to recover more quickly."

"Similarly, Jack's "vacation" plans are not just predictable, they are identical.  It is not that he rarely took vacations; the ONLY time he would ever take off would be for a week to see his parents in Florida."

"Jack has always been one of my most trustworthy and loyal employees.  I know that the books and records of the Company may have been disorganized and that we made some mistakes as a result.  However, at my urging, Jack always focused far more on getting our projects financed than the internal accounting.  We grew so fast that it was difficult for everyone to keep up."

"To say that I know Jack well and understand him is an understatement.  I have literally seen or spoken to Jack virtually every day for the past 17 years.  Jack is a quiet man, and he might not put himself out there in the public as much as I do, but he is a good man and an honest man."

"I have watched him (Jack) suffer alone without burdening anyone else with his problems, and continue to work as hard and as diligently as he ever has.  Jack is a good, decent person who, as many people have in their life, made some errors in judgment."

### Interview with Douglas Jemal

Douglas Jemal, owner Douglas Development, Corp. (DDC), has known Mr. Brownell "Jack" for approximately 17-18 years.

"Jack has difficulty with change.  He has been using the same disposable plastic water bottle for more than 9 months and won't throw it away.  When we try to toss it, Jack takes it out of the garbage and keeps using it."

"For years, Jack has rarely spoken on our frequent, long car rides to Richmond.  Whenever we were out to dinner, he just sat there wearing an obviously forced smile.  Whenever we're out, you can tell he's miserable being out of his routine and comfort zone…he's there but he's *not* there.  If we're all sitting around the table he is literally mute.  He doesn't 'bring anything to the table', so people have stopped inviting him to dinner.  He's not mean.  He's not anything…he just sits there and doesn't talk."

"I'm told the bartender at *Rock Bottom* occasionally took bets about what time Jack would arrive each day.  Most times, they literally had him down to the minute!"

"Jack is extremely regimented.  In the last 17-18 years, he has never missed a day of work."

"Since I've known Jack, if he does something once, he has to do it again and again in the exact same way.  That's why he didn't file his taxes for ten years…he *didn't* do it once and so he *didn't* do it every year after that."

"Whenever Jack is *forced* to break routine, he looks frazzled…miserable.  You can tell he's tormented, and he has a tough time digesting it…chewing on it over and over in his mind, trying to sort it out.  He told me over 100 times this week that Dr. Snyder was coming to interview us.  He knew I heard him the first time but he had to keep telling me again and again.  He's miserable because his whole routine is thrown- he's completely "fucked up" about it."

"At work, Jack rarely interacts.  We're a friendly bunch here, but Jack mostly keeps to himself and never spontaneously seeks out conversation.  There's a lot of joking around at the office- most of us have known each other for many years, but Jack can't 'kid around' and people quickly learned that they couldn't joke with him.  He wasn't mean about it, he just wouldn't get it."

"I've been to Jack's house and its very 'strange'…completely messy and disorganized with all this stuff lying around that he needs to throw out, but doesn't."

"At work, Jack avoids conflict.  Jack has never fired anyone-though he should have.  He'll let a bad thing keep going."

"Jack keeps track of and remembers the strangest things.  We used to pick up cigarette butts in the parking lots of our buildings to keep it cleaned up, but Jack always kept count.  "I got 72 today".  He's like Dustin Hoffman in *Rain Man.*  Jack remembers every property, the year bought and the price paid.  It's amazing- more than 180 properties over the last 18 years and it's right there in his head like some reference library.  At the office, if anyone needs to know *anything* they ask Jack- he's a walking dictionary."

"For the last eighteen years I can count the times that Jack has been able to look me in the eye.  Each day, I come to the office, I go around and say 'good morning' to everyone.  When Jack sees me coming, he turns his head- he's never said "good morning" so I've stopped trying.  And, he never looks you in the face when he's talking to you-he turns his head to the side."

"When I met him 18 years ago, all he did was go to work and go straight home.  I wanted him to get a life.  I suggested he come out with me, and we went out every Thursday to the same place: *Rock Bottom*.  It took him months before he felt comfortable and was able to go on his own.  Then, he went there one hundred twenty-eight times in a row.  When the bartender that he knew at *Rock Bottom* left to work at *Caddies*, Jack started going there-that's the only reason he changed places."

I gave Jack a shirt as a gift years ago.  Not only did he not wear it, but it's still in the same box I gave it to him in.  He keeps it on his cluttered office shelf with everything else he doesn't file or throw away.  It has been there for years and I don't think he ever opened it.  You would think he would take it home or give it away.  It was a gift I gave him and I have to look at it every day I walk into his office.  I don't think he gets it…he just doesn't understand these things."

"Jack is 'robotic'.  His smile, his speech and movements are all mechanical.  He's even uncomfortable shaking hands.  Whenever his routine gets messed up, he's like a 'derailed robot'".

"Conversations with Jack are always short and to the point.  He never initiates, and in conversations there are *no* unneccessaries."

"In terms of the success of Douglas Development Corp, I'm the visionary, Jack's the mechanic.  He's a brilliant financer."

### Excerpts from Lane Potkin's letter to Judge Urbina

"Jack was by nature a loner who was never married.  Jack was a runner, though his focus then was primarily fitness."

"Jack is very content with a simple, unobtrusive lifestyle, with a large emphasis placed on routine and order.  He is committed to running three times a week (with the highlight being his ascend of the "Exorcist" stairs in Georgetown which he completes ten times each Thursday

morning and keeps meticulous records on), and working out in the gym three other days a week. In discussing his need for maintaining routine (it is difficult for me to get him to alter our weekend running route for a little change), Jack related how his father, who is a retired Army colonel, ran into his 60's, always followed the same route, and kept a detailed log of his runs, including temperature and humidity."

"Jack's lifestyle is also austere by choice."

"Jack's day to day living expenses are minimal, he has no immediate family to support, and has never exhibited any interest in attempting to impress third parties with material possessions.  Given the choice, I have no doubt that Jack would prefer keeping his fifteen year old non-descript and somewhat run down truck rather than trading it in for a newer vehicle, an option which would be readily available to him if he chose."

"Jack also distains attention, whether at work or with his friends and acquaintances, and will always defer credit to others rather than accept it himself.  Jack always has worked and continues to work, behind the scenes with various charitable organizations associated with the company, and often times he is both the impetus and organizer of the company's (and its principals) many charitable undertakings."

"In short, the Jack Brownell I know is an intelligent, honest and essentially selfless person who bears no resemblance to the calculating and greed motivated individual that the government paints him out to be.  And while Jack certainly has made some errors in judgment, especially with respect to the timely filing of his tax returns (an error that in my mind was exacerbated by his adherence to routine) he continues to be a positive asset to the company and the community as a whole, and well deserving of a lenient sentence by this Court."

