**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Crim. No. 06-077 (RMU)** |
| | : | |
| **JOHN E. BROWNELL** | : | |

**GOVERNMENT'S RESPONSE TO**
**DEFENDANT'S SUPPLEMENTAL EXPERT DISCLOSURE**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Response to Defendant Brownell's Supplemental Expert Disclosure.

## I. INTRODUCTION

Defendant's psychological condition as described by Dr. Snyder's submission neither mitigates the conduct, militates for leniency, or otherwise provides a reason for the Court to impose a sentence outside the sentencing guidelines in this case. Dr. Snyder's suggestion that the Court should dispense with punishment and deterrence altogether in sentencing the defendant for a decade's worth of criminal conduct and instead base a sentence entirely on accommodating a mental health condition that is unrelated to the crime of the conviction is at odds with the accepted purposes of sentencing and is unsupported in this case.

Dr. Snyder has concluded that the defendant has "Asperger's Syndrome." The label "Aspergers" is less important than a consideration of the relationship of the traits he describes to the crime of conviction (and hence to the sentence). That Mr. Brownell may be a work-out fanatic who has difficulties in social situations and who goes to the same restaurant every night has nothing to do with his sentence in this criminal case. Describing these behaviors as

symptoms of Aspergers does not imbue them with relevance to his tax evasion conduct.[1]

Accordingly, the government urges the Court impose, at a minimum, the Guidelines sentence in this case.

## II.  THE DEFENDANT'S MENTAL CONDITION DOES NOT IMPACT CULPABILITY

The defendant is a highly successful accountant.  He graduated from high school and college, and received a Bachelor of Science Degree in Business and Accounting.  He worked for an accounting firm, and then went to work for Douglas Jemal.  As Mr. Jemal's fortunes have grown, so have Mr. Brownell's, and, as of 2004, he made about $275,000 per year.  (It is not clear from the pre-sentence report what he earns today.)  He owns two houses in Rockville – a personal residence and an adjacent property that he owns as a rental property – and several automobiles.  He has a net worth of over one million dollars.  He has carved out a niche in the inner circle of Douglas Development Corporation, an entity that this Court knows has a significant amount of social interactions among its employees.  He has traveled to Las Vegas with Mr. Jemal and others from the company.[2]  He is exceptionally talented in financial matters – both personal and in the context of his professional life – and for years has handled the

---

[1]     It should be noted that many persons with Aspergers are by standard measures quite successful.  For example, Pulitzer Prize winner Tim Page, a music critic, has written about having Aspergers in a recent article. Tim Page, "Parallel Play," New Yorker, Aug. 20, 2007 (available at http://www.newyorker.com/reporting/2007/08/20/070820fa_fact_page).  In this article, Page noted that certain aspects of Aspergers are positively associated with professional achievement.  To the same end, it is not surprising that Mr. Brownell is a highly skilled accountant.

[2]     As Dr. Snyder has noted, "working for 20 years with socially-minded colleagues who have taken an interest in Mr. Brownell has, (over many years)  enhanced his social skills and enabled him to develop more socialized routines."    Supplemental Expert Report at 26.

complicated finances of a growing real estate company.  Mr. Brownell is highly intelligent and copes skillfully and successfully in the affairs of daily living.  He has purchased houses, obtained loans, negotiated to obtain construction contractors to renovate the rental property, dealt with tenants at that property,  purchased automobiles, and managed his finances.  He is liked by others.

Dr. Snyder's repetition of the same few anecdotes about the defendant – his work-out regiment, his restaurant habits, his taciturn personality – tend to invite sympathy for him, but there is no suggestion that Mr. Brownell is depressed.  Moreover, to permit an impression of the defendant to be drawn from and dominated by the same few anecdotes is neither accurate nor fair to the defendant.  For example, the defendant's credit card and checking account records reflect the range of activity of a person actively engaging in the normal affairs of life, revealing expenditures for clothes (Hechts, Lord and Taylor, Nordstroms, Men's Warehouse, DSW Shoe Warehouse, Van Heusen Outlet), grocery shopping (Giant, Sutton Place Gourmet), automobile parts, supplies and repair, magazine subscriptions, utility and cable service, child support, fitness club (Bally's, Fitness First), dry cleaning, liquor stores, home repairs and renovations, as well as at other all purpose stores (Target, Sears).  He has had romantic relationships and is not a recluse. There was a reference by Dr. Snyder to a party that he held at his house.

