UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES** | ) | |
| | ) | |
| v. | ) | Crim. No. 06-CR-0077 (RMU) |
| | ) | |
| **JOHN E. BROWNELL,** | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT BROWNELL'S REPLY REGARDING EXPERT DISCLOSURE

Defendant John E. Brownell, by counsel, respectfully submits this reply memorandum regarding his expert disclosure.

Summary

The government contends that the expert report we have submitted from Dr. James Snyder is irrelevant to Mr. Brownell's sentencing because Dr. Snyder's diagnosis is demonstrably wrong, is causally unrelated to Mr. Brownell's criminal conduct, and is not cognizable under the Federal Sentencing Guidelines. We respectfully disagree. Further, it bears emphasis that Dr. Snyder's report is but one aspect of our submission to the Court in connection with this sentencing. It supplements and dovetails with other significant aspects of this case, which we have addressed in our prior submissions and will (with the Court's permission) address further at the sentencing hearing, including but not limited to the following:

- Mr. Brownell's contributions to the health and well-being of this city as an integral, critical part of Douglas Development, and the severe impact his incarceration would have on the company.

1

- The need to harmonize Mr. Brownell's sentence with the sentences received by others in this matter.

- Mr. Brownell's personal characteristics, as they emerge in the Presentence Report, the letters we have submitted and Dr. Snyder's report, are substantially mitigative. The humble manner in which Mr. Brownell lives, the poor state of repair of his home and the old car he drives, are at odds with the image of greed suggested by the government. Mr. Brownell is a person of humility who acts behind the scenes at Douglas Development as a key player in the critical community-oriented services, business and *pro bono*, provided by that company. He never takes a vacation except to visit his elderly parents. He has not told either of them about this case out of concern for how the knowledge of it might affect them. His father is an elderly career military man like his father before him, a graduate of West Point who was in Europe during the Second World War, fought in combat in Korea and Vietnam and then served at the Pentagon. If Mr. Brownell's father or mother became ill, Mr. Brownell, who is single, would immediately travel to care for them (though we do not contend that he is the only family member with the ability to provide any assistance to them).

With respect to Dr. Snyder's opinion, it is telling that the government elected not to have Mr. Brownell examined by its own expert witness, which it had every right to do, or to proffer any opinion at all from its retained expert. Instead the government relies only upon its own lay assertion that Dr. Snyder's report has "numerous flaws" (Government's Response to Defendant's Supplemental Expert Disclosure ("Government's Response") at 13, attaching documents which it incorrectly claims are at odds with Dr. Snyder's diagnosis. Beyond this, the government

2

proffers pre-*Booker* case authority concerning the sentencing impact of mental health disorders, but includes only a brief paragraph on the significantly different state of the law after *Booker*. The government does not even contest Dr. Snyder's diagnosis of Asperger Syndrome, nor could it do so without an examination. The government has presented no evidence – none at all – to rebut Dr. Snyder's carefully formulated diagnosis or his conclusion that Mr. Brownell's condition is in fact closely causally linked to the offense-related conduct in this case.

Dr. Snyder's opinion is of particular significance in light of the observation the Court has made about the particular need for deterrence in the context of criminal tax prosecutions, since, unlike other forms of conduct that can lead to criminality, virtually everyone files tax returns and pays taxes. The impairments observed by Dr. Snyder relate directly to the need for and fairness of a prison sentence in this case.

There is no reason, evidentiary or legal, to doubt, disregard or discount Dr. Snyder's detailed and thoughtful report. Dr. Snyder is a highly experienced and qualified clinician -- not a paid "talking head" professional expert witness -- who has provided barely any prior expert testimony during the course of his long career. He, unlike the government's expert Dr. Patterson, is a specialist in Asperger Syndrome. Dr. Snyder spent many hours with Mr. Brownell, first in Dr. Snyder's office, and then over two days in the District of Columbia area, observing Mr. Brownell's behavior at work, home and the sports bar he frequents. This extraordinary effort to gather information is entirely unmatched by the government. Dr. Snyder has provided a copiously detailed report in which he provides his diagnosis of Mr. Brownell and the reasons for it. Further, Dr. Snyder explains in detail the causal link between Mr. Brownell's disorder and the underlying conduct.