**Interview with Lane Potkin**

Lane Potkin, Douglas Development Corp., General Counsel, has known Mr. Brownell "Jack" personally and professionally for almost 20 years.

"Jack is an enigma.  After knowing each other for 20 years, he still appears stiff and guarded.  Jack never looks you in the eye and looks off to the side when talking with you.  Jack can't joke around or "kibitz".  After years of going out to dinner with him, you wouldn't know he was even there.  One year we decided to throw Jack a surprise birthday party at *Caddies*.  Apparently he got wind of it and refused to show up.  We were all waiting there and he couldn't even make an appearance.  It must have been too overwhelming for him."

"Financially, things were more difficult for Douglas Development Corp. until 2002.  Checks needed to be held or delayed to vendors and this was difficult for Jack.  Jack didn't like confrontation.  He would often avoid a conflict or "sugar coat" it rather than just address it head on.  With regard to Jack's not filing his taxes, after he missed the first filing he probably thought "what happens if I start filing now…" and couldn't deal with the problem….he's nonconfrontational.  I imagine that after not filing for a few years it became a habit for him not to file… part of his routine…his pattern."

### Interview with Eileen Brownell

Eileen Brownell is Mr. Brownell's sister who works as an attorney in Virginia.

"Jack has always been reserved.  At family gatherings and holidays, Jack would sometimes just not show up.  He wouldn't even call which we all thought was strange but we never said anything.  When Jack was present at family gatherings, he was 'physically' present but 'emotionally' distant.  He wouldn't add much to the conversation around the table."

"One time, I had a kidney infection which needed urgent medical attention.  I called Jack and he took me to the emergency room.  At the hospital, doctors and nurses were running in and out of my room and the concern level was obviously very high.  I remember Jack walking up to me at that point and suddenly say, "I gotta go" and then he turned around and walked out.  It was as if he had no awareness of what was going on and was clueless to how severe the situation was.  Here I am, laying there, the sickest I've ever been and thinking….this is odd."

"Our Dad is also noticeably 'different'.  He, like Jack, doesn't pick up on emotional signals very well.  It's hard to get him involved in family functions and he's also disconnected when it comes to family matters.  Our Dad is typically rigid, inflexible and difficult to joke around with.  He, unlike my Mother, doesn't socialize and has no friends.  Our Dad, like Jack, is 'there, but not there'.  But, as hard as it is to connect with our Dad, it is even harder to connect with Jack."

"Jack has friends but, many of them seem like acquaintances.  It seems Jack sometimes has trouble telling the difference."

"One time, Jack used the family car to go out and somehow, came home without it.  He wasn't drunk or anything- he just lost it.  My Dad kept asking him where it was but Jack just 'clammed up' and became silent.  I remember my Dad had to call every towing place in the phone book and finally found it.  Jack could have told us where it was - he remembers everything.  But, he just 'shut down' and couldn't say a thing.  It was very strange."

"Something else that seems strange is that Jack never said anything about his current legal problems to anyone in the family.  A friend who read it in the paper called one of my sisters and that's how we found out.  You would think he would have reached out to one of us at least, even if he didn't want my parents to find out.  It's just odd but, that's Jack."

### Excerpts from Kathryn Bonner's letter to Judge Urbina

Kathryn Bonner, grade school principal, is a friend of Mr. Brownell's (Jack), and has known him for 10 years.

"In the early years when I was working in the evening after a long day of teaching, Jack was a regular customer at the restaurant.  A man content with routine, Jack would come to the restaurant, generally order the same thing nightly and interact quietly with other customers and the restaurant staff.  Although on the surface he is not an overly gregarious man, Jack is a person people like to talk to and a person who listens genuinely to others."

11

"His long stretch of days at work reminds me of Cal Ripken Jr. and his record of days at work.  As far as I am aware, he has not missed a day of work in the ten years that I have known him, but I am confident that if he has, he could tell you the number of days and the dates."

"Jack enjoys a wonderful, insatiable drive to improve himself.  His workout program is a terrific example of that.  Jack has a rigorous, workout regime that could only be skipped if he were suffering from an extreme injury.  He keeps meticulous records of his running times and his improvements, never happy until the previous record has been beaten.  He studies what he has done and makes adjustments in his strategies in order to shave seconds off his time.  Recently he beat his goal for running a particular set of stairs.  In this case, it took him 78 times to reach his goal as to how fast he could run them.  I have seen Jack use the same strategies and determination to make changes in his personal and professional life, always striving to be better than he was the day before."

**Interview with Paul Millstein, Construction Manager, DDC**

"I have never heard Jack say a curse word, pretty amazing in a company like ours.  He's a good, kind hearted person who lives modestly.  There's nothing flamboyant or deceiving about Jack.  The Toyota truck he drives every day to work has over 180,000 miles on it.  He says its good transportation.  With Jack, what you see is what you get."

"When Jack gets stuck in a routine, he can't get off of it.  He's not flexible at all."

"The only way he can interact with anyone or with anything is if he's in control of the situation."

"Years ago, part of Jack's duties involved paying our vendors.  Sometimes he just wouldn't pay.  When we asked him about it he'd say "I'll check on it and get back to you" but then it wouldn't get done.  Eventually, he had to be removed from those responsibilities."

**Interview with Tim Roberts**

Tim Roberts is Mr. Brownell's colleague at Douglas Development Corp., and has known "Jack" personally and professionally for more than 16 years.

"Jack is a 'numbers' kind of guy.  He's well-liked but not outgoing, to put it mildly.  Socially, it's like he doesn't know how".

"Jack has a lot of trouble going outside of his comfort zone.  I have observed Jack for 16 years, in and out of work, and it has been the exact same routine.  Seven days a week- same day, everyday.  He can tell you exactly what he's doing and how long each thing takes."

"At *Caddies*, it's always the same routine.  He enters the bar the same time each day, has 1 or 2 drinks then just 'vanishes'.  At first it was so weird, no one knew where he went, and he never said 'goodbye'.  Then we learned that he was going next door to order his sushi.  The sushi place has his order hanging on the wall next to the register because he always orders the same exact thing.  Once we knew where he was going, it all made sense.  But *we* had to figure it out.  It never occurred to him to say anything before he disappeared.  If you didn't know him and the way he acts, he can be misunderstood.  Just walking out without saying goodbye seems rude but, it's just Jack."

"When Jack does have something to say, it's always thought out, deliberate and straight to the point.  He doesn't elaborate."

"When we're out socially, people tell me that when they first noticed Jack, he seemed extremely unapproachable.  He stands so 'stiff' and 'statue-like'.  If you didn't know him, you wouldn't go up and talk to him!  He's a really nice guy but you would never be able to tell by his body language."