Attached to this pleading as "Attachment 1" is an assortment  of documents and memoranda of Mr. Brownell.  Collectively, they provide a "voice" that is lacking from the Report, and provide the Court a basis to appreciate Mr. Brownell's ability to deal with others on a variety of matters, including the sort of casual interactions that is inconsistent with Dr. Snyder's portrayal of him (and of others with Aspergers).

In a 1992 memo to Douglas Jemal, for example, Mr. Brownell writes:

> My bank account is currently teetering on the precipice of a fiscal
> avalanche.  O.K., maybe overly dramatic – basically I'm hurtin'
> pretty bad this week.
>
> I though I may be able to make it, but upon arriving at Dewey
> Beach, I found many women in need of alcoholic beverages and I
> felt it was my duty to help (it seemed to pay off).
>
>       ***
>
> P.S.  I was finally on a ROLL this weekend, finally!!!!!!!!

The content and tone of this memo profoundly contradicts the overall impression left by

Dr. Snyder's report.  In an April 1996 memo, Mr. Brownell refers to a banker as a "dweeb."   In a

2000 letter to the bank, he informally wrote the he was "having a little trouble digging up [his]

1998 & 1999 tax returns."  These documents dispel any suggestion that Mr. Brownell is not

capable of accurate and careful communication, including using words appropriate to the

recipient, notwithstanding other social difficulties he may experience.[3]

    Indeed, far from mitigating the defendant's conduct, Dr. Snyder's report, including its

descriptions of his Mr. Brownell's financial skills and attention to detail serve to bolster the

---

[3]     Dr. Snyder wrote that "Double-entendres, colloquialisms and slang are typically
beyond [persons with Aspergers'] reach."  Supplemental Expert Disclosure at 24.

    Some of the anecdotes described by Dr. Snyder are of interest but may stem from other
causes.  Mr. Brownell is certainly not the first individual to go a long time without making a
needed home improvement (in this case repairing a dish washer) – especially where he rarely
uses his kitchen.  Yet the correspondence and other documents establish that he has made home
improvements as required.

Court's findings as to the full scope of the scheme. As Dr. Snyder noted: "As part of his condition, Mr. Brownell performs extremely well with tasks that are related to his particular areas of interest." Supplemental Disclosure at 27.[4] The description of Mr. Brownell's financial skills makes it abundantly clear that he did not make accounting "mistakes" for a decade, accounting for what the defense contends were loans to the defendant as loan repayments to third parties.[5] Similarly, the defendant would not have told three financial institutions that he had no outstanding loans to his employer if, in fact, as the defense contends, he owed his employer hundreds of thousands of dollars.[6]

        Dr. Snyder does not say – nor could he possibly say – that Mr. Brownell is incapable of forming an intent to steal or that he did not form such an intent in this case. The crime of tax evasion is as easily committed by a taciturn individual as by one who is cheerful; it is as easily committed by a person who needs routine in his life in terms of restaurants and a work-out schedules as by a person who is flexible. There is no suggestion that Mr. Brownell lacks the cognitive ability to know right from wrong, or was incapable of designing the careful scheme

---

[4]        "Despite their relative handicaps in social functioning, persons with Asperger's disorder can become quite expert and effective in their chosen activities, and are perhaps even helped in these accomplishments by the highly focused nature of their interests." Robert E. Hales, et al, The American Psychiatric Press Textbook of Psychiatry, 2d Ed., Washington D.C., at 792.

[5]        Thus, Dr. Snyder's report dispels all question that the defendant could have "mistakenly" recorded as a "loan repayment" a check from Douglas Development to "Tex-Mex Construction," a home improvement contractor that performed work on Mr. Brownell's property (and, critically, had not "loaned" money to Douglas Development). Once the blatant falsity of this item is understood, any questions about the defendant's capacity to falsify accounting records is put to rest.