We do not contend that this information is some sort of "silver bullet" that guarantees a particular outcome, or that it renders other sentencing-related considerations irrelevant. In fact, it is our view that other non-mental health factors also militate strongly against incarceration here. Mr. Brownell will emphasize to the Court in his allocution how strongly he feels about his obligation to step up and take responsibility for his conduct. His remorse is real and deeply felt. Despite the criminality of the underlying conduct, however, it is not a substantive response to Dr. Snyder's opinion to state conclusorily that it is patently wrong or irrelevant, notwithstanding the level of indignance with which such assertions are made. It is neither. It is a significant factor to be considered and balanced with and against other sentencing-related factors.

I.      The Significance of the Diagnosis of Asperger Syndrome

Much of the Government's Response is devoted to rebutting a proposition that we do not urge. The government says that Mr. Brownell's diagnosis of Asperger Syndrome does not exculpate him or negate his criminal intent. *We agree.* Mr. Brownell is a legally competent individual who has pleaded guilty to the instant tax offense knowingly and voluntarily and stands prepared to accept whatever sentence this Court sees fit to impose. It is a common rhetorical technique to set up a "straw man" and then proceed to knock it down. The notion of an insanity defense here is a straw man which we entirely disavow. Accordingly, it does not advance the dialogue to aggressively refute it and express umbrage at it. Further, Mr. Brownell's mental health diagnosis is but one part of the complex multi-factor calculus presented to the Court in this case pursuant to 18 U.S.C. § 3553.

A.      Dr. Snyder's Report

Dr. Snyder initially saw Mr. Brownell at his office in Roslyn, New York. Dr. Snyder then came to the D.C. area, where he met again with Mr. Brownell, visited Douglas Development Corporation, interviewed Mr. Brownell's colleagues, and interviewed Mr. Brownell's sister Eileen (an attorney). Dr. Snyder spent an entire day with Mr. Brownell, including observation of Mr. Brownell at the sports bar he spends time at virtually every day, a tour of Mr. Brownell's running routes, a visit to his home, and a meeting with Clare Marie Leigh, who has had a relationship with Mr. Brownell for a number of years.

Based on all of this information, as well as a review of documents, Dr. Snyder concludes that Mr. Brownell "clearly meets the criteria for the diagnosis of Asperger Syndrome as described in the Diagnostic Statistical Manual (DSM IV)." Snyder Report at 23. The basis for Dr. Snyder's conclusion is presented in detail at pages 23-32 of his Report. The diagnosis is eminently supported by the information Dr. Snyder reviewed. It is not impeached by an attempt to oversimplify, exaggerate or distort it and then contradict it. For example, the government submits documents showing that Mr. Brownell has used slang terminology and has attempted humor with his colleagues, and has submitted false bank loan applications, asserting that this demonstrates that Dr. Snyder's conclusions are without factual basis. In fact, however, Dr. Snyder's observations concerning Mr. Brownell are far more nuanced than that. Dr. Snyder delineates the *general characteristics* of Asperger Syndrome and then explains how he arrived at his diagnosis. Accordingly, Dr. Snyder found

> significant, lifelong deficits in social interaction, restrictive and repetitive patterns of behavior, inflexible adherence to rigid routines, marked reliance on formalistic behavior and excessively rigid social conventions. The intensity, severity and duration of these symptoms, as well as the consequential impairments in functioning, strongly support the diagnosis of Asperger Syndrome – a

5

> neurologically based disorder at the high-functioning end of the Pervasive Developmental Disorder spectrum.

Snyder Report at 24. Dr. Snyder notes that

> [t]hroughout his adulthood, Mr. Brownell has frequently demonstrated a tendency to become easily overwhelmed at subsequently dysfunctional in handling matters that *complicate or fall outside of his predictable routine.*

Snyder Report at 24 (emphasis added). Dr. Snyder then lists a litany of personal characteristics, none of which is contradicted by any of the documents the government submits or, indeed, anything else in the record.