**Interview with Clare Marie Leigh**

Clare Leigh, a medical assistant to a plastic surgeon, has been involved with Mr. Brownell "Jack" 'on and off' for nearly eight years.

"(Mr. Brownell) shared information only when I began questioning him after observing unusual emotional responses and repetitive behavior during our initial courtship. Mr. Brownell is unable to commit time to our relationship in a "normal" way, which has been an ongoing issue for us. He is currently trying to assess aspects of his personality and life choices that he has previously ignored. Mr. Brownell has a long history of interpersonal difficulties. He seems to relate best to numbers and objects rather than people. His difficulty with socialization has at times severely impacted our relationship and now his life. The process of facing his interpersonal issues and the mismanagement of his finances has been a struggle for Mr. Brownell. He has great trouble navigating and redirecting his focus once he finds himself in a crisis."

"Jack's behavior is extremely repetitive and he has a lot of trouble breaking his routine. It's so hard to try to get him to do something new. We argue constantly about his refusal to do things or go anywhere. I take my vacations alone, he won't leave town even if he has the time. Sometimes I'll get so frustrated and stop calling him. Rarely, if I protest enough and threaten to leave him, he'll break his routine to go to the park or pool on a Saturday. But then, even that (going to the pool) becomes a routine and I can't get him to stop. It has to be the same thing, in the same place, at the same time, over and over, again and again. It's enough to drive anyone crazy. But for Jack, that's how he needs it to be."

During one of my many frustrating times with Jack for not being able to break his routine for even one day or afternoon, I got mad and refused to take his calls or respond to his emails. When he realized I was serious and was considering an end to the relationship, he sent me flowers to my workplace the following Monday and that itself (sending flowers to Clare's workplace every Monday) became a pattern for some time before he eventually just stopped

14

doing it.  It was sweet that he did it but, like everything else, the sentiment was lost in the routine."

"Jack has always mismanaged his own finances.  Jack gets his mail and drops it on the floor of his truck.  At times, you can not even open up the passenger side door without spilling mail all over the ground.  Jack's disorganization and avoidance in these matters have resulted in multiple late payments and fees."

"The week before you came, Jack had weeds growing from the ground all the way up onto his deck that overtook at least a quarter of his deck; they were another 3 feet higher than the railing.  When I saw them I was taken aback and I said, "What is up with this mess?"  He responded that he liked it and it gave him more privacy from his neighbors."

"His dishwasher was broken for 2 years before he finally replaced it and that was only because I threatened not to see him again until he did do something about it.  His oven had been partially working for the last 3 years with only 1 burner working and could only broil and not bake.  By that time I didn't care as much because I wasn't spending time at his place anymore.  It was just making me upset.  I have no longer been spending time at his home, and demand that he fixes things if he wants me to stay in his life."

"Jack loves to watch his sports.  To say that he's a 'sports fanatic' is an understatement.  He's obsessed.  Everything has to revolve around watching the game.  Once, we were out to dinner with another couple (rare) having a good time and all of a sudden around eight o'clock, Jack got up and started to leave.  I went after him to see where he was going and he said 'home to watch the game'.  The game was on TV at the restaurant but he needed to be home to watch it.  He wasn't mad or upset.   To him it was just something he planned to do in his own head, his routine, but he didn't let any of us know and it never occurred to him that he should have."

"A few years ago I had to have a lumpectomy and I was nervous.  I asked Jack to go with me and all he said was 'I can't' - but he could have.  I know he cares but he couldn't break his routine and couldn't register or empathize with my need or the seriousness of the situation."

15

"For as long as I've known him, Jack has had trouble making eye contact.  For a very long time, our relationship lacked intimacy or even holding hands.  Physical displays of affection were null and void."

"Jack's brain is like a calculator.  He can do numbers in his head.  It's his special gift.  He also knows all the baseball stats going back 50 years or more."

"Whenever I'm able to get him to do something outside his routine (rare), he has to know exactly how long it will be and how far away it is from home.  Jack is happy being by himself...too comfortable.  He'll never initiate going anywhere or being with anyone, except going to *Caddies*.  Everything else has to be someone else strongly encouraging or twisting his arm."

"About his not filing taxes, I've seen first hand the way he lives- the mess, the disorganized chaos.  If he loses or misplaces something, he can't complete it.  When he can't complete it, he ignores it.  Then when it's a problem, he avoids dealing with it which makes it worse.  But, I don't think he is able to anticipate the consequences until it's too late."

"Jack can't throw anything away.  His house is literally cluttered with old, broken lamps (one of them is in the center of his living room with no bulb or shade for years), rusted unusable barbeques, broken gym equipment, chairs with ripped cushions and broken legs, old clothes he never wears and...it's just a mess.  I don't know how he can live like this.  I refuse to go there anymore, I'm not comfortable."

"Jack dresses nice but it's because there is a salesman at Nordstrom's who picks out all his clothes for him and tells him what looks good.  Jack buys and wears whatever he tells him to.  (Recently, Jack informed me that 'his guy' at Nordstrom's passed away and he needs to find someone new)."

"As far as money goes, Jack refuses to buy anything new.  He just doesn't desire or feel the need to buy anything.  If it's my birthday and I'd like a gift, I have to pick it out myself and

he goes and gets it.  As for his birthday, I stopped getting him anything years ago because he barely unwraps it and then it stays in the box, thrown in the back room with all the others, year after year."

"Humor goes right over Jack's head.  He's not a joker.  He's too literal, no imagination. Even fiction to him is a 'waste of time'.  Jack's speech has always been monotone.  Even if he's really happy it's hard to tell.  He's never animated and his tone doesn't change even when his mood does."

"When we first started dating, I invited him over to watch a movie.  In the middle of the movie, he got up and left the room.  After 5 or 10 minutes, I got up and started going room to room looking for him.  I found him in my guest room, in bed, trying to go to sleep.  I was shocked.  We only knew each other a short time.  I said "Jack, you could have said something before you walked away."  He said "I was tired."  Never in a million years would I have expected anyone to do that."

### Excerpts from Robert Leibner's letter to Judge Urbina

"Jack had an uncanny ability to instantly identify and locate crucial documents needed for litigation matters, and Jack was always able to recall and provide much of the history which accompanied each matter.  His broad range of knowledge of the financial history of DDC is impressive and unyielding, both in historical perspective and factual detail.  Lenders would often marvel at his ability to single-handedly harness the necessary documents and financial information."

"Over the years much of Jack's life was, (and remains), consumed by his work at DDC. Jack is renowned among his friends for his incredibly challenging work-out routines.  Consistent with his personality, Jack rarely volunteers much about his work-out routines, preferring to remain modest."

"Jack's infrequent vacations invariably consist of nothing more exotic than a visit to his mother and father, which includes staying in their Florida home."