[6]        At the evidentiary hearing in support of sentencing, the government produced evidence of a check kiting scheme as well.

characterized by laundering company funds through his line of credit account and falsely

recording them transactions as "loan repayments" on the company books. Indeed, facts are

stubborn things, and demonstrate – as the Court has found – that Mr. Brownell did have such an

intent and that he maintained that intent, month in, month out, for a decade. [7]

     The one attempt by Dr. Snyder to link an aspect of the conduct at issue to the defendant's

mental condition has to do with Mr. Brownell's failure to file tax returns. Dr. Snyder implies

that once Mr. Brownell failed to file he was thus, in some way, paralyzed from commencing to

file thereafter.[8]  This suggestion does not survive scrutiny. Such an assertion does not, for

example explain how Mr. Brownell managed to file truthful tax returns until 1994 but failed to

file for calendar year 1995 when he first received unreported income, and why only thereafter did

he fail to file (when he was receiving significant distributions of unreported income). Such an

assertion fails to explain how it is that Mr. Brownell had the attention to detail and the

motivation to prepare <u>false</u> returns and <u>false</u> W-2s  for purposes of loan applications while at the

same time he was supposedly incapable of preparing and filing <u>truthful</u> returns. Dr. Snyder fails

to identify the unique feature of Mr. Brownell's condition that supposedly disabled the defendant

---

[7]    The <u>Diagnostic and Statistical Manual of Mental Disorders</u>, Fourth Edition
("DSM-IV") makes clear the limitations of the DSM-IV in forensic settings. "When the DSM-
IV categories, criteria, and textual descriptions are employed for forensic purposes, there are
significant risks that diagnostic information will be misused or misunderstood. These dangers
arise because of the imperfect fit between the questions of ultimate concern to the law and the
information contained in a clinical diagnosis. *** Even when diminished control over one's
behavior is a feature of the disorder, having the diagnosis in itself does not demonstrate that a
particular individual is (or was) unable to control his or her behavior at a particular time."
American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 4th
Ed., Washington D.C. (1994) at p. xxiii.

[8]    This is the one way that the psychiatrist attempts to fashion a link between the
defendant's mental condition and the conduct at issue.

from honest conduct (preparing and filing honest returns) but propelled him to dishonest conduct (preparing and submitting false and fraudulent returns, loan applications, and related fraudulent documents).  Moreover, notwithstanding this broad assertion by Dr. Snyder, the <u>evidence</u> demonstrates that in matters that are important to Mr. Brownell (and particularly those within his sole control – be it company matters, or handling personal financial affairs, or even the patterns of his life that involve maintaining a routine), he is capable of controlling his conduct to achieve desired results.  Moreover, there is no attempt by Dr. Snyder to link the defendant's condition to the more elaborate tax scheme described in the indictment and proved at the evidentiary hearing for the simple reason that there is no such relationship.

## II.  DEFENDANT'S MENTAL CONDITION <br> <u>DOES NOT IMPACT THE TYPE OF SENTENCE</u>

The defendant is by all accounts a functioning member of society.  He has gone 45 years without being diagnosed with mental illness, or seeking or receiving  mental health treatment. During this time, he has graduated from college and thrived in a demanding professional job. However, facing sentencing for a decade's worth of criminal acts involving fraud against the United States, the defendant claims that his mental condition is such that he really should not be held accountable – even though, as discussed, his mental condition had nothing to do with that conduct – but instead should receive therapy.

The substance of the defendant's submission is that the Court should depart downward from the guidelines sentence.  Every principle of sentencing announced by Congress, the Sentencing Guidelines and the federal courts require that this claim should be rejected.

Congress spoke first on this issue.  In enacting the legislation that established the

sentencing guidelines, Congress specifically provided that the Sentencing Commission, in

formulating the Guidelines, should take specific facts into consideration "only to the extent that

they do have relevance," including "mental and emotional condition to the extent that such

condition mitigates the defendant's culpability or to the extent that such condition is otherwise

plainly relevant."  28 U.S.C. §  994(d)(4).