Dr. Snyder does not opine on subjects outside his qualifications, nor does he describe the criminal conduct inaccurately. The government characterizes as a "remarkable assertion" Dr. Snyder's observation that, "Not surprisingly, some of [Mr. Brownell's] strategies (while effective in maintaining order and reducing his anxiety) have been insufficient when dealing with less straight forward matters such as those related to his conviction." Government's Response at 13-14 (citing Snyder Report at 29). First, the phrase "less straight-forward matter[]" is by no means a "stunningly inappropriate euphemism." Government's Response at 14. It is not a euphemism at all. Dr. Snyder is not saying or implying that the conduct is inconsequential. Rather, he is saying that there is ambiguity in it. We certainly thought so too, given the lengthy evidentiary hearing during which we urged that very proposition on the Court. And there is *unquestionably* ambiguity in it, given the fact that the Potomac Valley Bank credit line started out as a mechanism for Mr. Brownell to lend money to DDC, not vice versa, and given that these payments were characterized as loans in the independent accounting firm's workpapers. This is not in any way to take issue with the Court's ultimate conclusion concerning the loss amount, but

it is to say that Dr. Snyder's characterization of it as a "less straight-forward matter" is not provocative or euphemistic in any way.

The government next suggests that Dr. Snyder's reference to Mr. Brownell's needing a "strategy" to deal with the underlying conduct is an attempt to exculpate Mr. Brownell by implying that the "tax fraud scheme somehow came into existence by means of [] some force external to Mr. Brownell." Government's Response at 14. This, according to the government, "not only absolves Mr. Brownell of all responsibility and culpability, but, moreover, is simply inaccurate," and "is an advocate's characterization, not that of an independent expert." That is an unfair characterization of what Dr. Snyder is saying. Given the lack of any opposing expert opinion or evidence contradicting Dr. Snyder's findings, the government is resorting to distorting Dr. Snyder's conclusions in an effort to suggest that they are irreconcilable with the Court's findings as to tax loss or the underlying nature of the offense. Dr. Snyder is saying no such thing. Dr. Snyder's report states:

> Without the benefit or diagnosis or early intervention, Mr. Brownell has had to develop his own strategies and set of rules to compensate for the deficits of his condition. Not surprisingly, some of his strategies (while effective in maintaining order and reducing his anxiety) have been insufficient when dealing with less straight forward matters such as those related to his conviction.

There is nothing remotely offensive about this conclusion, nor is there anything euphemistic about it, nor does in constitute in any way, shape or form an attempt to minimize the nature of the conduct or exculpate Mr. Brownell.

The government then takes out of context Dr. Snyder's observation that Asperger sufferers "are concrete thinkers." Government's Response at 14 (citing Snyder Report at 24). The government tries to set up this observation as an attempt by Dr. Snyder to deny the dishonest

7

nature of the underlying conduct, ignoring Dr. Snyder's observation in the *very same paragraph* that "[i]t is possible that the person with Asperger Syndrome has learned through experience to lie but, her or his attempts to lie will be done poorly." Snyder Report at 24.

The government also takes issue with Dr. Snyder's observation that "usual sentences based on confinement with many others, such as jail sentences, are simply not appropriate for a person with Asperger Syndrome" (Government's Response at 15, citing Snyder Report at 30), ignoring Dr. Snyder's statement one page earlier that, "As with all citizens, individuals with Asperger Syndrome should be held accountable for their behavior." Snyder Report at 29. It is not appropriate to dismiss the import of this thoughtful and carefully reasoned report by means of exaggeration and distortion. Dr. Snyder is making a general observation about the special characteristics of Asperger sufferers; he is not, as the government would have it, making a blanket observation that they should never go to jail under any circumstances.

Nor is Dr. Snyder saying that a person with Asperger Syndrome can never use slang or say something humorous. Rather, he is, in very deliberate and comprehensive fashion, setting forth some of the characteristics of Asperger Syndrome generally and then explaining how his careful observations of Mr. Brownell support the diagnosis.