## Observation of Mr. Brownell's Home

Mr. Brownell picked me up in D.C. to take me to his home in Rockville, Maryland. As I entered the passenger side of his 1991 Toyota pick-up truck, I noticed how worn it was, inside and out. Also, there were random collections of paper and debris in the outer truck bed and strewn across the floor and seats of the interior. Mr. Brownell made no excuses for the truck's condition and he seemed satisfied with the truck; showing me the speedometer with 180,000 miles and stating "the air conditioning works good".

We pulled up to the front of his house at 6151 Tuckerman Lane, which is located on a main road. I immediately noticed how the house was in need of great repair. The front porch was rotting and loose boards were covering a hole directly in front of the entrance door. There were overgrown weeds and bushes and the gutters were also growing weeds.

After entering the house, I was immediately impressed with a tremendous amount of clutter- a mixture of papers, old books, exercise equipment, and broken antique furniture. Everything was randomly scattered about- odd placement of old photographs, broken record players and artifacts that were left by the previous owners 12 years ago. Many other items were still in partially opened boxes, cluttering his common living areas. Jack made a passing reference about having a garage sale one day and that most of the stuff was worth 'something'. There was a strong musty smell in the house, especially on such a hot day. Jack opened the doors to the backyard and it was then I was greeted by Jack's two cats.

Jack's kitchen was cramped and cluttered. There didn't seem to be adequate space for food, preparation or cooking and his appliances seemed worn and out-dated. Later, I was informed by Clare Leigh that only one burner on the stove was working.

Jack acknowledged that most of the furniture and artifacts left behind by the previous owners remained in the same place they were left when he moved in.  In the past 12 years, very little has been thrown away, repaired or replaced.  Oddly, there were personal photographs and family heirlooms still placed prominently on the shelves in his living room.  Mr. Brownell has very few, if any, personal items of his own on display.

Jack's 'guest room' appeared to be more of a disorganized makeshift storage room, filled with boxes, clothes, and other belongings strewn about.  The bed itself was broken and unusable and items were also scattered about on top of it.  While we were standing there, Jack walked to the back of the room and recovered the dashboard to one of his old Mercury Cougars, saying "I've been looking for this and forgot it was back here.  Now I can put it back in the car."

There was a small TV and DVD player in his living room with five of his favorite movies stacked on top of the DVD player which include *Rocky I*, *As Good As It Gets*, *Forrest Gump* and 2 fitness/work-out videos.  Jack's tendency is to watch each movie several times before switching to another.

In the backyard, there was a rusted exercise bicycle and Jack said "I haven't thrown that out yet."  There was also what seemed to be a worn, unused barbeque and many pieces of broken outdoor furniture tangled up in the overgrown weeds throughout the yard.  In the barn out back, were remnants of a 'party' he had in 2000.  Unopened beer bottles in dried up ice tubs- exactly where they were left that night.  Upstairs were many unopened boxes and items left behind by the previous owners 12 years ago and Jack says he hasn't 'gone through yet.'

Behind the barn were four automobiles (three of which are late model Mercury Cougars) under blankets and covers but partially uncovered so that various bugs, dirt and spiders were both inside and outside of the vehicles.  Clare Leigh later referred to them as 'just more junk he can't throw away.'

Before leaving, Jack was sorting through his closet and I asked him about Douglas Jemal's comment about not owning a winter coat, and reports of his walking around outside in

freezing temperatures wearing only a light sports jacket. Jack's initial response was "a winter coat is too inconvenient and too much to carry". Then he replied, "By the time I think about getting one, the winter's almost over". After that, Jack went into another room for several minutes and reappeared holding a jacket on a hanger that he bought in 1985 and said, 'I forgot I had it'. Upon closer examination, he noticed the coat had a removable liner and made reference to it being too much trouble to take the liner out and put it back in, as the reason for not wearing it for 22 years.

While searching through his belongings, Jack uncovered an old report card from 1968 written by his fourth grade teacher. I reviewed the teacher's notations and saw that Jack had received check marks for outstanding in academics, there were also two written comments; the first relating to trouble with handwriting and "neatness issues" and the second referred to Jack's need to strengthen his "interest in others and improve his social interaction."

PERSONAL HISTORY

John "Jack" Brownell was born on October 8, 1961 in Heidelberg, Germany to his parents James Brownell, currently retired from the United States Army, and Mary Brownell, a retired librarian and homemaker.

Jack Brownell is the youngest of six children. He has never been married but has a 16 year old son, Christopher Scholz, from a previous relationship, who resides with his mother in Stafford, Virginia. Mr. Brownell last had contact with his son about six years ago, however, he pays regular child support.

Jack Brownell lived in Germany for the first ninth months of his life while his father served in the United States Army. The family then moved to Montgomery, Alabama for one year, and then various cities in Virginia until Jack graduated high school. Jack obtained a Bachelor's of Science (BS) degree in business with a major in accounting from Virginia Tech University. Since September, 1990, Mr. Brownell has been employed as Chief Financial Officer (CFO) at Douglas Development Corp. in Washington, D.C. Douglas Jemal, owner of Douglas

Development Corp. described the company as a "family business" and Mr. Brownell is an "excellent employee" and "family member".  Since 1995, he has owned his home in Rockville, Maryland, where he resides alone.

MEDICAL HISTORY

Mr. Brownell denies any current or previous chronic illnesses.  Mr. Brownell has never been hospitalized or undergone any surgeries.  Currently, Mr. Brownell states he is in good health and is not taking any medications.

PAST PSYCHIATRIC HISTORY

Mr. Brownell has never been diagnosed or treated for any mental health problems. Several years ago, someone close to Mr. Brownell suggested he may have Asperger Syndrome and asked him to read a book about it.  Until this evaluation, Mr. Brownell never sought the assistance of a counselor, psychiatrist or psychologist.

FAMILY HISTORY

Eileen Brownell, Mr. Brownell's sister, states that her father also had odd or eccentric tendencies.  She states that her father was a good person and provider but was "unemotional", "strict" and had few, if any friends.  Eileen Brownell also states that her older twin sisters were very smart but also had "social deficiencies…they hardly ever socialized with anyone at school, and weren't interested in the typical things young girls did at their age".  Eileen Brownell was not aware of any family history of Depression, Bipolar Disorder, Obsessive-Compulsive Disorder or Schizophrenia.

SUBSTANCE USE HISTORY

Mr. Brownell first tried alcohol when he was 15 years of age and began more regular consumption in college.  At the present time, Mr. Brownell drinks socially, approximately four times per week but does not "normally" drink to intoxication.

Mr. Brownell admittedly smoked marijuana while in college.  After graduation, his usage "tapered off" until he eventually stopped in 1992.  At age 19, Mr. Brownell first experimented with cocaine.  He used the drug "a couple of times" and then several times a week in college until 1984 or 1985, and has not used cocaine since.  A urinalysis was conducted on the initial interview at the United States Probation Office on February 23, 2007, and was negative for the presence of illicit substances.