The United States Sentencing Commission, in promulgating the Guidelines, made it

clear:  "Mental and emotional conditions are not ordinarily relevant in determining whether a

departure is warranted, except as provided in [the provisions permitting downward departures]."

U.S.S.G. § 5H1.3 (1998 ed.).  The one exception to this general rule is section 5K2.13, which

provides for a downward departure only where there is "diminished mental capacity or where the

mental issue contributed to the commission of the offense."[9]  U.S.S.G. § 5K2.13 (2007 ed.).[10]

These two provisions, read together, form a coherent whole:  section 5H1.3 provides the general

---

[9]      Section 5K 2.13 provides, in pertinent part:

A downward departure may be warranted if (1) the defendant
committed the offense while suffering from a significantly reduced
mental capacity; and (2) the significantly reduced mental capacity
contributed substantially to the commission of the offense.
Similarly, if a departure is warranted under this policy statement,
the extent of the departure should reflect the extent to which the
reduced mental capacity contributed to the commission of the
offense.

U.S.S.G. § 5K 2.13 (emphasis supplied).

[10]      The 1998 edition of the Guidelines does not specifically contemplate
consideration of "mental and emotional conditions" in allowing a departure for diminished
mental capacity. The government cites to the current provisions that specifically contemplates the
consideration of  "mental and emotional conditions" in that this appears broader and more
favorable to the defendant.  .

rule that mental health issues are not to be considered, and section 5K2.13 provides the exception, namely, they may be considered if they contributed to the commission of the offense, but even so, only to the extent "to which the reduced mental capacity contributed to the commission of the offense."

This understanding of these two provisions, and the limited bases for a departure under section 5K2.13, are well-illustrated by cases from the District of Columbia Circuit and from the other federal courts, in both the pre-<u>Booker</u> and post-<u>Booker</u> context.  In <u>United States v. Edwards</u>, 98 F.3d 1364, 1371 (D.C. Cir. 1996), for example, the District of Columbia Circuit affirmed the trial court's interpretation of section 5K2.13 as denying a departure for an individual who – analogous to the defendant – suffered from "extreme introversion" and "an inability to interact or connect with people":

> [The defendant] produced only a report from a psychologist opining that she suffered from "extreme introversion, ... an inability to interact or connect with people and ... pronounced distrust of others." *** These traits do not entitle [the defendant] to a diminished capacity departure.  Moreover, there was nothing in the report to suggest that her personality problems contributed to the crime by diminishing her ability to reason.

<u>Id</u>.  Similarly, in <u>United States v. Long</u>, 185 F.Supp.2d 30 (D.D.C. 2001), the trial court, relying on <u>Edwards</u>, <u>supra</u>, after a thorough review of the case law on the topic, likewise embraced the principle that to justify a departure on mental health grounds, the mental health condition must have impeded the defendant's ability to reason or to appreciate the wrongfulness of his conduct:

> In order for a psychological or behavioral disorder to serve as the basis for departure, "there must be an accompanying inability to reason."  <u>United States v. Edwards</u>, [supra].  ***  Diminished capacity has been found where a defendant was "functioning at the borderline mental defective level of intelligence and ... suffering

> some degree of organic brain dysfunction," <u>United States v.</u>
> <u>Chambers</u>, 885 F.Supp. 12, 14 (D.D.C.1995), or where he had
> suffered a "psychotic break with reality" and was "unable to grasp
> ordinary concepts." <u>United States v. Royal</u>, 902 F.Supp. 268,
> 271-72 (D.D.C.1995).

<u>United States v. Long</u>, 185 F. Supp 2d at 45-46.