The government quotes, in a footnote, an article by Tim Page, a music critic, for the proposition that "many persons with Aspergers are by standard measures quite successful" (Government's Response at 2 n.1). This observation is precisely consistent with Dr. Snyder's report (Mr. Brownell has an "astounding work ethic and an outward appearance of sophistication") at 23. The government does not, however, append a copy of Mr. Page's article,

8

which is submitted herewith as Exhibit 1.  It is instructive to note how consistent it is with Dr. Snyder's report and with his observations of Mr. Brownell.

Hales *et al.*, *The American Psychiatric Press Textbook of Psychiatry*, 2d Ed., Washington, D.C. at 792 is cited by the government for the proposition that "[d]espite their relative handicaps in social functioning, persons with Asperger's disorder can become quite expert and effective in their chosen activities, and are perhaps even helped in these accomplishments by the highly focused nature of their interests."  Government's Response at 5 n.4.  Again, however, the government does not append the relevant excerpt.  Appended as Exhibit 2 hereto is the discussion of Asperger Syndrome in the current edition of the Hales textbook, Hales *et al.*, *Textbook of Clinical Psychiatry*, 4th Ed. (American Psychiatric Publishing, 2003).  It is completely consistent with Dr. Snyder's conclusions, noting that Asperger Syndrome is a "pervasive developmental disorder that is similar to autistic disorder."

Finally, according to the government, "the correspondence and other documents establish that [Mr. Brownell] has made home improvements as required."  Government's Response at 4 n.3.  This is at odds with the record.  It does not require a trained observer to note, upon a visit to Mr. Brownell's home, the rotting floorboards on the porch, the archaic furnishings, the old cars and the general state of disarray.  The government's attempt to minimize this is irreconcilable with the observations of Dr. Snyder and of a number of the authors of letters we have submitted concerning the grossly dilapidated condition of Mr. Brownell's home.  Further, Mr. Brownell's net worth, upon which the government expounds, is attributable virtually entirely to appreciation in the home he lives in and the rental home next door.

9

B.     Impact of the Diagnosis on Sentencing Factors

Mr. Brownell's diagnosis is "unrelated to the crime of the conviction," according to the government. Government's Response at 1. This assertion is without factual basis. Moreover, the government never really joins issue with Dr. Snyder's conclusions in this regard, instead relying upon pre-*Booker* case authority focused on the strictures of U.S.S.G. §§ 5H1.3 and 5K2.13.

Fortunately enough, however, we now live in a post-*Booker* world in which the focus is upon the much broader criteria and discretion conferred upon this Court by 18 U.S.C. § 3553. The government never addresses the provisions of § 3553, presumably because the mandate of § 3553(a)(1) that "the history and characteristics of the defendant" be considered plainly incorporates within its ambit the considerations set forth by Dr. Snyder.

Dr. Snyder sets forth copious observations providing a causal link between the underlying conduct and Mr. Brownell's disorder. That this link exists is not to say that Mr. Brownell is psychotic, legally insane or incapable of formulating the requisite intent for the offense to which he pleaded guilty. It is to say, however, that the disorder from which he suffers is substantially mitigative. Some of the observations demonstrating a causal link between the conduct and the disorder are as follows:

- Mr. Brownell demonstrates "significant, lifelong deficits in social interaction, restrictive and repetitive patterns of behavior, inflexible adherence to rigid routines, marked reliance on formalistic behavior and excessively rigid social conventions." Snyder Report at 24. Persons with these deficits simply are less able than non-Asperger sufferers to exercise

judgment when making determinations concerning what conduct is appropriate and inappropriate.

- "Throughout his adulthood, Mr. Brownell has frequently demonstrated a tendency to become easily overwhelmed and subsequently dysfunctional in handling matters that complicate or fall outside of his predictable routine." Snyder Report at 24. Similarly, these characteristics, by their very nature, impair judgment as to what conduct is acceptable or unacceptable.

- "Persons with Asperger Syndrome may have been conditioned through their lifetime to look to authority figures to make many of life's important decisions for them. They have learned to depend on and trust these authority figures to be right." Snyder Report at 25. This again underscores the impairment of the kind of open, independent judgment that non-Asperger sufferers can utilize in making decisions concerning their conduct.