MENTAL STATUS EXAM:

Mr. Brownell presents as a neatly dressed, fit man with blue eyes and graying brown hair. He entered my office in a somewhat rigid gait and posture.  His facial expression was neutral and did not change throughout the entire interview.  Upon extending my hand and saying hello, he seemed friendly yet uncomfortable.  He awkwardly shook my hand and then abruptly let go. During the entire greeting, Mr. Brownell did not make eye contact and turned his gaze to the side.  His aversion of eye contact also remained constant throughout the interview.

Mr. Brownell appeared physically uncomfortable with himself.  His stiff, wooden body posturing, supports a grim, long face, and when Mr. Brownell speaks, his monotonic voice, and short clipped speech pattern is deliberate and to the point.  When Mr. Brownell was asked if he understood the reason for this evaluation, he simply said "yes".  When asked to elaborate he stated that a close friend told him he "might have Asperger Syndrome and should look into it". Mr. Brownell then remarked how worried he was about not finding his way around New York, having only traveled here one or two times before.

Mr. Brownell's speech was normal, understandable and without any reported delay or obvious impairment in expressive language form or verbal intelligence.  However, his range of intonation and inflection were noticeably restricted.  He also had difficulty elaborating and was rather short and deliberate in his responses.  Mr. Brownell maintained a serious disposition throughout the interview, despite several attempts at casual conversation or humor.  Even when discussing his known areas of interest, Mr. Brownell remained somewhat "technical" when describing his running routines and fascination with old cars.  Mr. Brownell also sat stiffly throughout the entire three hour interview without the need to re-adjust his position, and rarely used any nonverbal gestures (i.e. hand gestures) or facial expressions to convey his feelings.

A sampling of metaphors and visual euphemisms revealed a rather literal interpretation of language.  Despite subtle prompting and encouragement, Mr. Brownell had difficulty engaging in reciprocal conversation.  Throughout the interview, he adopted an unusual, overly formal, manner of speaking.   He applied a concrete and literal problem solving style to verbal abstract reasoning tasks.

Mr. Brownell was alert and oriented.  There were no expressed delusions, hallucinations or grandiose thoughts and no paranoid ideation.  Mr. Brownell denied any suicidal or homicidal ideation.

FORMULATION:

After an extensive interview with Mr. Brownell, a subsequent visit to his workplace, several interviews with colleagues, friends, and acquaintances, a visit and observation of Mr. Brownell at his favorite bar and restaurant, a tour of his running routes, a visit to his home and a review of more than 80 letters of reference testifying to Mr. Brownell's character, Mr. Brownell clearly meets the criteria for the diagnosis of Asperger Syndrome as described in the Diagnostic Statistical Manual (DSM IV) .  (Appendix A; see attached)

Despite a highly regarded moral character, charitable nature, astounding work ethic and an outward appearance of sophistication, Mr. Brownell's presentation and history have revealed

significant, lifelong deficits in social interaction, restrictive and repetitive patterns of behavior, inflexible adherence to rigid routines, marked reliance on formalistic behavior and excessively rigid social conventions.  The intensity, severity and duration of these symptoms, as well as the consequential impairments in functioning, strongly support the diagnosis of Asperger Syndrome – a neurologically based disorder at the high-functioning end of the Pervasive Developmental Disorder spectrum.

Without the benefit of early diagnosis and intervention, the symptoms of Asperger Syndrome have had a profound impact on Mr. Brownell's current conduct and behavior. Throughout his adulthood, Mr. Brownell has frequently demonstrated a tendency to become easily overwhelmed and subsequently dysfunctional in handling matters that complicate or fall outside of his predictable routine.  The diagnosis of Asperger Syndrome and its significant impact on Mr. Brownell's life are evident within the following details:

- A largely practiced and formulistic approach towards socialization.
- Extremely regimented-restricted lifestyle and range of interests.
- Apparent indifference regarding the care and maintenance of his personal property while living in relative isolation.
- Excessive preoccupation within very circumscribed areas of interest
- Empathic deficiencies and problems developing consistent, meaningful relationships.
- General anxiety, avoidance and resistance when managing activities and situations outside of his predictable routine.
- A monotone and restrictive range of affect and expression.

Persons with Asperger Syndrome are concrete thinkers.  Jokes, sarcasm, innuendo, satire, trickery, and deceit are difficult concepts for them to understand and appreciate.  Their world is unadorned with pretext, pretense, sham and dishonesty.  They are naturally guileless and very honest.  It is possible that the person with Asperger Syndrome has learned through experience to lie but, her or his attempts to lie will be done poorly.  Double-entendres, colloquialisms and slang are typically beyond their reach.  Their body language and gestures are awkward and are

often taken out of context. Their stiff posture, serious demeanor and avoidance of eye contact may be mistaken for disinterest, lack of remorse or malicious intent. Persons with Asperger Syndrome may have been conditioned through their lifetime to look to authority figures to make many of life's important decisions for them. They have learned to depend on and trust these authority figures to be right.

Suffering from Asperger Syndrome has placed significant limitations on Mr. Brownell's interpersonal growth and development. The chronic and persistent nature of this condition (unrecognized, undiagnosed and untreated, throughout his entire life) has had a direct and negative impact on his actions and behavior. Mr. Brownell's systematic approach towards people and situations is frequently impaired by his extremely straight-forward and literal interpretation of events, strict adherence to routines and overwhelming anxiety when having to deal with complex or changing scenarios.

Since childhood, Mr. Brownell has been at a neurocognitive disadvantage when attempting to interpret societal norms and expectations, especially when they are not obvious. He has trouble with understanding social cues, implied directions, and difficulty 'reading between the lines'. Mr. Brownell has always maintained an interest and fascination with numbers, facts and objects (plastic water bottle, old cars, antiques etc.,) but, his understanding of affection, friendship and empathy have been circuitously learned, rather than naturally acquired. Difficulty with spontaneous conversation, especially in unstructured social gatherings (i.e., dinner parties or long car rides) forces Mr. Brownell into adopting a state of relative silence, even in the presence of colleagues he's known for 20 years.