This understanding that the mental health defect must impede the ability to reason or otherwise affirmatively contribute to the commission of the offense to constitute a basis for a departure is illustrated by <u>United States v. Goossens</u>, 84 F.3d. 697, 700-02 (4th Cir. 1996).  In <u>Goossens</u>, the trial court departed in a child pornography case, where the defendant had been diagnosed with a "general anxiety disorder" – a condition with traits somewhat comparable in terms of impact on everyday functioning as the traits that Dr. Snyder describes as characterizing Mr. Brownell.  Even though the defendant in <u>Goossens</u> showed "no signs of psychosis or gross organic dysfunction," his emotional disorder (anxiety) "narrow[ed] available repertoire of responses to particular behavioral strategies ... ." <u>Id</u>. at 701.  The Court of Appeals reversed the trial court's decision to depart in language and reasoning that aptly applies to the circumstances of this case:

> This [psychiatrist's] report nowhere concludes that [the
> defendant's] problems "impair[ed] the formation of reasoned
> judgments," ***, or prevented him from processing information
> when he committed the offenses, ***.
>
> Further, all of the other information concerning [the defendant] that
> was presented to the district court indicates a high level of mental
> functioning on his part.  For example, [the defendant] was
> employed in a responsible position and was conscious enough of
> the illegality of his conduct to encrypt the pornographic material on
> his computer to avoid detection. ***
>
> Moreover, even if [the defendant] suffered from diminished mental

-10-

> capacity, no evidence supports a conclusion that it contributed in any degree to the commission of the offense.  At no point did the psychiatric report attribute any causative connection between the emotional problems it diagnosed and the offense to which [the defendant] admitted guilt. *** .

United States v. Goossens, 84 F.3d at 701-02 (citations omitted).[11]

It is no surprise that defendants facing sentencing frequently raise mental health issues unrelated to the crime of commission.  Courts have rightly and repeatedly rejected the contentions that those conditions mitigate the sentence where they are unrelated to the crime of conviction.[12]  Courts have properly recognized that of all the reasons to grant a departure, a court

---

[11]     The Fourth Circuit in Goossens cited to a wealth of authority, and the Fourth Circuit's opinion is squarely in line with accepted interpretations of the proper treatment in the context of sentencing of mental health conditions that do not impair reasoning and are unrelated to the crime of the conviction.  See, e.g., United States v. Cantu, 12 F.3d 1506, 1512-13 (9th Cir. 1993) ("In everyday language, 'reduced mental capacity' refers to a lack of full intellectual functioning.... [It] comprehends both organic dysfunction and behavioral disturbances that impair the formations of reasoned judgments.");  United States v. Hamilton, 949 F.2d 190, 193 (6th Cir.1991) (per curiam) (noting that a defendant who "was able to absorb information in the usual way and to exercise the power of reason" was not suffering from diminished mental capacity); United States v. Maldonado-Montalvo, 365 F.3d 64, 74-74 (1st Cir. 2003) (depression not a basis for section 5H.13 departure);  United States v. Barton, 76 F.3d 499, 502 (2d Cir.1996) (vacating § 5H1.3 departure absent evidence defendant suffered from psychosis, where defendant's sense of morality remained intact, and "[h]e appreciate[d] both the societal and moral constraints of his behavior"); United States v. Lauzon, 938 F.2d 326, 333 (1st Cir.1991) (noting that defendant's "borderline intelligence" was not ground for § 5H1.3 departure); compare United States v. Philibert, 947 F.2d 1467, 1471-72 (11th Cir.1991) (holding evidence that defendant "suffer[ed] from severe mental illness, including paranoid delusions" was sufficient to permit departure based on diminished mental capacity.

[12]     United States v. Valdez, 426 F.3d 178, 183 (2d Cir. 2005).  Valdez is one of many such cases where the mental condition at issue was far more debilitating than that of Mr. Brownell's.  The description of the defendant's condition in Valdez was as follows:

> On June 24, 2004 Dr. Berrill testified that Valdez suffered from clear cognitive defects, could barely read or write, and had an anxiety disorder. Dr. Berrill further testified that Valdez was "extremely dependent on others" and that, because of these

should not rely on a factor that is explicitly discouraged by Congress and the Sentencing Commission in doing so.