- "Mr. Brownell's systematic approach towards people and situations is frequently impaired by his extremely straight-forward and literal interpretation of events, strict adherence to routines and overwhelming anxiety when having to deal with complex or changing scenarios. . . . [For] those with Asperger Syndrome[,] lacking cognitive flexibility and reacting to situations with 'black-and-white thinking'[] often leads to inaccurate interpretations of the world and what is expected of them." Snyder Report at 25, 27. These characteristics plainly impaired Mr. Brownell's judgment.

- "Since childhood, Mr. Brownell has been at a neurocognitive disadvantage when attempting to interpret societal norms and expectations." Snyder Report at 25. Again, the impact on the free and open exercise of judgment is plain.

11

- "For Mr. Brownell, and others who suffer with Asperger Syndrome, the most effective way to eliminate distress is either to remove or, simply not address changes and variability within the problem at hand. . . . Mr. Brownell's inclination is to maintain order and avoid uncertainty by doing things the same way he's always done them, especially when circumstances change and require a different method or revised technique."  Snyder Report at 26.  These observations relate to various aspects of the underlying conduct, particularly Mr. Brownell's failure to address his non-filing of tax returns over many years.  This does not mean that Mr. Brownell lacked the physical ability to respond differently to these situations or that he suffered a delusion absolutely precluding him from doing so.  The absence of these extremes, however, does not diminish the force of Dr. Snyder's observations relating to diminished capacity.

- "When situations or problems do not conform to Mr. Brownell's rigid system, they become intolerable and are put off or, completely avoided.  Avoidance and neglect result in behavior or problems that may be misinterpreted as *intentionally defiant* rather than unintentional errors and oversights related to the deficits of Asperger Syndrome. . . . Those with Asperger Syndrome may ignore or not recognize the implications of their behavior as they struggle to maintain control through their obsessive patterns and routines."  Snyder Report at 28-29 (emphasis in original).  This is an especially relevant observation in light of the government's repeated insistence that Mr. Brownell's failure to file tax returns for consecutive years represents nothing more than an arrogant thumbing of his nose at the obligations of citizenship.

The case authority upon which the government relies is almost entirely pre-*Booker*, providing only one brief paragraph relating to the law after *Booker*. Government's Response at 12-13. A more useful statement of the current state of the law concerning the impact of diminished mental capacity at sentencing is provided in *United States v. Miranda*, __ F.3d __, 2007 WL 312098 (7th Cir. October 26, 2007), decided slightly more than one month ago. The Court of Appeals remanded that case for resentencing because the district court had not adequately considered the defendant's psychiatric illness in the context of the factors set forth in 18 U.S.C. § 3553. The Court of Appeals' observations resonate here in light of the government's contention that the issues presented in Dr. Snyder's report are irrelevant and preposterous:

> Sentencing Guideline 5K2.13 recognizes diminished capacity as a ground for a downward departure. . . . The concept of departures has been rendered obsolete in post-Booker sentencing but the district court may apply those departure guidelines by way of analogy in analyzing the section 3553(a) factors. *United States v. Johnson*, 427 F.3d 423, 426 (7th Cir.2005); *United States v. Castro-Juarez*, 425 F.3d 430, 434-36 (7th Cir.2005). . . .
>
> Under section 3553(a)(2), the primary purposes of a criminal sentence are to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes by the defendant, and to provide the defendant with needed training, medical care or correctional treatment in the most effective manner. *See also United States v. Dyer*, 216 F.3d 568, 570 (7th Cir.2000) (the principal objectives of criminal punishment that guide the design and application of the sentencing guidelines are retribution, deterrence, and incapacitation). Mental illness, we noted in *Dyer*, might make it more difficult for a person to comply with the law, and so a heavy sentence would not have a significant general deterrent effect on persons in the defendant's class. 216 F.3d at 570. . . . As for specific deterrence, it is for the district court to decide in the first instance whether a heavy sentence is necessary to deter Miranda from committing further crimes. The court may decide that Miranda, after being treated for mental illness, is not inclined to commit crimes and so does not require the added encouragement of a lengthy sentence.
>
> If the mental illness is treatable, as is the case with Miranda, the goal of incapacitation may not be advanced by a heavy sentence. *Dyer*, 216 F.3d at 570.