Despite persistent and methodic, almost robotic, attempts at socialization, Mr. Brownell lives in relative isolation with very superficial and tenuous relationships. Mr. Brownell's social life does not typically extend outside the rigid confines of his routine and evenings at *Caddies* bar. Mr. Brownell's current relationship of eight years with Clare Leigh, while significant in terms of length, is constantly disrupted by Mr. Brownell's adherence to routine and lacks the intimacy and 'connectedness' of more traditional long-term relationships. However, this does not make Mr. Brownell's feelings for others any less genuine. Unlike those on the lower

functioning end of the developmental disorder spectrum, people with Asperger Syndrome desire and seek out friendship but, especially when younger, are awkward in their attempts and deficient in the skills needed to be successful.  As adults, many of them have been able to model or mimic more appropriate social graces which allows them to achieve some level of social normalcy, at least on the surface.  Likewise, Mr. Brownell has always been desirous of friendship and there are many people Mr. Brownell considers to be his friends.  His friendships stand out as tributes to his perseverance and ability to assemble, piece by piece, a basic understanding of what to expect and what is expected of him in social situations.  In addition, working for 20 years with socially-minded colleagues who have taken an interest in Mr. Brownell has, (over many years) enhanced his social skills and enabled him to develop more socialized routines.  Without the benefit of knowing anything about Mr. Brownell's undiagnosed condition, but sensing Mr. Brownell's vulnerability, Douglas Jemal and the staff at DDC provided the necessary platform for Mr. Brownell's societal adaptation.  These deliberate efforts of modeling, supporting and nurturing socially appropriate behavior by his colleagues at DDC, closely resemble the approach of more typical therapeutic treatment strategies for Asperger Syndrome and seem to have circumvented at least some of Mr. Brownell's restricted and solitary tendencies.

Mr. Brownell and those with Asperger Syndrome are constantly attempting to impose their own sense of order on a world they don't understand.  Conflicts and uncertainty overwhelm and confuse them.  Overly concerned with their imperatives and typically unaware of the unspoken rules of complex human interaction, they continually experience anxiety and paralyzing distress.  When confronted with ambiguity or new ideas, Mr. Brownell's tendency is to first reduce or eliminate emerging anxiety.  For Mr. Brownell, and others who suffer with Asperger Syndrome, the most effective way to eliminate distress is to either remove or, simply not address changes and variability within the problem at hand.  When the familiar and predictable road or path is blocked and no immediate detour is visible, Mr. Brownell becomes overwhelmed and 'stuck'.  The ability to adjust and react to unforeseen complications in Mr. Brownell's case is extremely limited and directly conflicts with his tendency is to create his own set of rules for everyday functioning in order to keep things from changing and thereby minimize his anxiety.  Mr. Brownell's inclination is to maintain order and avoid uncertainty by doing

things the exact same way he's always done them, especially when circumstances change and require a different method or revised technique.

As with most people suffering with Asperger Syndrome, Mr. Brownell is deficient in the skill of *flexibility*. Flexibility is critically necessary to solve complex and changing scenarios. Similarly, Mr. Brownell is also not very adept at responding to situations in an organized, efficient way. Asperger Syndrome is also commonly associated with inattention and impairments in executive function; the brain's ability to plan and carry out a series of behaviors to complete complicated tasks. When faced with uncertainty, Mr. Brownell can become easily overwhelmed and confused which further complicate his attention to detail and subsequent disorganization. Mr. Brownell's need for sameness and control cause him to avoid or retreat from 'unworkable' tasks while reverting back into his preferred activities and the comfort of his obsessive rituals and predictable routines.

Mr. Brownell's extraordinary gifts involve focusing on the minutia of the task at hand, running numbers and calculations in his head while accumulating and maintaining massive amounts of information. To his colleagues at Douglas Development Corp., Mr. Brownell is an incredible "resource of information" and an incredible "numbers man". As part of his condition, Mr. Brownell performs extremely well with tasks that are related to his particular areas of interest. However, his problem solving skills are deficient and inevitably hampered by his adherence to strict patterns of behavior and a tendency to react poorly to new events. With Asperger Syndrome, there is no middle ground. His perception of events is black or white; there is no grey area. Mr. Brownell doesn't 'just like' something; he either loves to do an activity or hates it. Not only does Mr. Brownell have difficulty *stopping* his preferred routines, he also has trouble *replacing* preferred activities for less desirable, non-preferred ones. When multiple non-preferred elements are combined together (i.e., filing taxes, paying bills, renewing his car registration, the upkeep of his home and property, etc.) the more overwhelmed, resistant and avoidant Mr. Brownell becomes. Likewise, those with Asperger Syndrome lacking cognitive flexibility and reacting to situations with 'black-and-white thinking', often leads to inaccurate interpretations of the world and what is expected of them. How Mr. Brownell interprets a situation determines how he will respond to it. Unfortunately, many times, Mr. Brownell's

interpretation of an event is either inaccurate or not one that leads to the most appropriate behavior.

Affected by the deficits inherent in Asperger Syndrome, Mr. Brownell at times relies on a very rigid set of rules to impose order on problems he cannot solve. Like those with Asperger Syndrome, Mr. Brownell looks for patterns or the logic of a situation to make it less chaotic, more predictable and understandable. When situations or problems do not conform to Mr. Brownell's rigid system, they become intolerable and are put off or, completely avoided. Avoidance and neglect result in behavior or problems that may be misinterpreted as *intentionally defiant* rather than unintentional errors and oversights related to the deficits of Asperger Syndrome. When we look more critically at Mr. Brownell's ineffective handling of matters outside of his preferred routines, there is usually evidence of underlying distress, anxiety, and heavy reliance on obsession or routine (an experience entirely consistent with the experiences of those who suffer from Asperger Syndrome).

Mr. Brownell, entrenched in his routines, has created an existence that attempts to eliminate most of life's uncertainty in order to keep things from changing and thereby minimize his anxiety. He has *never* missed a day at work in 20 years and can be seen walking into the same restaurant, at the same time, nearly everyday. Unfortunately, his predictability and near perfect scheduling are not especially compatible with sustaining deeper emotional relationships where the needs of others have to be considered and may occasionally disrupt his routine. Mr. Brownell's extraordinary adherence to routine fits well with his relatively solitary existence but, has come at the cost of significant interpersonal disconnection and problems related to his conviction.

RECOMMENDATIONS

While the disorder of Asperger Syndrome had been discussed in psychiatric literature for many years, it was poorly understood and there were no official diagnostic criteria until the 1994 publication of the DSM-IV. As a result, Mr. Brownell lived his entire life with neurodevelopmental disadvantages without ever having a reference point for understanding the

reasons behind his difficulties.  Unlike many children today, Mr. Brownell never benefited from diagnosis, treatment or educational support for his condition.  Unfortunately, like other undiagnosed adults who suffer with Asperger Syndrome, Mr. Brownell's diagnosis was made only as a result of information gathered during his encounter with the criminal justice system.

Within the criminal justice system, incidents involving people with Asperger Syndrome as offenders are isolated and rare.  As a result, many experts, lawyers and jurists remain unfamiliar with Asperger Syndrome.  It becomes essential that defense attorneys, prosecutors and judges seek input from mental health professionals who can explain the disability while simultaneously dispelling myths, stigmas and misinformation.  Criminal justice professionals, working in partnership with advocates and mental health experts, will better understand the offender with Asperger Syndrome and the mitigating factors that the condition may bring to the situation.