Moreover, courts, including the District of Columbia Circuit, have been particularly loath to permit mental health adjustments where the conduct at issue involved repeated, calculated acts over time. See, e.g., United States v. Sammoury, 74 F.3d 1341, 1346 (D.C.Cir.1996) (upholding district court's rejection of departure based on claim that "battered women's syndrome" had "diminished her ability to make sound judgments," on grounds that the defendant's crime was a long-range, calculated enterprise requiring extensive planning on her part and that her mental capacity "did not keep her from exercising sound financial judgment when it came to her own finances."). See also United States v. Goossens, supra, 84 F.3d at 701 (defendant who "displayed considerable mental agility in his professional and personal affairs, both legal and illicit," not eligible for a mental health departure); United States v. Hamilton, 949 F.2d 190, 193 (6th Cir.1991) (defendant who "was able to absorb information in the usual way and to exercise the power of reason" not suffering from diminished mental capacity); United States v. Johnson, 979 F.2d 396, 401 (6th Cir. 1992) (reversing diminished mental capacity departure in part on the basis that defendant, who was a bank vice president "displayed considerable mental agility in his professional and personal affairs, both legal and illicit").

Finally, though certainly the Court has increased latitude post-Booker to impose a

---

> problems, Valdez could not have thought of the scheme himself, nor did he have the capacity to engage in the conduct without reenforcement.

Id. The Second Circuit affirmed the trial court's decision not to depart on the grounds there was no evidence that the defendant's "diminished mental capacity significantly impaired his judgment or his ability to understand the wrongfulness of his actions." Id. at 184.

sentence outside a strict application of the Guidelines, the principles announced by Congress, in

the Guidelines themselves, and repeated by the federal courts provide substantial guidance as to

how the Court should treat the defendant's request.   See, e.g., United States v. Borho, 485 F.3d

904, 912 (6th Cir. 2007) (reversing departure in child pornography prosecution based

"discouraged" consideration of defendant's depression and diabetes).  Simply stated, a personal

circumstance that neither mitigates, nor explains, nor is really related to the crime of conviction,

provides no basis for leniency.

### III.  DR. SNYDER'S REPORT

Finally, Dr. Snyder's report has numerous flaws.  Dr. Snyder opines on subjects outside

his qualifications.  He is unable or unwilling to describe accurately the criminal conduct at issue

(which he instead minimizes or disregards), and, in several instances, demonstrates a lack of

independent judgement that calls into question his objectivity.[13]

First, rather than describe Mr. Brownell as an individual who for years committed a fraud

on the United States, Dr. Snyder refers to the facts of this case as follows:  "Not surprisingly,

some of [Mr. Brownell's] strategies (while effective in maintaining order and reducing his

anxiety) have been insufficient when dealing with less straight forward matters such as those

related to his conviction."  Supplemental Expert Disclosure at 29.  Two things stand out from

---

[13]    The Government has retained a forensic psychiatrist, Dr. Ray Patterson, to provide
assistance in this matter.  His c.v. is attached as "Attachment II."

The defense has represented to government counsel that it intends to have Dr. Snyder
available as a witness at the December 13, 2007 hearing.  The Government will cross-examine
him along the lines suggested in this pleading, and is relying on counsel's representations as to
Dr. Snyder's availability.  The Government does not expect to call Dr. Patterson as a witness, but
expects to have him available if there are additional forensic issues that arise and to assist with
cross examination.

this remarkable assertion.  First, Dr. Snyder employs a stunningly inappropriate euphemism to describe the conduct at issue, referring to the tax fraud scheme – a serious felony – as nothing more than a "less straight-forward matter[]."  This description of Mr. Brownell's conduct calls into question Dr. Snyder's objectivity, his role as an expert, and his appreciation for what is at stake here.  Second, Dr. Snyder suggests that the tax fraud scheme constituted a challenge to Mr. Brownell that required him to devise a "strategy" to "deal with" –  the import being that the tax fraud scheme somehow came into existence by means of a some force external to Mr. Brownell.   This characterization not only absolves Mr. Brownell of all responsibility and culpability, but, moreover, it is simply inaccurate.  This is an advocate's characterization, not that of an independent expert.