> Instead, mental health treatment would "incapacitate" Miranda from committing further crimes. In this case, . . . there is also some evidence that Miranda was not correctly diagnosed or appropriately treated until his imprisonment for this crime. . . .
>
> Finally, a person who would not have committed a crime but for his mental illness would be less deserving of punishment because he is "not as evil, as worthy therefore of punishment, as one who would not be law abiding even if he were not mentally impaired." *Dyer*, 216 F.3d at 571.

Similarly, in *United States v. Myers*, 503 F.3d 676 (8th Cir. 2007), also decided in October 2007, the Court of Appeals upheld a downward "variance" based on the defendant's mental health condition, noting that "his mental illness interfered with his ability to control his impulses and reduces his culpability for his action . . . Where as here, a sentencing court fully explains a well-reasoned rationale for rejecting an advisory guidelines range under § 3553(a), and that explanation relies on grounds more nuanced and specific than provided within the Guidelines, [this court] do[es] not believe there is a violation." *Id*. (citation omitted).

In the post-*Booker* context, the government cites only *United States v. Borho*, 485 F.3d 904, 912 (6th Cir. 2007) (Government's Response at 13). There, however, the reversal was engendered because the district court did not adequately set forth its rationale for a variance from the Sentencing Guidelines; the defendant's mental health condition was only one of a number of factors there at issue. Further, as the *Borho* Court observed, the Sixth Circuit required the presence of "extraordinary circumstances for a substantial variance." *Id*. at 915. There appears to be no authority in this Circuit supporting application of that rubric.

Even the pre-*Booker* cases upon which the government relies suggest that Mr. Brownell's condition warrants a downward departure. *See, e.g., United States v. Long*, 185 F Supp. 2d 30, 46 (D.D.C. 2001) (downward departure based on reduced mental capacity encompasses

14

"behavioral disturbances that impair the formation of reasoned judgments"); *United States v. Goosens*, 84 F.3d 697, 700-02 (4th Cir. 1996) (same; diminished capacity under the Guidelines includes impairment of "the formation of reasoned judgments"); *United States v. Edwards*, 98 F.3d 1364, 1371 (D.C. Cir. 1996) (diminished capacity under Guidelines includes a reduction of "one's ability to reason or make judgments"). So long as such impairment is present, no distinction is made in the cases between conduct occurring in an instant versus acts over a lengthy period of time. Further, it is important to understand that Asperger Syndrome is not analogous to a mood disorder, in which a defendant is chronically sad or depressed but his or her ability to reason is unaffected. Asperger Syndrome unambiguously does impair a person's ability to exercise sound judgment and thereby modify behavior, in a milder but nonetheless similar manner as autism. The fact that it is more subtle than outright autism, and that persons who suffer from it are more functional than autism sufferers, does not mean that its effect – or its appropriate impact on sentencing -- is not real.

      For the foregoing reasons, it is respectfully requested that the Court sentence Mr. Brownell to a period of probation and other appropriate conditions, but refrain from incarcerating

him.  In addition to the exhibits referenced above, we append as Exhibit 3 some additional letters that have been received since the time of our previous sentencing submissions.

        Respectfully submitted,

        JOHN E. BROWNELL

        By Counsel:


        /s/ Barry Coburn_____
        Barry Coburn (D.C. Bar #358020)
        Gloria B. Solomon (D.C. Bar #358880)
        Jeffrey C. Coffman (D.C. Bar #493826)
        TROUT CACHERIS PLLC
        1350 Connecticut Avenue, N.W.
        Suite 300
        Washington, D.C.  20036


## CERTIFICATE OF SERVICE

    I hereby certify that on this 4th day of December, 2007, I served a copy of the foregoing reply memorandum, by ECF.



        /s/ Barry Coburn_____