As with all citizens, individuals with Asperger Syndrome should be held accountable for their behaviors.  However, when one is affected by Asperger Syndrome, certain elements of behavior are a result of an inability to accurately perceive or understand rules and expectations in the world around them.  Those with Asperger Syndrome may ignore or not recognize the implications of their behavior as they struggle to maintain control through their obsessive patterns and routines.  Without the benefit of diagnosis or early intervention, Mr. Brownell has had to develop his own strategies and set of rules to compensate for the deficits of his condition.  Not surprisingly, some of his strategies (while effective in maintaining order and reducing his anxiety) have been insufficient when dealing with less straight forward matters such as those related to his conviction.

Mr. Brownell was first diagnosed with Asperger Syndrome as a result of the heavy scrutiny of his background.  The fact remains that those diagnosed with Asperger Syndrome are very difficult to diagnose, or may have been misdiagnosed prior to their entry into the criminal Justice system.  However, the Asperger Syndrome diagnosis is becoming more common as better information and diagnostic tools surface and the stigma attached to the autism spectrum lessens.  When laws have been broken, the person's fate is in the hands of criminal justice professionals

who may be misinformed about Asperger Syndrome due to unfamiliarity with the diagnosis and little exposure to those suffering with the condition. Prosecutors may mistakenly look at autism as simply another defense ploy for leniency. Criminal justice professionals will need to become aware of the higher rate of diagnosis of those with Asperger Syndrome and consider the diagnosis of Asperger Syndrome as a condition affecting the entire life of an individual and a mitigating factor during every part of the criminal justice process.

In making recommendations for an appropriate sentence for Mr. Brownell, focus should be on prevention of future behavior rather than strict punishment for the crime. Usual sentences based on confinement with many others, such as jail sentences, are simply not appropriate for a person with Asperger Syndrome. In addition, prisons are ill-equipped to deal with an offender with this condition. For most offenders, the punishment should fit the crime. For those with Asperger Syndrome, the punishment may need to fit the offender

Individuals with Asperger Syndrome may strongly insist on sameness in their environment. They may enter settings with a memorized preconceived visual standard, note any discrepancies, attempt to make adjustments to fit their standard and sometimes inadvertently violate the space and property boundaries of others. Once incarcerated, they will likely fall victim to other inmates who prey on their obvious vulnerabilities and naiveté. Also, because of their cognitive limitations, they are likely to have a difficult time understanding jail and prison rules and may spend much time in segregation- which limits their work opportunities, and hence 'good time' credits and early release.

Alternatives to prison should be considered. Disability courts have been established or are being formed in some jurisdictions across the United States and offer diversion options for offenders with Asperger Syndrome. Diversion is a program to allow offenders who are not believed to be repeat offenders to have a second chance. An appropriate diversion program for Mr. Brownell might be court-ordered counseling to help him better understand and control his behavior, along with an appropriate community service. These more appropriate dispositions might use Mr. Brownell's strengths, such as his intelligence level, and should be designed to

minimize the requirement for interactions in non-therapeutic communal settings (i.e. jail). In all cases, the court would monitor Mr. Brownell's progress.

In this case, careful consideration should be given to returning Mr. Brownell to the reorganized and familiar setting of his work space at Douglas Development where his colleagues have already begun modeling more appropriate social interaction. It has taken Mr. Brownell almost twenty years at Douglas Development Corp. to establish a comfortable and productive lifestyle while simultaneously struggling against tremendous tendencies and developmental limitations. If he is removed from his current support network and comfort zone, it may cause profound setbacks and a prolonged time period to re-establish and re-integrate back into society, especially considering the deficits and limitations defined by his diagnosis of Asperger Syndrome.

Now that Mr. Brownell has finally been diagnosed, he can begin to untangle deep-seeded routines and, with support, can begin the process of recovery. A prison term would only disrupt his prognosis and delay intervention while even further setting back this already disadvantaged, yet capable man. With return to his familiar work place, (with the accompanying changes and controls put in place at Douglas Development Corp.) and the newfound knowledge of Asperger Syndrome and the proper treatment and support, Mr. Brownell will be able to learn from his mistakes, model appropriate behavior and continue to lead a charitable and productive life.

Mr. Brownell should seek supportive and cognitive-behavioral therapy with particular attention towards assertion training, social skills building, and organizational guidance. Behavioral strategies should target Mr. Brownell's difficulties with balancing the demands of his personal and professional life, mismanagement of his personal finances and deficits in assertiveness. Mr. Brownell will also need to be guided and encouraged to increase his range of interests and pleasurable activities. Finally, it is important for Mr. Brownell to learn more appropriate coping strategies while attempting to break or shift from routine. In time, with these recommendations, Mr. Brownell may look forward to improvements in the quality of his

relationships, in the ability to manage his personal finances and property, and the capacity to foresee and accurately interpret the consequences of his actions and behavior.

James B. Snyder. M.D.
*Board Certified Psychiatrist*

References:

1. American Psychiatric Association. *Diagnostic and Statistical Manual of Mental Disorders DSM-IV-TR* (Text-revised).  Washington, DC: American Psychiatric Association; 2000.
2. The Oasis Guide to Asperger Syndrome.  *Advice, Support, Insight and Inspiration*. Patricia Romanowski Bashe and Barbara Kirby; Crown Publishers New York; 2001
3. Tantam, D. (1991). *Asperger's Syndrome in Adulthood*. In U. Frith (Ed.), Autism and Asperger Syndrome (pp. 147-183). Cambridge, England: Cambridge University Press.
4. Volkmar, F.R., Klin, A., Schultz, R., Bronen, R., Marans, W., Sparrow, S., Cohen, D.J. (1996). *Asperger Syndrome*. Journal of the American Academy of Child and Adolescent Psychiatry, 35 (1), 118-123.
5. Wing L. *Asperger's Syndrome: A clinical account*. Psychol Med. 1981; 11:115-130.

## Appendix A

### 299.80 Asperger's Disorder

**Diagnostic Features**

The essential features of Asperger's Disorder are severe and sustained impairment in social interaction (Criterion A) and the development of restricted, repetitive patterns of behavior, interests, and activities (Criterion B). The disturbance must cause clinically significant impairment in social, occupational, or other important areas of functioning (Criterion C). In contrast to Autistic Disorder, there are no clinically significant delays in language (Criterion D). In addition, there are no clinically significant delays in cognitive development or in the development of age-appropriate self-help skills, adaptive behavior (other than in social interaction), and curiosity about the environment in childhood (Criterion E).