Next, Dr. Snyder on several occasions describes the behavior of "persons" with Aspergers.  However, every person is unique. Some may be high achievers (like Mr. Brownell – who earns well in excess of a six figure income, or the Pulitzer Prize winning music critic, supra at footnote1), others may not be so successful.  Dr. Snyder's general descriptions of conduct of other persons has little relevance to understanding this particular defendant.  For example, Dr. Snyder writes:

> [P]ersons with Asperger's Syndrome are concrete thinkers. ... Their world is unadorned with pretexts, pretense, sham and dishonesty. They are naturally guileless and very honest.

Supplemental Expert Disclosure at 24.  It may be that the above description characterizes some with Aspergers,  but it certainly does not describe Mr. Brownell.  For example:

•    In a letter in connection with a loan application, Mr. Brownell represented that he could not "dig up" his 1998 and 1999 tax returns – returns he had not in fact

filed.[14]

• On a hand-written personal financial statement found in the search of his house,
Mr. Brownell answered the question as to the "[l]ast year for which income taxes
have been filed" as "[19]99," when in truth, he had not filed a return for 1999.[15]

• On a memorandum to Joseph Cayre in November 2002, Mr. Brownell
represented that all the proceeds of the Tenant Improvement reserve were going to
"outside brokers" when in fact they were going to Mr. Jemal.[16]

These are just a few examples, and do not include the numerous false returns and false W-2s that
were identified as part of the evidentiary hearing in this case. Mr. Brownell, unlike Dr. Snyder's
description of "persons with Aspergers," simply was not "very honest" in the matters under
consideration. Dr. Snyder makes no attempt to reconcile the actual facts in this case with his
broad generalities as to "persons with Aspergers."

Third, Dr. Snyder opines on matters outside his expertise. He states, for example:

> In making recommendations for an appropriate sentence for
> Mr. Brownell, focus should be on prevention of future behavior
> rather than strict punishment for the crime. Ususal sentences based
> confinement with many others, such as jail sentences, are simply
> not appropriate for a person with Asperger Syndrome.

At bottom, this assertion is nothing more than a personal opinion of Dr. Snyder as to the

---

[14] See Letter from Jack Brownell to Arrel Godfrey, October 30, 2001 (attached as
part of Attachment 1).

[15] See Personal Financial Statement for John Brownell (attached as part of
Attachment 1).

[16] See Memorandum from John Brownell to Joseph Cayre, November 18, 2002
(attached as part of Attachment 1).,

purposes of the criminal justice system and is not a medical opinion. It is unknown, for example, whether Dr. Snyder would voice the same opinion if this were a crime of violence – say rape or murder – or whether he views tax evasion as such a petty offense that the sole purpose of sentencing "should be ... prevention on future behavior" and not deterrence or punishment. His unqualified statement that persons with Asperger's should never be subject to "usual sentences ... such as jail" is truly remarkable, truly indefensible and again reflective of a mindset that lacks objectivity.[17] According to Dr. Snyder, no person with Aspergers should go to jail.

We note that the Bureau of Prisons has outstanding medical and mental health treatment facilities, and treats persons with medical and mental difficulties far more disabling that those presented by Mr. Brownell. Mr. Brownell, as of the date of the offense, the plea, and indeed, as of the original August sentencing in this case, had never sought or received mental health treatment – indeed, he appeared resistant to it even when suggested by the defense. There is no reason whatsoever to doubt the ability of the Bureau of Prisons to meet the defendant's needs in this regard.[18]

---

[17]    By analogy, a court should neither favor nor disfavor in sentencing a man with a broken leg who may need physical therapy – especially if such therapy can be provided in custody.

[18]    Attached as "Attachment 3" is a letter from the Bureau of Prisons that addresses this point specifically.

WHEREFORE, the Government requests the Court sentence the defendant to the presumptive Guideline sentence.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY

By:    _____/s/_____
Mark H. Dubester, D.C. Bar No. 339655
Assistant United States Attorneys
555 4th Street, NW
Room 5917
Washington, D.C. 20530
(202) 514-7986