**Course**

Asperger's Disorder appears to have a somewhat later onset than Autistic Disorder, or at least to be recognized somewhat later. Difficulties in social interaction may become more apparent in the context of school. It is during this time that particular idiosyncratic or circumscribed interests may appear or be recognized as such. As adults, individuals with the condition may have problems with empathy and modulation of social interaction. This disorder apparently follows a continuous course and, in the vast majority of cases, the duration is lifelong.

**Familial Pattern**

Although the available data are limited, there appears to be an increased frequency of Asperger's Disorder among family members of individuals who have the disorder.

**Diagnostic Criteria**

    **A.** Qualitative impairment in social interaction, as manifested by at least two of the following:

        (1) marked impairment in the use of multiple nonverbal behaviors such as eye-to-eye gaze, facial expression, body postures, and gestures to regulate social interaction

        (2) failure to develop peer relationships appropriate to developmental level

        (3) a lack of spontaneous seeking to share enjoyment, interests, or achievements with other people (e.g., by a lack of showing, bringing or pointing out objects of interest to other people)

        (4) lack of social or emotional reciprocity

B. Restricted repetitive and stereotyped patterns of behavior, interests, and activities, as manifested by at least one of the following:

        (1) encompassing preoccupation with one or more stereotyped and restricted patterns of interest that is abnormal either in intensity or focus

        (2) apparently inflexible adherence to specific, nonfunctional routines or rituals

        (3) stereotyped and repetitive motor mannerisms (e.g., hand or finger flapping or twisting, or complex whole-body movements)

        (4) persistent preoccupation with parts of objects

C. The disturbance causes clinically significant impairment in social, occupational, or other important areas of functioning.

D. There is no clinically significant general delay in language (e.g., single words used by age 2 years, communicative phrases used by age 3 years).

E.   There is no clinically significant delay in cognitive development or in the development of age-appropriate self-help skills, adaptive behavior (other than in social interaction), and curiosity about the environment in childhood.

F.   Criteria are not met for another specific Pervasive Developmental Disorder or Schizophrenia.

# JAMES B. SNYDER, M.D.

Long Island Psychiatric, P.L.L.C.

2 Main Street – Suite 8 Roslyn, NY 11576

Email: jbsnyder@aol.com

Office:(516) 626-2182 Cell:(917) 270-7516

Fax:(516) 626-9367

## EDUCATION

| | |
|---|---|
| 09/1883-07/1987 | B.A. State University of New York at Stony Brook |
| 09/1988-07/1992 | M.D. SUNY at Stony Brook School of Medicine |

## POSTDOCTORAL EMPLOYMENT

| | |
|---|---|
| 09/2001-Present | *Director, Long Island Psychiatric, P.L.L.C.* <br> Comprehensive Outpatient Treatment Center <br> Roslyn, New York |
| 09/1999-Present | *Psychiatric Consultation Liaison Service* <br> St. Mary's Children's Hospital <br> Bayside, New York |
| 09/2005-05/2007 | *Psychiatric Consultant* <br> Mercy First Hospital/Home Care <br> Syosset, NY |
| 02/2005-01/2006 | *Psychiatrist, Assistant Professor of Pediatrics* <br> Cody Center for Autism <br> Stony Brook University School of Medicine <br> Stony Brook, New York |
| 07/1997-09/2001 | *Pediatric Consultation Liaison Service* <br> *Physician-in-Charge ADHD Program* <br> Division of Child and Adolescent Psychiatry, North Shore <br> Long Island Jewish Health System <br> Manhasset, New York |

## POSTDOCTORAL TRAINING

| | |
|---|---|
| 09/1992-07/1993 | *Intern in Surgery* <br> Nassau County Medical Center <br> East Meadow, New York |
| 09/1993-07/1995 | *Resident in Psychiatry* <br> Harvard Medical School, Massachusetts General Hospital <br> Boston, Massachusetts |
| 09/1995-07/1997 | *Fellow in Child and Adolescent Psychiatry* <br> Harvard Medical School, Massachusetts General Hospital <br> Boston, Massachusetts |

**LICENSURE AND CERTIFICATION**

06/1993                National Board Certification
07/1997-Present        New York State Medical License #206446
03/1998-03/2008        ABPN Board Certified #45404


**ACADEMIC APPOINTMENTS**

09/1993-07/1997        *Clinical Fellow*
                       Harvard Medical School – Massachusetts General Hospital
09/1997-07/2002        *Clinical Assistant Professor in Psychiatry*
                       New York University School of Medicine
01/2005-12/2005        *Assistant Professor of Pediatrics*
                       SUNY Stony Brook School of Medicine

**RESEARCH EXPERIENCE**

1987          *Serotonin in a Model of Learned Helplessness*
              Department of Psychiatry, SUNY at Stony Brook
1987          *Nuclear Regulatory Factors in Gene Expression*
              Department of Neonatology, SUNY at Stony Brook
1995          *Atomoxetine for Attention Deficit Disorder*
              Department of Child Psychiatry, MGH, Boston, MA
1996          *Sertraline for Childhood Major Depression*
              Department of Child Psychiatry, MGH, Boston, MA

**PUBLICATIONS**

*Depression and Suicide in Children and Adolescents*
       Snyder JB, Jellinek MS
       Pediatrics in Review – August 1998
*Mania in Children with Pervasive Developmental Disorder*
       J Wozniak, J Biederman, et al.
       J Amer Acad Child Adol Psychiatry, 1997
*Preproenkephalin DNA-Binding Proteins in the Rat*
       EF LaGamma, NK Goldstein, JB Snyder and G Weisinger
       Molecular Brain Research, 5 (1989) 131-140


**ACKNOWLEDGMENTS**

*Co-Editor, Review of Manuscript - Medication Chapter*
       The Oasis Guide to Asperger Syndrome. 2001, 2005 editions
       Patricia Romanowski Bashe MS Ed., Barbara Kirby

## TEACHING EXPERIENCE

*Obsessive Compulsive Disorder in Children*
   Grand Rounds, Department of Pediatrics, MGH

*Bipolar Disorder in Autism*
   Psychosomatic Conference, Department of Psychiatry, MGH

*Depression and Suicide in Children and Adolescents*
   Grand Rounds, Dept of Psychiatry, North Shore Univ. Hospital

*Autism and Asperger Syndrome*
   Queens Pediatric Society Meeting, Queens, NY

*Asperger Syndrome – Medication Treatment Options*
   Cody Center for Autism, SUNY Stony Brook

*Selective Mutism-Overview and Treatment Options*
   Guest Lecturer, Selective Mutism Society Meeting, NY

*Asperger Syndrome and Psychiatric Comorbidity*
   Guest Lecturer, David Center for Autism, Annual Meeting, NY

On April 4, 2007, in Nassau County Supreme Court, Dr. Snyder provided expert testimony in a wrongful death suit against the Estate of Eugene Goldberg.